IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | Crim No. 1:19-CR-253 |
| v. | * | |
| KRISTOPHER LEE DALLMANN, *et al.* | * | The Honorable T.S. Ellis, III |
| *Defendants.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### DEFENDANT KRISTOPHER LEE DALLMANN'S
### MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

Defendant Kristopher Lee Dallmann, by and through undersigned counsel and pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, hereby moves this Honorable Court to issue a pretrial ruling suppressing certain evidence confiscated by FBI agents during the execution of a search warrant for 2216 Tona Circle, Las Vegas, Nevada on the grounds that the evidence was improperly seized, as well as all statements made to FBI agents and all evidence contained within Defendant's cellular phone that was seized during the execution of a search warrant for 2154 Tona Circle, Las Vegas Nevada on the grounds that the statements were not voluntary and the cellular phone was improperly seized. In support thereof, Defendant states as follows:

### RELEVANT FACTUAL BACKGROUND

On November 16, 2017, the FBI simultaneously executed search warrants for Mr. Dallmann's two neighboring properties located at 2154 and 2216 Tona Circle, Las Vegas, Nevada (attached hereto as Exhibit A and Exhibit B, respectively) in conjunction with suspected copyright violations through a streaming media service run by Mr. Dallmann. The search warrants permitted FBI agents to search the properties and seize, *inter alia*, "all records and information from October 1, 2011 to the present …. including … [r]ecords and information relating to notices, letters, emails,

and complaints about copyright infringement, piracy, and the use of copyrighted works without permission and compensation to the copyright owners[.]"

Mr. Dallmann and his husband, Jared Edwards, were at home at the property located at 2154 Tona Circle when the warrants were executed via a surprise raid. The FBI did not have a corresponding arrest warrant at the time of the raid. Regardless, Mr. Dallmann and his husband were removed from the house by gunpoint. Mr. Dallmann's tenant living in 2216 Tona Circle was similarly removed from his home. All three were and detained as FBI agents ransacked the homes. Their cellular phones were taken from them. At no time was Mr. Dallmann informed that he was free to leave, nor was he provided a copy of the warrants granting the FBI authority to search his home and rental property. He feared for his own safety and the safety of his husband.

After Mr. Dallmann and Mr. Edwards' bedroom had been thoroughly searched by FBI agents, the couple was brought into the room for further detainment and interrogation. An FBI agent came to the room with Mr. Dallmann's phone and requested that he unlock it. He was told by an armed SWAT officer guarding the door that he was not to touch his phone, and was instead asked to write the unlock code down for the FBI agents to use.

At this point, considering that he felt threatened and obligated to comply with the FBI, and was unsure of his rights, Mr. Dallmann asked the FBI agents if he could call a lawyer. An FBI agent told Mr. Dallmann that a lawyer was "unnecessary" and would just "complicate" things. Mr. Dallmann believed his request for a lawyer was being ignored and he was powerless to do anything about it. He then, under duress, provided the agent with is cellular phone unlock code.

The FBI agents then requested to interview Mr. Dallmann and Mr. Edwards separately, without counsel. The FBI agents pressured the couple, claiming that cooperation now would have a significant impact on how possible future criminal proceedings would turn out. They requested

that Mr. Dallmann and Mr. Edwards sign Miranda waivers and agree to do as the FBI agents requested. The contents of the waivers were not explained to Mr. Dallmann. Mr. Dallmann felt that he was at the agents' mercy and did not have the option of objecting. He consented to the FBI agents' demands under duress, as did Mr. Edwards. The FBI agents then gave Mr. Dallmann a copy of the warrant authorizing the search. Almost an hour had passed since the raid had begun.

Mr. Edwards was taken from the bedroom and the FBI agents proceeded to interrogate Mr. Dallmann alone. The FBI agents asked pointed questions that Mr. Dallmann knew could incriminate him, but he felt helpless to refrain from answering. The events of the morning were intensely distressful to Mr. Dallmann. Indeed, in his affidavit, the FBI agent who interrogated Mr. Dallmann described that at one point he started "crying spontaneously." Regardless, the FBI agents pressed on with the interview. At no point during the interview did Mr. Dallmann feel that he had any choice but to comply with FBI.

