IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 1:19-CR-253 |
| v. | The Honorable T.S. Ellis, III |
| KRISTOPHER LEE DALLMANN, | |
| *Defendant*. | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT KRISTOPHER LEE
DALLMANN'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**

The United States of America, by and through its attorneys, G. Zachary Terwilliger, U.S.

Attorney for the Eastern District of Virginia, Matthew A. Lamberti, Special Assistant U.S.

Attorney, and Senior Counsel, Computer Crime and Intellectual Property Section, U.S.

Department of Justice, and Alexander P. Berrang, Monika Moore, and William E. Fitzpatrick,

Assistant U.S. Attorneys, respectfully oppose Defendant Kristopher Lee Dallmann's Motion to

Suppress Statements and Evidence and request that the Court deny the Motion. As detailed

below, Dallmann's Motion is meritless for at least three reasons.

First, Dallmann offers a panoply of self-serving unsworn statements with no

corroborating evidence. He claims that the Court should suppress his confession to his crimes

because (1) he was "effectively taken in custody and detained" during an interview at his home

and that the Federal Bureau of Investigation (FBI) "refused to permit [him] to consult with

counsel, despite his request for the same" in violation of his constitutional rights and (2) he was

"coerced" into "involuntarily" signing a *Miranda* waiver. Not so. Dallmann was not taken into

custody, detained, or coerced, and his statements were plainly voluntary, and his assertions to the contrary contradict the evidence in the case and that which the government expects to adduce at any hearing.

Second, Dallmann asserts that the Court should suppress a memorandum to him from his attorney dated January 2008, which the FBI seized pursuant to search warrant, because the warrant referred to records and information from October 1, 2011 to the present.  Dallmann also claims that the memorandum is privileged and that he did not waive the privilege.  Strangely, Dallmann seeks to suppress this memorandum under the warrant for his house at Residence B even though agents seized the document pursuant to a different search warrant for his house at Residence A.[1]  In any event, regardless of the date mentioned in the search warrant, agents were entitled to look through every document at Residence A in their search for evidence to be seized under the warrant.  The agents properly seized the memorandum because it was in plain view, and seemed on its face to provide evidence of the crimes being investigated and that were the subject of the search warrant.  In addition, Dallmann himself repeatedly told agents that the memorandum was relevant to his conduct and the agents' search and even pointed them to the file cabinet where he thought it was located.  Moreover, given Dallmann's statements and actions regarding the memorandum during the search, there was no violation of any privacy interest he may have had and, by his own words and conduct, he consented to its search and seizure.  And,

---

[1] Dallmann owns two houses on the same street, which are referred to herein as Residence A and Residence B for purposes of protecting Dallmann's privacy.  Residence A refers to the residence at issue in the document filed by Dallmann as Exhibit A to his Motion and Residence B refers to the residence at issue in the document filed by him as Exhibit B to his Motion.  He used both locations to operate Jetflicks, and the government executed search warrants at both houses.  Only the search warrant for Residence A—which seems to have been Dallmann's primary residence—seems relevant to the instant motion.

as argued at length in the government's previously filed motions regarding attorney-client privilege, Dallmann waived any privilege he had with regard to the memorandum and any other communications he had with the attorney regarding the operation of Jetflicks.

Third, Dallmann claims that any evidence from a cellphone belonging to him, which agents seized from Residence A, should be suppressed because he "asked to speak to an attorney" before providing consent to unlock his phone.  Yet, Dallmann does not identify the phone in question or what evidence he believes should be suppressed.  Agents seized a number of phones and subsequently returned two iPhone Xs to Dallmann and co-defendant Jared Edward Jaurequi, a/k/a Jared Edwards.   Moreover, during the execution of the warrant, Dallmann signed a written consent to the search and seizure of his devices and data thereon, and even provided the pertinent passcodes and passwords.  And, because Dallmann was not in custody, he had no right to talk to a lawyer anyway.  Nonetheless, Dallmann never requested an attorney, but he even specifically waived in writing at the beginning of the search any right to talk to a lawyer.

Accordingly, Dallmann fails to meet his burden of proof to suppress and the Court should deny his Motion.

## PROCEDURAL BACKGROUND

On August 27, 2019, a grand jury in the Eastern District of Virginia returned a multicount indictment against Dallmann and seven other individuals.  Dallmann was charged with nine counts in the indictment: (1) one count of conspiracy to commit criminal copyright infringement, in violation of 18 U.S.C. § 371; (2) two counts of criminal copyright infringement by reproduction or distribution or aiding and abetting, in violation of 17 U.S.C. §§ 506(a)(1)(A) and 106(1) and (3) and 18 U.S.C. §§ 2319(b)(3) and 2; (3) two counts of criminal copyright infringement by public performance or aiding and abetting, in violation of 17 U.S.C.

§§ 506(a)(1)(A) and 106(4) and 18 U.S.C. §§ 2319(b)(3) and 2; (4) three counts of money laundering by promotion or concealment, or aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2; and (5) one count of money laundering by promotion or concealment, or aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(3)(A) and 2.

Two defendants have pleaded guilty in this case, and Dallmann and five co-defendants are set to go to trial beginning on July 14, 2020.