During the interview, the Government alleged that Mr. Dallmann described that he had previously been advised by counsel through a memorandum about what constituted copyright violation versus what constituted legal use. The Government alleged that Mr. Dallmann explained that he believed his actions all constituted legal use of copyrighted media, pursuant to the attorney's legal memo.

Also, during the execution of the warrants, FBI agents searching the 2216 Tona Circle property discovered a document dated January 2008, addressed to Mr. Dallmann, issued from Mr. Dallmann's then-attorney, and labeled as "privileged" (hereinafter, the "Confiscated Document"). The FBI understood that the Confiscated Document was that which Mr. Dallmann alluded to in his interview. Despite the time limitations as to seizable documents per the warrant, the Government searched all of the documents contained within the files at the property. Despite the

3

warrant limiting seizable documents to those dated October 1, 2011 and later, the FBI agents searched for and seized the Confiscated Document.

## ARGUMENT

I. Mr. Dallmann's statements made during the interrogation were involuntarily made, and thus should be suppressed.

   A. *Mr. Dallmann's statements were rendered involuntarily as part of a coerced custodial interrogation*

Upon entering the house and removing Mr. Dallmann at gunpoint, Mr. Dallmann was effectively taken in to custody and detained. Consequently, Mr. Dallmann's subsequent interview was a custodial interrogation.

The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 US. 436, 444 (1966). The accused's custodial status "must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652 662 (2004). In *Thompson v. Keohane* 516 U.S. 99 (1995), the Court explained the custody test as follows:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Id*. at 112 (internal quotations omitted). As *Keohane* suggests, courts have established that the totality of the circumstances, including the location of the interrogation, must be taken into consideration when evaluating whether the accused was in custody. *Dickerson v. United States*, 530 U.S. 428, 434 (2000) ("The due process test takes into consideration 'the totality of all the

4

surrounding circumstances-both the characteristics of the accused and the details of the interrogation. *Reck v. Pate*, 367 U.S. 433, 440 (1961) ("All the circumstances attendant upon the confession must be taken into account.").

In this case, the interview of Mr. Dallmann was a custodial interview because the questioning occurred under circumstances in which a reasonable person would not have felt he was at liberty to terminate the interrogation and leave. *See Thompson*, 516 U.S. at 112. He and his husband were removed from gunpoint, detained for an extended period of time, then brought back into the house where they were watched over by guarded SWAT officers. Their inquiries regarding counsel were shot down, they were pressured to cooperate, and threatened with adverse legal ramifications if they did not. The couple was then separated and Mr. Dallmann was interrogated alone, under extreme pressure to the point that he broke down crying in fear. Under such conditions, there is tremendous compulsion and psychological pressure for a suspect to respond to questions. *Dickerson*, 530 U.S. at 447 ("…the process of in-custody interrogation contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.").

Though persuasive, the Ninth Circuit's opinion in *U.S. v. Baron* is highly analogous. 860 F.2d 911 (9th Cir. 1988). In that case, police detained Baron and her boyfriend outside of their apartment for questioning related to suspected drug activity. After being detained for approximately thirty-five minutes, three police officers escorted Baron alone into her apartment, took her to her bedroom, read Miranda rights, and conducted a blacklight search. The *Baron* court found this interrogation "highly coercive," amounting to a constructive arrest. The Court noted that gender differences between the suspect and the police officers played a role in the suspect's perceived helplessness, and analogized such dynamics with other cases where differences in race

5

and nationality can create further subjective impressions of pressure and lack of free will. Similarly here, along with being escorted front his house by gunpoint, held in extended detention, and subjected to an isolated bedroom interrogation while surrounded by armed agents, Mr. Dallmann's sexual orientation played a role in his feeling like an "other" who needed to submit to the officer's demands so as to protect himself and his same-sex partner. Accordingly, there is no doubt that Mr. Dallmann's interview was a custodial interrogation coercively obtained.