On January 6, 2020, Jaurequi filed a motion to suppress statements he made to the FBI on November 16, 2017. Jaurequi, who is married to Dallmann, was present at the search of their residence, during the *Miranda* warnings given to both of them, and for the first part of Dallmann's interview. In his motion, Jaurequi made a number of boilerplate claims of how his statements to the FBI were "involuntary," he was "functionally under arrest," and the like, citing many of the cases Dallmann discusses in the instant motion. (Def.'s Mot., Dkt. 162) However, Jaurequi did not provide any factual support whatsoever for his claims. (*Id.*)

On February 4, 2020, the Court summarily denied Jaurequi's motion to suppress without a hearing because Jaurequi failed to state sufficient facts which, if proven, would justify relief. (Order, Dkt. 195.)

On April 2, 2020, Dallmann filed the instant Motion to suppress statements and evidence, attaching the search warrants for Residences A and B as sealed attachments. In fact, those search warrants had been unsealed on September 6, 2019. Then, on April 7, 2020, Dallmann filed unsealed copies of the two search warrants.

## FACTUAL BACKGROUND

As alleged in the indictment, Dallmann and his co-conspirators operated Jetflicks, an online, subscription-based service that permitted users to stream (and, at times, to download)

copyrighted works without the permission of the copyright owners.  The government will prove

at trial with testimony and other evidence—including admissions Dallmann made to FBI agents

on November 16, 2017—that Dallmann committed the crimes charged in the indictment.

As discussed in more detail below, Dallmann voluntarily agreed to a lengthy interview

with FBI agents that covered everything from his schooling to the operation of his business.  The

interview started with Dallmann lying about Jetflicks.  Yet, he later decided to be more truthful.

During the interview, Dallmann essentially admitted that he ran a massive copyright

infringement operation, an admission corroborated by other evidence.

If the Court were to hold a hearing on the circumstances of the interview, the government

expects that it would elicit the following facts from FBI Special Agents Timothy Lynch, Lance

Shakespear, Curtis Cox, and Todd Tumbleson who assisted with the execution of search

warrants at Residence A and/or the interview of Dallmann. [2]  The search began with a number of

FBI agents approaching the front door of the residence at which Dallmann and Jaurequi lived,

knocking on the door, and announcing their presence.  There was no SWAT team.  Either

Dallmann or Jaurequi answered the door.  Ultimately, both men exited the house in their

underwear and stood in the front yard for five to ten minutes with Special Agent Lynch, who

never drew his gun or restrained them.  The FBI then conducted a preliminary walkthrough of

the house for safety purposes.  For security reasons, the agents at the door had their guns drawn

to go into the house but, again, Dallmann and Jaurequi were outside.  Special Agent Shakespear

---

[2] Some of these facts are set forth in Exhibit G to the government's Renewed Motion
Requesting Confirmation of Waiver of Attorney-Client Privilege, Affidavit of Special Agent
Timothy Lynch in Support of Motion to Confirm Waiver of Attorney-Client Privilege.  *See*
Gov't Motion, Dkt. 197.  Unlike Dallmann's "relevant factual background," these facts are
sworn under oath.

saw the scene while doing surveillance outside the house and entered the house with the other agents.

While they were outside, Special Agent Lynch explained to Dallmann and Jaurequi why the FBI was there and advised that they were investigating Jetflicks.  He also told them that they were not under arrest, not detained, and free to leave.  In fact, he said this repeatedly to Dallmann over the course of the morning.  In turn, Dallmann stated that there was a misunderstanding, and that they wanted to remain at the house.  According to Special Agent Lynch, both Dallmann and Jaurequi were nervous but calm and seemed eager to tell their side of the story.

After the premises were secured, Special Agent Lynch escorted Dallmann and Jaurequi to a bedroom so that they could get dressed in private.  *See* Gov't Exh. 1 (search diagram of Residence A, with the bedroom designated by letter "P").  The trio subsequently went to a living room (letter "B" in the diagram) with Special Agent Shakespear.  The living room was an open plan area with plenty of space, with no partition between the room and the dinette (letter "C" in the diagram) and kitchen (letter "D" in the diagram), and it was in full view of other agents in the house.  The living room had an L-shaped couch, television, and other furniture.  Dallmann and Jaurequi selected the couch to sit on and Special Agents Lynch and Shakespear sat down on nearby furniture.[3]  Special Agents Lynch and Shakespear then explained again what the FBI was looking for, and told Dallmann and Jaurequi that they were not under arrest, were not being detained, and that they could leave at any time.  Again, both Dallmann and Jaurequi stated they

---

[3] Later in the interview, perhaps around 9:00 am or 9:30 am, the three moved to the pool area outside of Residence A ("pool" in the diagram) because agents needed to search the living room.  The two agents and Dallmann sat in pool lounge chairs.

preferred to stay at the house, and Dallmann indicated he wanted to make statements to the FBI. In addition, Jaurequi said that he wanted to remain with Dallmann.