The Fourth Circuit has held similarly in analogous cases. In *United States v. Hashime*, the 19-year old defendant

> had awoken at gunpoint to a harrowing scene: his house was occupied by a flood of armed officers who proceeded to evict him and his family and restrict their movements once let back inside. Throughout the interrogation, Hashime was isolated from his family members, with his mother's repeated requests to see him denied. It is little wonder that Hashime testified that, during the interrogation, 'I didn't think I had any chance to leave.... I felt that I was ... trapped and ... had to stay where I was and do what I was told.'

734 F.3d 278, 284 (4th Cir. 2013). The *Hashime* Court held that, even though the police had told the defendant that he was free to go at any time, the totality of the circumstances clearly rendered the interview a coercive custodial interrogation.

A similar conclusion was reached in *U.S. v. Colonna*. 511 F.3d 431, 435 (4th Cir. 2007). There, the Fourth Circuit found a coercive custodial interview where

> Colonna was awakened by armed agents and guarded by agents until the search and interview concluded. The home was inundated with approximately 24 officers who gave Colonna and his family members instructions; that is, they told them where to sit and restricted their access to the home. Colonna did not voluntarily request to speak with Agent Kahn. Instead, Agent Kahn requested that Colonna accompany him to a FBI vehicle to answer questions, wherein a full-fledged interrogation took place. Agent Kahn questioned Colonna for almost three hours, albeit with breaks. But, even during these breaks, Colonna was constantly guarded. Although Colonna was not placed under formal arrest, he was told twice that lying to a federal agent was a federal offense. And, at no time was he given Miranda warnings or informed that he was free to leave.

*Id.* at 435.

6

Here, based upon the totality of the circumstances (an early morning raid of the home of a vulnerable same-sex couple, the men being forcibly removed from the house at gunpoint and detained outside of the house for an extended period of time, Mr. Dallmann being guarded by armed agents at all times, his request for an attorney ignored, being separated from his husband and isolated in his bedroom with several agents, being told that he would be treated more harshly if he did not cooperate, and being pressed to continue the interrogation even after he broke down crying) clearly demonstrate that Mr. Dallmann had felt that he had lost his agency and was compelled to submit to the will of the federal agents. Accordingly, the interview was a coercive custodial interrogation.

> B. *Mr. Dallmann's statements were not voluntary because the FBI refused to permit Mr. Dallmann to consult with counsel, despite his request for the same, in violation of Mr. Dallmann's Sixth Amendment rights.*

As previously described, Mr. Dallmann asked an FBI agent whether he could call his attorney before continuing to lend the agents his assistance in their search. The FBI agent rejected the request, telling Mr. Dallmann that attorneys just make things more complicated. This is a clear violation of Mr. Dallmann's Sixth Amendment right to counsel. The FBI's claim that attorneys are a hassle was deceptive and obviated any waiver or consent that Mr. Dallmann gave at the moment. Mr. Dallmann felt intimidated and believed that his request was being ignored and would not be honored, thus compounding his impression of being at the mercy of the FBI agents.

This case is analogous to that of *U.S. v. Nichols*. 438 F.3d 437 (4th Cir. 2006). In *Nichols*, the defendant had requested an attorney prior to being interviewed. None was provided to him and he was pressured to, and did, subsequently sign a Miranda waiver and submit to an interview. The interviewing officer later provided contradictory testimony claiming that the defendant had never made such a request for an attorney. The district court determined, and the 4th Circuit upheld, that the defendant's testimony was credible and thus suppressed the statements given pursuant to the

interview, regardless of the Miranda waiver. The exact situation occurred here – Mr. Dallmann requested an attorney, his request was denied, and he was subsequently pressured to sign a waiver and submit to interrogation. The entire interview, therefore, should be suppressed.