The agents did not put any pressure on Dallmann or Jaurequi and they seemed very cooperative. Special Agent Shakespear described the situation as cordial. According to Special Agent Shakespear, Dallmann held his dog on his lap for part of the interview and also showed agents the chickens that he kept outside the house.

Special Agent Lynch placed two blank forms with a *Miranda* warning on the table in front of both Dallmann and Jaurequi so that they could read them. Special Agent Lynch read each *Miranda* right and then asked them to put their initials next to the right if they understood the right. Special Agent Lynch told them that the initials did not mean that they were waiving the right, only that they understood it. He also told them to ask him any questions about the rights. At the end, Special Agent Lynch asked them if they waived each right, and, if they did, to sign the forms. Both Dallmann and Jaurequi signed the forms acknowledging and waiving each of the rights and consenting to the interview.[4]

---

[4] The advice-of-rights form for both Dallmann and Jaurequi stated in relevant part:

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

Special Agent Lynch then began to interview Dallmann.  At some point Special Agent Lynch contacted Special Agents Alexis Brown and Jessica Marrone, who were assisting with the search of Dallmann's next-door residence and had not participated in the earlier protective sweep of Dallmann's primary residence.  Special Agent Lynch asked Special Agents Brown and Marrone to come to his location.  Upon arriving, Jaurequi was asked if he wished to talk with Special Agents Brown and Marrone.  Jaurequi agreed and the three of them went to the bedroom for purposes of conducting the interview.  That was maybe 30 minutes into the interview. Special Agent Brown and Marrone's weapons were holstered and neither Dallmann nor Jaurequi ever saw those agents with their weapons out.

The agents' interview with Dallmann lasted around four hours and is summarized in the report attached as Exhibit 3.  Dallmann provided details about his education and prior employment history.   He spoke about creating an aviation services business, which started when he converted the personal DVD collection of a couple so they could watch movies on their private plane.  Dallmann then described creating two businesses, one an aviation services for converting clients' DVD collections and one for streaming television shows.  He then lied about the nature of his business.  Specifically, Dallmann claimed that Jetflicks did minimal streaming

---

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Both Dallmann and Jaurequi initialed each of the lines set forth above and then provided written consent to the interview, signing below the statement, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."  Special Agents Lynch and Shakespear then signed the forms as witnesses. Dallmann's initialed and signed advice-of-rights form is attached as Exhibit 2.

services and mainly made money from the aviation services business, asserting that Jetflicks grossed about $30,000 a month from the latter.  Later, Dallmann admitted that the aviation services business only had two customers, who had paid him a total of around $80,000.

Subsequently, Dallmann admitted that Jetflicks was committing copyright infringement and streaming shows without permission.  Dallmann then claimed that he removed shows anytime he received a complaint and thus was not committing a crime.  He added that he had received only one cease-and-desist letter, which was from HBO; the letter listed three shows; and he removed them.  Evidence in the case shows that those statement were false.

Dallmann then stated that PayPal contacted him in 2016 about Jetflicks committing copyright infringement; that he had printout of the 1978 federal copyright code but had not read it; and that he assumed that he needed licenses to be permitted to legally stream shows but did not really know.

At around 8:17 am, the interview paused so Dallmann could use the restroom.  He left the room, going into the bathroom (letter "E" in the diagram) by himself and closing the door.  After leaving the bathroom, Dallmann made himself coffee in the kitchen in full view of the agents. When Dallmann returned, Special Agent Lynch asked if he could use the bathroom as well. With Special Agent Lynch gone, Dallmann began speaking to Special Agent Shakespear but Special Agent Shakespear mostly remained silent and told Dallmann he should speak to Special Agent Lynch.  When Special Agent Lynch returned, Dallmann was crying.  Special Agent Lynch asked Dallmann if he wanted to tell the truth.  Dallmann said yes.  By then, the break had lasted around 30 minutes.

Dallmann then admitted that he started with the idea of making the aviation services business work but it was not successful, so he turned to copyright infringement through illegal

streaming of television shows.  He stated that he downloaded television shows from various websites and file sharing networks and then illegally streamed them to subscribers.  For example, Dallmann noted that from 2007 to 2008, he downloaded shows through torrent sites.  Customers liked older shows, so he focused on them.  Dallmann emphasized that Jetflicks streamed television shows, not movies.

Dallmann then said that he paid $3,000 to an attorney for legal advice on what he could and could not do to operate Jetflicks' streaming services.  According to Dallmann, the attorney gave him three categories within which he could operate.   Dallmann described one category as covering the following situation: if you have content someone does not like, they will ask you to remove it; they can only sue if you do not remove it.  Dallmann volunteered that the memorandum detailing the three categories would be among records seized by FBI that day.

Later, Dallmann admitted that he had received a second cease-and-desist letter, this time from the Motion Picture Association of America.  Dallmann claimed he showed this letter to his attorney, who told him to ignore it.