Moreover, when Mr. Dallmann was interrogated, he made comments about a memorandum his attorney had drafted that provided him with parameters for how to legally run his media streaming business. Upon pressure, Mr. Dallmann discussed advice he had received from counsel. Particularly considering Mr. Dallmann's prior request for counsel, the agents should have stopped the interrogation from going any further, or at the very least stopped that line of questioning. Instead, the agents continued the interview without the presence of an attorney and grilled Mr. Dallmann to further discuss privileged information. Mr. Dallmann felt that his compliance was not optional. As Mr. Dallmann's right to an attorney had been denied, this disclosure should never have been made, cannot constitute a waiver of the attorney-client privilege in the document, and should be suppressed.

   C.   *Mr. Dallmann did not waive his rights because the FBI coerced Mr. Dallmann into involuntarily signing the Miranda waiver.*

It is well-established that the admissibility of an accused's statements to government investigators in a custodial setting hinges on whether the accused received adequate warnings and voluntarily waived his rights before making the statements. *See Miranda*, 384 US. at 475. When questioned in a custodial setting, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). ("Failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.").

The question of whether the accused waived a constitutional right "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the

8

Miranda case. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). When performing this inquiry, courts must "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). Moreover, courts must again take into account the totality of the circumstances surrounding the case. A suspect's relinquishment of the rights established in Miranda must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412 421 (1986). In addition, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." 475 U.S. at 421.

Here, there is simply not sufficient evidence to suggest that Mr. Dallmann knowingly, intelligently, and voluntarily waived his constitutional rights. Instead, all the evidence points to a coercive effort to all but force Mr. Dallmann to sign the Miranda waiver against his will. Moreover, although the Miranda rights were contained within the document, the FBI agents never read those rights to Mr. Dallmann and never permitted him to read and consider the document before signing it. Accordingly, Mr. Dallmann was never adequately appraised of his rights and did not knowingly waive them.

For all of these reasons, Mr. Dallmann never waived his rights and was coerced into providing information against his will. Such improperly acquired evidence should be suppressed.

II. <u>The Confiscated Document was improperly seized and thus should be suppressed.</u>

    A. *The Confiscated Document was outside of the defined scope of the search warrants being executed.*

The warrant authorizing the search of 2216 Tona Circle and seizure of evidence found therein limited the date of evidence permitted to be seized to evidence dated from October 1, 2011 to the present. The Confiscated Document was dates January, 2008, thus was well outside the permissible range of evidence that could legally be seized. Consequently, the seizure of the

Confiscated Document was clearly, on its face, impermissibly seized and cannot now be used as evidence against Mr. Dallmann.

While it is true that there are limited instances where seizures that fall outside of the scope of a search warrant can still be used as evidence[1], the Confiscated Document is not encompassed by these exceptions, and thus is contained within the confines of a search warrant's defined scope. Indeed, the search warrant here even pre-contemplated that documents regarding the legality of copyrighted material would likely be part of the search and seizure, and expressly limited the scope of such documents eligible for seizure to those dated from October 1, 2011 to the present. Accordingly, no good faith exception can save the Confiscated Document from inadmissibility.

> B. *The Confiscated Document is protected by attorney-client privilege, which Mr. Dallmann has never waived.*

As the Confiscated Document is a confidential memorandum written by Mr. Dallmann's attorney, it is protected by attorney-client privilege. That privilege does not disappear in the face of a search warrant. *See, e.g.*, McArthur, Eric D., *The Search and Seizure of Privileged Attorney-Client Communications*, 72 University of Chicago Law Review 72, Iss. 2, Art. 7 (2005) (remarking that "to refuse to extend the protections of the attorney-client privilege to the investigatory stage preceding trial would be profoundly at odds with the policies behind the privilege. If the government could search and seize privileged communications, attorney client communications would be severely chilled and lawyers' ability to represent their clients effectively would be undermined.").

---

[1] "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 290 (1978).