In the interview, Dallmann spoke extensively about his work with co-defendant Darryl Polo, who pleaded guilty before this Court to similar crimes as those which Dallmann has been charged.  Dallmann stated that he met Polo in 2010 and hired him to work at Jetflicks. According to Dallmann, when Polo worked for him in 2011 and 2012, Jetflicks grossed $30,000 a month from the streaming business.  Around this time, Jetflicks acquired television shows from torrent sites but it was becoming harder to find the right content.  So, Dallmann learned about Usenet NZB sites from Polo.  Dallmann stated that Polo ran an NZB indexer called

SmackDownOnYou (SDOY) and he let Dallmann download TV shows through SDOY to obtain content for Jetflicks.[5]

Dallmann also spoke in more detail about being shut down by PayPal in October 2016 for copyright infringement.  After PayPal closed the Jetflicks account, Dallmann signed up with Stripe to replace PayPal as payment processor for Jetflicks subscriptions.  In the interview, Dallmann admitted to lying to Stripe by claiming he used Stripe for the aviation services business when, in fact, he was using it for his illegal streaming business.  Dallmann stated that what he did was not right but that he did it to keep his business going.

Returning to his discussion of Polo, Dallmann asserted that Polo stole all of Jetflicks' information and used it to create a competing site called iStreamItAll (ISIA).  Dallmann stated that ISIA committed copyright infringement.  He then noted that Jetflicks' servers crashed in 2016 and he lost everything.  Polo told Dallmann that he had a backup of Jetflicks' information and he shared that backup with Dallmann so he could restart Jetflicks.

Subsequently, Dallmann took another bathroom break, after which the interview resumed.

Although the agents did not record the interview with Dallmann, they documented it in a detailed report made within a few days of the interview while it was still fresh in their minds.

During the execution of the search warrant at Residence A, Special Agent Tumbleson searched the file cabinet in Dallmann's home office (letter "I" in the diagram," with the square marked "file" being the file cabinet) for documents to be seized.  He collected numerous documents but left even more behind, including many dated before the date restriction in the

---

[5] Torrent sites and Usenet NZB sites are defined and discussed in more detail in the indictment.  (Dkt. 1, ¶¶ 3a and 3b.)

warrant.  He does not remember any attorney memorandum specifically but states that if he saw an attorney memorandum with a privilege banner, then he would have spoken with other agents such as Special Agent Lynch or Special Agent Cox before collecting it.  Special Agent Cox does not remember any specific documents they seized.  In any event, according to FBI search records, Special Agents Tumbleson and Cox seized an attorney memorandum. This appears to be the memorandum that Dallmann described in detail to Special Agents Lynch and Shakespear. According to Dallmann's Motion, this memorandum was dated in January 2008.  The undersigned have not reviewed this memorandum so they do not have any information about its date.[6]

As the interview and search were coming to a close, Dallmann took Special Agent Lynch into his home office and pointed to his file cabinet.  He said that if he had the attorney memorandum it would likely be in there.  Special Agent Tumbleson saw the two come in searching for a document in the file cabinet.  Dallmann looked at some files in the cabinet and said something about the document already being taken.  Moreover, at some point before the agents left, Jaurequi returned from the bedroom (letter "P" in the diagram) where he was being interviewed and rejoined Dallmann.

During the execution of the search warrants, agents seized a number of cellphones, including from Residence A an iPhone X with a red case with a serial number ending in 32Z4, and another iPhone X.  Apparently, the former cellphone was Dallmann's.  The on-site FBI forensic team assisting the search needed the passcode to extract the data from the phone so they

---

[6] Dallmann erroneously states that this memorandum was seized from Residence B and moves to suppress it.  The search warrant for Residence B is irrelevant to Dallmann's Motion.

could leave it behind with Dallmann.  During the interview of Dallmann with Special Agents

Lynch and Shakespear, at approximately 7:03 am, FBI personnel asked Dallmann if he would

consent to the search of the phone, his iPad, and Jetflicks systems and provide passcodes and

passwords for those devices and systems.  He did.  Special Agent Lynch acted as a witness for

this consent, which was in writing and signed by both Dallmann and Special Agent Lynch.  This

consent is attached as Exhibit 4.[7]  Dallmann never requested an attorney.  Even with Dallmann's

passcode, the FBI forensic team still had difficulty extracting the data from the phone and so

they took it (and Jaurequi's).

At some point, FBI agents gave a copy of the search warrant to Dallmann and Jaurequi.

Dallmann asserts in his Motion that this was done an hour into the search, but normally this is

done at the end of the search once the agents have finalized the inventory and can give the owner

of the premises a receipt for any property removed.  According to Special Agent Shakespear,

when the agents left, Dallmann and Jaurequi seemed lighthearted and were even laughing.

On November 20, 2017, agents drove back to Residence A and returned the two iPhone

Xs to Dallmann and Jaurequi.  On that occasion, Dallmann continued to cooperate with agents

---

[7] The consent-to-search form stated that Dallmann had been asked by FBI agents to permit a complete search of his iPhone, iPad, and Jetflicks systems and it listed the passcodes and passwords for those devices and systems.  The form further read in relevant part:

> I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind.

> I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software, and computer peripherals.

and freely handed over additional evidence in the case including a Plextor hard drive and a

Drobo 5D hard drive enclosure that had not been seized a few days before.  Dallmann also

volunteered more information.  For example, he claimed that he needed money from Jetflicks to

pay for medication and blamed Polo for making Jetflicks operate differently than Dallmann

intended.