Although there is no uniform consensus between federal courts as to how to treat privileged documents seized pursuant to a search warrant, the vast majority (if not all) of those that have considered the issue have determined that suppression, in one form or another, is the appropriate remedy. *See, e.g.*, *id.*; *United States v. Abbell*, 914 F. Supp. 519, 522 (S.D.Fla 1995) (ordering that when privileged documents that have in fact been seized, they should be "returned forthwith."); *National City Trading Corp v. United States*, 635 F.2d 1020, 1026 (2d Cir. 1980) ("To the extent that the files obtained here were privileged, the remedy is suppression and return of the documents in question.") (internal citation omitted); *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 58 (S.D.N.Y. 1994) ("[P]rivileged documents ... should remain privileged, and ... should be restored to their owner or owners."). This Court should align with the prevailing jurisprudence and protect the attorney-client privilege Confiscated Document from being introduced into evidence by suppressing the same.

Finally, to the extent that the Government is arguing that the attorney-client privileged was waived as to the document as a result of Mr. Dallmann's discussion about the document during his custodial interrogation, such a claim must obviously fail because the interrogation was a coercive violation of Mr. Dallmann's rights to protect against self-incrimination and to counsel. *See supra*, Sec. I. Because those admissions were improperly acquired, the government cannot rely on the same to argue that Mr. Dallmann waived his attorney-client privilege to the document, or any other privileges that the government may assert were waived.

The Government has argued in the past that Mr. Dallmann's statements during the interview constituted a complete waiver of his attorney-client privilege for anything related to advice of counsel he received regarding avoiding copyright infringement. *See, e.g.*, Gov't Mot. Re: Waiver of Attorney Client Privilege, Doc. No. 197 (Feb. 12, 2020). The Government relies

11

primarily on *In re Grand Jury Subpoena*, 341 F.3d 331 (4th Cir. 2003) in support of its argument. This case, however, does not provide the support that the Government argues. In *In re Grand Jury Subpoena*, the appellant offered certain privileged information as part of a consensual, voluntary non-custodial interview. *Id.* at 337. The *In re Grand Jury Subpoena* court expressly found that the interview was not coercive, thus could not protect the appellant from the waiver of his privilege. Here, the facts are just the opposite. Mr. Dallmann was coerced in many ways, subtle and overt, throughout the entirety of his detention and custodial interrogation. Accordingly, the Government has not provided proper support for its unfounded claim that Mr. Dallmann waived all rights to privilege on this issue.

III. <u>The search of Mr. Dallmann's cellular phone was conducted through improperly coerced information</u>

During the raid, agents improperly confiscated Mr. Dallmann's cellular phone, demanded that he provided the unlock code for the same, and examined contents therein. As previously described, Mr. Dallmann asked to speak to an attorney in response to an FBI agent's request that he provide the FBI with the unlock code to his cellular phone. The FBI denied Mr. Dallmann's request. Only then, once he believed he had no other choice but to comply, did Mr. Dallmann write down the unlock code pursuant to which the phone was searched. As described *infra*, the FBI's failure to immediately stop the interview and comply with Mr. Dallmann's request constituted a violation of his rights, and prevents the government from using any evidence obtained form information provided thereafter. Accordingly, any information that the FBI obtained from Mr. Dallmann's cellular phone must be suppressed.

## **CONCLUSION**

For the foregoing reasons, Defendant Kristopher Lee Dallmann respectfully requests that this honorable Court enter an order suppressing as evidence Mr. Dallmann's statements made during the interview, the Confiscated Document, and information pulled from Mr. Dallmann's cellular phone, and granting Defendant any further such relief that this Court deems necessary and appropriate.

        Respectfully Submitted,
        Kristopher Dallmann
        By Counsel

        _/s/_____
        Vernida R. Chaney
        Chaney Law Firm PLLC
        4120 Leonard Drive
        Fairfax, VA 22030
        Tel. 703-879-6650
        Fax 703-776-9008
        vchaney@chaneylawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2020, I will file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties.

      /s/
Vernida R. Chaney
Chaney Law Firm PLLC
4120 Leonard Drive
Fairfax, VA 22030
Tel.  703-879-6650
Fax  703-776-9008
vchaney@chaneylawfirm.com

# EXHIBIT A

# (UNDER SEAL)

# EXHIBIT B

# (UNDER SEAL)