**ANALYSIS**

As a general rule, the burden of proof is on the defendant who seeks to suppress the

evidence.  *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981).  Only if the defendant

establishes a basis for his motion to suppress does the burden shift to the government to prove,

by a preponderance of the evidence, that the challenged evidence is admissible.  *United States v.*

*Matlock*, 415 U.S. 164, 177-78 (1974).  As discussed below, Dallmann fails to establish any

basis for his suppression motion.

I.      **Dallmann Falsely Claims That He Was In Custody During His Interview And Also
        That He Asked To Speak To His Attorney During The Search But The FBI Ignored
        Him And Violated His Sixth Amendment Rights**

Dallmann first claims that he "was effectively taken into custody and detained" during

his interview and also asserts he asked FBI agents "whether he could call his attorney" before

continuing to help agents with their search and they ignored him, violating the Sixth

Amendment.  (Def.'s Mot. at 4, 7.)[8]  Nothing could be further from the truth.

---

[8] The Sixth Amendment right to counsel only applies when a suspect has been formally
charged and the prosecution is at a "critical stage."  *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001)
(citation omitted).  At the time of the search, Dallmann had not even been indicted.  Presumably,
Dallmann means the Fifth Amendment right to counsel.

The test for determining whether an individual who has not been formally arrested is in custody is whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013) (quoting *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007)) (internal alterations omitted).  According to the Fourth Circuit,

> [f]acts relevant to the custodial inquiry include, but are not limited to, the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.  Also pertinent are the suspect's isolation and separation from family and physical restrictions.

*Id.* at 283 (quotations omitted).  Courts also examine "[w]hether [the] defendant voluntarily submitted to questioning," "[w]hether the agents employed strong arm tactics or deceptive stratagems during questioning," and "[w]hether [the] defendant was placed under arrest at the termination of the questioning."  *United States v. Jefferson*, 562 F. Supp. 2d 707, 714 (E.D. Va. 2008) (collecting cases) (Ellis, J.); *see also United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017).

Not all factors are given equal weight in this analysis.  Statements that a defendant is not under arrest and free to leave, although not "talismanic" or sufficient standing alone, are "highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was 'in custody.'"  *Hashime*, 734 F.3d at 284 (quotations omitted).

The totality of circumstances surrounding Dallmann's confession here shows that he was not in custody.  First, agents told Dallmann from the beginning of the search that he was not under arrest, not detained, and free to leave.  They repeated this a number of times throughout the morning.  Second, Dallmann was never restrained or otherwise restricted in his movement.

Third, Dallmann stated that he wanted to stay and make statements to FBI and made no effort to depart even though he could have at any time.  Fourth, agents did not put any pressure on Dallmann.  He was not separated from his husband or dog.  Fifth, no one pointed a weapon at Dallmann or intimidated him.  Sixth, the interview took place in Dallmann's living room with plenty of space and no partitions around and subsequently moved to an open pool area outside the house.  Seventh, Dallmann took at least two bathroom breaks and even left the interview briefly to make himself coffee.  Eighth, at least to the agents, the atmosphere seemed cordial and low-key.

Significantly, three days after the search and interview, FBI agents visited Dallmann to return two phones to him.  At that time, Dallmann freely provided additional physical evidence that had not been seized earlier and volunteered more statements about Jetflicks.  If Dallmann had really been in "custody" and "coerced" and "intimidated" into confessing at the time of the search, he would not have chosen to continue his cooperation with the FBI a few days later.

Accordingly, Dallmann was not in custody during his interview, had no right to counsel, and the agents did not even need to give him a *Miranda* warning before the interview.  *See United States v. Holness*, 706 F.3d 579, 594 (4th Cir. 2013) (noting that the Fifth Amendment right to counsel applies only to custodial interrogation); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (stating that *Miranda* warnings only apply when a person has been arrested or is in custody).  In fact, the agents were so careful and solicitous before Dallmann's interview that—out of an abundance of caution—they *did* give him a *Miranda* warning, which is discussed in more detail below.[9]

---

[9] The cases Dallmann discusses in his motion regarding his "custody" do not support his argument.  For example, he cites a Ninth Circuit case, *United States v. Baron*, 860 F.2d 911

In addition, according to FBI agents, Dallmann never requested the assistance of an attorney at any time.  In fact, before being interviewed and after being *Mirandized*, Dallmann waived each *Miranda* right (including all the rights involving an attorney).  Moreover, he consented to the interview; was extremely cooperative before, during, and after the interview; and made numerous statements to the FBI over the course of the morning and even a few days later.  Thus, Dallmann had no right to counsel and, even if he did, he specifically waived it.[10]

---

(1988).  But this case involved the issue of when an investigative detention becomes so intrusive as to constitute a *de facto* arrest.  In that case, police officers ordered Baron not to speak or touch anything, detained her for 35 to 40 minutes, ordered her to move from a public area to a porch and then ordered her to go into a bedroom where she found herself alone, behind closed doors and obscured windows, with three male officers.  The Ninth Circuit found that these circumstances were so coercive that Baron's detention became a full-scale arrest.  In the instant case, however, agents did not detain Dallmann, let alone coerce him in any way.

The Fourth Circuit cases Dallmann discusses are inapposite as well.  *See Hashime*, 734 F.3d 278 (holding that Hashime was in "custody" during his interview and should have received a *Miranda* warning where Hashime was rousted from bed at gunpoint, not allowed to move unless guarded, separated from his family, and placed in a small storage room with two agents); *United States v. Colonna*, 511 F.3d 431, 435-37 (4th Cir. 2007) (holding that Colonna was in "custody" during his interview and should have received a *Miranda* warning where the FBI interviewed him in an FBI vehicle and the district court found that a reasonable person in the same situation would believe that he was not free to leave and had to speak to the agents).  In this case, Dallmann was not in custody or restrained in any way during his interview, the agents read him his *Miranda* rights at the beginning of the interview, and the agents repeatedly told Dallmann that he did not have to speak to them and was free to leave at any time.

[10] The one case defendant cites in support of his argument on this point, *United States v. Nichols*, 438 F.3d 437 (4th Cir. 2006), is irrelevant.  In that case, police arrested Nichols for bank robbery and interviewed him; Nichols requested an attorney twice before he made any statements to the police but the police continued the interrogation.  The government conceded that Nichols' statements were inadmissible for purposes of conviction but wanted to use one of his statements at sentencing.  The Fourth Circuit agreed that the statement could be considered for sentencing.  In this case, we are not at the sentencing stage and, in any event, Dallmann was not arrested, detained, or otherwise placed in custody.

## II.     Dallmann Falsely Claims That FBI Agents Coerced Him Into Involuntarily Signing A *Miranda* Waiver

Dallmann claims, with absolutely no basis whatsoever, that the FBI "coerced" him into signing a *Miranda* waiver.  Dallmann even falsely states that FBI agents never read his rights to him and never permitted him to read or consider them, and that—as a result—he did not "knowingly, intelligently, and voluntarily waive[] his constitutional rights."  (Def.'s Mot. at 8-9.)

However, Dallmann was not in custody and agents did not need to give him a *Miranda* warning at all.  But when agents did opt to provide this warning to Dallmann, they did so without intimidation, pressure, or confusion.

In any event, the government need only establish the voluntariness of a statement by a preponderance of the evidence, and a statement is involuntary only where "the defendant's will has been overborne or his capacity for self-determination is critically impaired."  *United States v. Giddins*, 858 F.3d 870, 881 (4th Cir. 2017).  In other words, coercive police activity is a necessary but not sufficient finding for a confession or a *Miranda* waiver to be considered involuntary.  *Id.* at 885 ("It is not enough . . . to simply find coercion.").

Given these principles, "it is not surprising that very few incriminating statements, custodial or otherwise, are held to be involuntary."  *United States v. Braxton*, 112 F.3d 777, 786 (4th Cir. 1997) (*en banc*) (quotations omitted).  Courts evaluate the voluntariness of a statement by the totality of the circumstances and consider such factors as the characteristics of the defendant, the setting of the interview, and the details of the interrogation.  *Id.* at 780.  Markedly, the Fourth Circuit in *United States v. Nielsen*, 640 F. App'x 224 (4th Cir. 2016), held that none of the factors relevant to a custodial analysis—*i.e.*, "the sometimes aggressive questioning of the agents, the length and location of the interview, or the continuation of the interview after Nielsen

had confessed to the substance of the allegations"—amounted to coercive conduct, and noted in that case the absence of the pressures typically present where coercion is found, such as "threats or violence, lengthy marathon interrogations, or extended isolation," *id.* at 229.

Similarly here, the typical characteristics of coercive police pressures are absent.  Special Agent Lynch placed the *Miranda* waiver forms on the table in front of the couch where Dallmann and Jaurequi were sitting (see letter "C" in the sketch).  The forms were upside so they could read them.  He then read each *Miranda* right and asked them to put their initials next to the right if they understood it.  He also told them to ask him questions about any of the rights.  At the end, Special Agent Lynch asked them if they waived each right and, if they did, to sign the forms.   Dallmann's *Miranda* form shows that he initialed each of the rights and then signed the form stating, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."

At the time Dallmann waived any *Miranda* rights, he was well aware of why the agents were at his house and the nature of the offense of which he was suspected.  Indeed, over the course of the morning, he admitted his involvement in that offense and his guilt.  Furthermore, the interview was conducted in Dallmann's own home and there is no indication Dallmann was subjected to physical or psychological coercion.  Thus, while agents had no need to afford Dallmann a *Miranda* warning given that he was not in custody, it was perfectly valid.  *See, e.g., United States v. Hoang*, 238 F. Supp. 3d 775, 786 (E.D. Va. 2017) (Ellis, J.) (finding that Hoang's *Miranda* waiver was knowing and intelligent in part because the agent reviewed each and every *Miranda* right with Hoang, asking after each question if Hoang understood each right, and Hoang repeatedly confirmed that he understood each right); *United States v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002) (finding that Cristobal's *Miranda* waiver was voluntary because

the interviewing agent introduced himself to Cristobal and advised him of the nature of the

investigation, read him his *Miranda* rights, and made sure even after the waiver that Cristobal

was a willing participant); *see also United States v. Ramamoorthy*, 949 F.3d 955, 965-66 (6th

Cir. 2020) (holding that where agents went through *Miranda* waiver form line by line,

Ramamoorthy wrote his initials next to each line, agents offered explanations of the rights as

needed, and he signed waiver form, the agents had no reason to believe that he misunderstood his

*Miranda* rights and thus his waiver of those rights was knowing, voluntary, and intelligent).

## III.   FBI Agents Properly Seized A Memorandum Written For Dallmann By His Attorney In Connection With The Operation Of Jetflicks

Dallmann argues that the FBI improperly seized a memorandum written for him by his

attorney in connection with the operation of Jetflicks because it is dated in January 2008 and

Attachment B of the warrant refers to "[a]ll records and information from October 1, 2011 to

present…."  (Def.'s Motion, at 9-10.)  However, regardless of any date restriction in the warrant,

agents were authorized to seize this memorandum.

First, agents were entitled to look at every document in their search for evidence to be

seized under the warrant, even those dating before October 1, 2011.  *See, e.g.*,

*United States v. Gray*, 78 F. Supp. 2d 524, 528 (E.D. Va. 1999) (Ellis, J) ("[A]gents authorized

by warrant to search a home or office for documents containing specific information are entitled

to examine all files located at the site to look for the specified information" and "many, and often

all, documents in the targeted location [may] be searched").  That is even truer when the

government is investigating an ongoing conspiracy or fraud.  *See United States v. Zanche*, 541 F.

Supp. 207 (W.D.N.Y. 1982) (approving warrant for examination of business records despite

absence in the warrant of specific dates and stating, "[I]f the fraud operation under investigation

was ongoing, evidence of illegal activity in the past would be relevant to the conspiracy, while records of legitimate transactions prior to the conspiracy will help determine how and when the fraud scheme began"). Here, the scope of the search warrant included certain evidence of various offenses committed by Dallmann including conspiracy and criminal copyright infringement, and ultimately the grand jury charged Dallmann with conspiracy to commit criminal copyright infringement going back to 2007.

Second, agents properly seized the memorandum pursuant to the plain-view exception to the warrant requirement. As this Court has pointed out before:

> [I]t is not surprising . . that in the course of conducting a lawful search pursuant to a search warrant, law enforcement agents often discover evidence of criminal activity other than that which is the subject of the warrant. If an agent sees, in plain view, evidence of criminal activity other than that for which she is searching, this does not constitute an unreasonable search under the Fourth Amendment, for viewing an article that is already in plain view does not involve an invasion of privacy.

*Gray*, 78 F. Supp. 2d at 528 (citation and internal quotation marks omitted). Under the Supreme Court's three-prong *Horton* test, the plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed, (2) the officer has a lawful right of access to the object itself, and (3) the object's incriminating character is immediately apparent. *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997); *Horton v. California*, 496 U.S. 128, 133 (1990).

Here, the *Horton* elements are met. The agents were at the residence lawfully pursuant to the warrant; the warrant gave the government the authority to search the entire residence for documents including the file cabinet where Dallmann stored the memorandum; and the document's incriminating nature was immediately apparent on its face. So, it is immaterial that

the memorandum may have been dated a few years before October 1, 2011. *See, e.g.*, *United States v. Rude*, 88 F.3d 1538, 1551-53 (9th Cir. 1996) (noting that, although the search warrant had a post-May 1992 date restriction, the district court denied motion to suppress seized documents that were dated before May 1992 where agents quickly ascertained the incriminating nature of the documents, but affirming on other grounds); *United States v. Soussi*, 29 F.3d 565, 572 (10th Cir. 1994) (holding that even if a warrant is impermissibly broad, the government may nevertheless seize items pursuant to the plain view doctrine as long as the government scrupulously adheres to the three-prong *Horton* test); *United States v. Menon*, 24 F.3d 550, 563 (3rd Cir. 1994) (holding that, during execution of a search warrant to seize blank invoices, it was permissible for agent to seize documents that were not blank invoices because "it was immediately apparent, using the collective knowledge of the officers on the premises, that the documents were evidence of criminal activity"); *United States v. Slocum*, 708 F.2d 587, 603 (11th Cir. 1983) (concluding that agents acted reasonably examining documents dated before the substantive offenses averred in the affidavit and then later seizing those documents under the plain view exception); *United States v. Medows*, 540 F. Supp. 490, 501 (S.D.N.Y. 1982) (finding that "the discovery and seizure of the documents not mentioned in the search warrant or containing the names of aliens listed in the rider was lawful under the 'plain view' exception to the warrant requirement. The agents were entitled to peruse briefly each file and document encountered in defendant's office to ascertain whether there was probable cause to believe that the document or file was or contained evidence of the criminal activity under investigation.").

In addition, it was even clearer here that the memorandum was relevant and incriminating given that Dallmann—who had confessed to copyright infringement to the FBI—specifically highlighted the document to agents, described it in detail, said that the agents would seize it, and

even pointed out the location where the memorandum was ultimately seized.  That gave the agents even more reason to seize the document since *Dallmann himself* stated that he relied upon it in running his illegal streaming operation.

Third, given Dallmann's statements and actions regarding the memorandum during the search, there was no violation of his privacy interest, which underlies the Fourth Amendment interests here.  As the Supreme Court has made clear, courts should allow the seizure of incriminating evidence in plain view during the course of a lawful search because such a seizure "does not involve an intrusion on privacy.  If the interest in privacy has been invaded, the violation must have occurred before the object came into plain view." *Horton*, 496 U.S. at 141; *see also Jackson*, 131 F.3d at 1110 (stating that a search compromising the individual's interest in privacy must be unreasonable to implicate the Fourth Amendment) (citation omitted).  Here, given the fact that Dallmann essentially helped agents search for and seize the memorandum, and even pointed to its location, the search and seizure of that document could not have violated any privacy interest.

Fourth, Dallmann consented to the search and seizure of the memorandum.  He volunteered information about the memorandum to the agents (who knew nothing about it before the search), described it in detail, said that he requested the memorandum and it was written for him, stated that agents would seize it, and even showed them where it was, namely, in a file cabinet in his home office.  Those actions constitute consent.  *See Scheckloth v. Bustamonte*, 412 U.S. 218, 248 (1973) (holding that when a subject of a search is not in custody, the search can be justified where he voluntarily gives consent); *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (stating that consent to search is valid if it is knowing and voluntary and given by one with authority to consent); *United States v. Purcell*, 526 F.3d 953, 962 (4th Cir. 2008) (noting

that a person purporting to consent must possess either actual or apparent authority over the item or place to be searched and the scope of consent should be measured under the standard of what a typical reasonable person would have understood by the exchange between the officer and the subject).

Accordingly, agents properly seized the attorney client memorandum.[11]

## IV. Dallmann Falsely Claims That He Asked For An Attorney When Agents Asked For His Cellphone Passcode

Lastly, Dallmann claims that FBI agents improperly confiscated his cellphone, demanded that he provide the unlock code for the phone, ignored his request for an attorney, and examined the contents of his phone. (Def.'s Mot. at 12.) This is not true.

While executing the search warrant, agents seized various electronic devices and other evidence pursuant to the warrant. One device was an iPhone X with a red case that apparently belonged to Dallmann. Dallmann signed written consent to the search of a number of his devices and systems—including the iPhone X—and seizure of their data, and provided the passcodes and passwords to those devices and systems in that consent. Even with the passcode, on-site FBI forensic experts had trouble imaging the phone. As a result, they took it to another location to extract the data. Agents returned the phone to Dallmann a few days later.

Dallmann did not ask for an attorney at the time he voluntarily provided the passcode to his phone and consented to its search. And he did not ask for an attorney before or after he provided that consent. In addition, Dallmann was not in custody and so had no right to counsel

---

[11] Dallmann also asserts that the memorandum is protected by attorney-client privilege and that he never waived that privilege. As argued in two previous government motions, he clearly waived any privilege in the document. (*See* Gov't Motions, Dkt. 148, 197, and 224.) The government incorporates those filings by reference here.

that could have been violated, and, in fact, about 30 minutes before disclosing his iPhone X passcode to the FBI, he specifically waived in writing any right to speak to an attorney.

In sum, Dallmann's claims are false.

(CONTINUED ON NEXT PAGE)

## CONCLUSION

The defendant's Motion is meritless.  He fails to meet his burden to suppress his statements or other evidence, and for the reasons set forth above, the government asks the Court to deny his Motion.


Respectfully submitted,


Date:   April 16, 2020                    G. Zachary Terwilliger
                                          United States Attorney


                                          _____/s/_____

                                          Matthew A. Lamberti
                                          Special Assistant United States Attorney,
                                            Eastern District of Virginia
                                          Senior Counsel,
                                            Computer Crime and Intellectual Property Section
                                          United States Department of Justice
                                          1301 New York Avenue, NW, Suite 600
                                          Washington, DC 20530
                                          Phone: (202) 514-1026
                                          Email: Matthew.Lamberti@usdoj.gov


                                          _____/s/_____

                                          Alexander P. Berrang
                                          Monika Moore
                                          William E. Fitzpatrick
                                          Assistant United States Attorneys
                                          United States Attorney's Office
                                          2100 Jamieson Avenue
                                          Alexandria, Virginia 22314
                                          Phone: (703) 299-3700
                                          Fax: (703) 299-3981
                                          Email: Alexander.P.Berrang@usdoj.gov
                                          Email: Monika.Moore4@usdoj.gov
                                          Email: William.Fitzpatrick@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 16, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filling (NEF) of the foregoing to the attorneys for the defendants.


By:   _____/s/_____
    Matthew A. Lamberti
    Special Assistant United States Attorney,
      Eastern District of Virginia
    Senior Counsel,
      Computer Crime and Intellectual Property Section
    United States Department of Justice
    1301 New York Avenue, NW, Suite 600
    Washington, DC 20530
    Phone: (202) 514-1026
    Email: Matthew.Lamberti@usdoj.gov