IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | Crim No. 1:19-CR-253 |
| v. | * | |
| KRISTOPHER LEE DALLMANN, *et al.* | * | The Honorable T.S. Ellis, III |
| *Defendants.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT KRISTOPHER LEE DALLMANN'S**
**REPLY IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**

Defendant Kristopher Lee Dallmann, by and through undersigned counsel and pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, hereby files this Reply in support of his Motion suppressing certain evidence confiscated by FBI agents during the execution of a search warrant for 2216 Tona Circle, Las Vegas, Nevada on the grounds that the evidence was improperly searched, as well as all statements made to FBI agents and all evidence contained within Defendant's cellular phone that was seized during the execution of a search warrant for 2154 Tona Circle, Las Vegas Nevada on the grounds that the statements were not voluntary and the cellular phone was improperly searched. Pursuant thereto, Defendant states as follows:

I. <u>Mr. Dallmann's statements were rendered involuntarily as part of a coerced custodial interrogation</u>

Even considering the Government's downplaying of the events that transpired during the execution of the search warrants, it is clear that Mr. Dallmann was taken into custody and thus was entitled to the protection of his Miranda rights. As the Government itself acknowledges in its own factual statement, Mr. Dallmann and his husband, Jared Edwards, were woken up early in the morning and brought outside in their underwear while "a number of FBI agents" using drawn

weapons raided their home and the neighboring property owned by Mr. Dallmann. (Gov't Opp. to Mot., Dkt. No. 250, at 5.) According to the Government, Mr. Dallmann and Mr. Edwards, while standing outside without clothing, were told that they were not under arrest and were free to go. After securing the home, the FBI agents collected Mr. Dallmann's telephone, diverted Mr. Dallmann's request for counsel, and pressured Mr. Dallmann with the possibility of more lenient criminal proceedings if he agreed to submit to an interview. The Government contends that such conditions do not constitute having taken Mr. Dallmann into custody. However, no "reasonable person" would feel under such conditions that he was at liberty to leave.

Moreover, the Government's version of events minimizes and omits certain additional relevant facts. The FBI arrived at Mr. Dallmann's home early in the morning, before 6 am. Mr. Dallmann was asleep in bed. An FBI agent yelled from the front door that he would break the door down if Mr. Dallmann did not open it. Mr. Dallmann ran to the front door. From the window, he observed a long line of agents approaching his house from the street. The agent at the front of the line held a battering ram. He opened the door and an FBI agent grabbed him and pulled him outside. Mr. Edwards followed. They were wearing only their underwear. As soon as Mr. Dallmann and Mr. Edwards were removed from the home, a number of agents with guns drawn ran in behind them. Mr. Dallmann screamed, "Please don't shoot my dogs! They nip when they are scared!" Mr. Dallmann and Mr. Edwards stood outside in nothing but their underwear for some time while the FBI ransacked the house. Other armed FBI agents kept guard over them and demanded that they sit on the curb. They were not in possession of their wallets, cell phones, car keys, or even shoes or a pair of clothes. Clearly, under such circumstances, Mr. Dallmann was not free to leave.

At some point, FBI agents brought Mr. Dallmann back into the house. His phone had been confiscated while he had been held in custody outside the home. He and Mr. Edwards were brought into their bedroom and permitted to get dressed. They were not permitted to leave the bedroom until they had agreed to submit to separate interviews. Subsequently, Mr. Edwards was kept in the bedroom while Mr. Dallmann was removed and interviewed in the living room. Despite it being his own house, Mr. Dallmann's movement was restricted at all times. He was required to remain seated on the sofa. He was not permitted to use the bathroom except under the condition that the door was left open and an FBI agent with a drawn gun guarded the open door. Mr. Dallmann was not permitted to enter his own home office at any time, and thus refutes the Government's claim that he assisted FBI agents in finding records in that room.

As the 4th Circuit has mandated, an individual is in custody "when, under the totality of the circumstances, 'a suspect's freedom from action is curtailed to a degree associated with formal arrest.'" *U.S. v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see also U.S. v. Parker*, 262 F.3d 415 (4th Cir. 2001); *California v. Beheler*, 463 U.S. 1121 (1983). Under these conditions, Mr. Dallmann was very clearly detained and in custody at all times. He was initially forcibly removed from his home wearing nothing but underwear and had no access to his personal belongings or his pet dogs. Once he was permitted to get dressed, his telephone had been confiscated and his movement was restricted. He was held in his room until he agreed to submit to an interview, at which time he was separated from his husband and detained on his own sofa. Accordingly, the Government's assertion that Mr. Dallmann was not in custody is clearly self-serving and contrary to the evidence.

The Government relies heavily on its claim that Mr. Dallmann was told on certain occasions that he was not under arrest and was free to leave. However, "there is no precedent for

the contention that a law enforcement officer simply stating to a suspect that he is 'not under arrest' is sufficient to end the inquiry into whether the suspect was 'in custody' during an interrogation. *Colonna*, 511 F.3d at 435 (*citing Davis v. Allsbrooks*, 778 F.2d 168 (4th Cir. 1985)). This is primarily because "even if the agents truly requested [a suspect's] voluntary participation in an interview, it is highly doubtful that a reasonable person would have felt entitled to decline their request [to talk]." *Id.* at 435-36. Accordingly, the Government's statements are self-serving and do not mitigate the other coercive tactics used to hold Mr. Dallmann in custody.

Additionally, considering other indicia of detainment described, the Government's own actions belie that the Government intended to detain Mr. Dallmann and hold him in custody. Similarly, in *Colonna*, "the agents did everything short of actually, physically restraining Colonna to make him, or any reasonable man, believe that he was not free to leave." *Id.* at 436. Such was also the case here. Indeed, the facts here are very much in alignment with those in *Colonna* (early morning raid, held outside in underwear, separated from family, movement guarded by armed officers). *See generally, id.* Accordingly, the Government cannot plausibly allege that Mr. Dallmann was not held in custody.

The Government asserts, in part, that Mr. Dallmann could not have been in custody because he was permitted on one occasion during the four-hour-long interview to use the bathroom and make a cup of coffee. The Government omits, however, that Mr. Dallmann was guarded by armed FBI agents at all times during this break in the interview (including by being forced to leave the bathroom door open) and never had full freedom of movement in his own home. The Government also omits that their visit lasted for a total of eleven hours, during which time Mr. Dallmann was constantly guarded and never ate. Once again, *Colonna* establishes that the Government's position fails. In *Colonna*, the suspect was permitted to take cigarette breaks during his 3-hour interview,

but was guarded by an agent at all times. 511 F.3d at 436. The 4th Circuit determined that such guarding during breaks actually indicated that the suspect was in custody, or would at least perceive himself as such. *Id.* (*quoting United States v. Griffin*, 922 F.2d 1343, 1350-51 (8th Cir. 1990) ("We realize that the likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest.")). Accordingly, the Government's attempt to paint the scene as a cordial and relaxed interview over coffee, with breaks, fails. Mr. Dallmann felt, despite occasional statements by the FBI, to the contrary, that he was not free to go because he was, in fact, *not free to go*.

II. <u>Mr. Dallmann's statements were not voluntary because the FBI refused to permit Mr. Dallmann to consult with counsel, despite his request for the same, in violation of Mr. Dallmann's Fifth Amendment rights.</u>

Because Mr. Dallmann had been taken into custody, he was entitled to his *Miranda* rights, including the right to counsel. "If a suspect continues to be interrogated after an unequivocal request to speak with an attorney, his statements are presumed involuntary and are therefore inadmissible at trial, even where the suspect executes a waiver that would render his statements voluntary under traditional standards." *United States v. Hunter*, 63 F. Supp. 3d 614, 621 (E.D. Va. 2014) (citing *Michigan v. Harvey,* 494 U.S. 344, 350, (1990)); *see also Maryland v. Shatzer,* 559 U.S. 98, 104, (2010) ("[I]f the suspect states that he wants an attorney, the interrogation must cease until an attorney is present.").

Tellingly here, in its Opposition, the Government does not refute that Mr. Dallmann asked whether he could call an attorney regarding the confiscation of his cell phone during the execution of the warrant. Nor does the Government refute that an FBI agent told Mr. Dallmann in response that he a should not call an attorney because they "are unnecessary" and "just complicate things." Indeed, the Government does not address these statements at all. Instead, the Government carefully parses its words by simply and plainly stating that Mr. Dallmann never requested an attorney. This

5

is the entirety of the Government's analysis of the issue. At the very least, whether Mr. Dallmann's statements regarding whether he could consult an attorney constituted a request for an attorney such that an interview should have been precluded until an attorney was present is a question for the courts, and not for the FBI, to determine. Rather than confront this issue, the Government has flatly ignored it and, in its place, asserted self-serving, legally-deficient conclusions.

III. Mr. Dallmann did not waive his Fifth Amendment right to counsel because the FBI coerced Mr. Dallmann into involuntarily signing the Miranda waiver.

Clearly, the Government's assertion that Mr. Dallmann was not detained, and thus had no right to his *Miranda* warnings, is false. Because Mr. Dallmann had been taken into custody, he was entitled to his *Miranda* warnings. "When law enforcement interrogates a suspect while in custody, *Miranda* warning are required. *Hunter*, 63 F. Supp. 3d at 619 (E.D. Va. 2014) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444 (1966)). A suspect can only waive his Miranda rights when such waiver is made "voluntarily, knowingly and intelligently." *Id.* at 620. The **Government**, and not Mr. Dallmann, "bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings. *Id.* at 619 (citing *Colorado v. Connelly,* 479 U.S. 157, 168 (1986)). A court must find that "the relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Cristobal,* 293 F.3d 134, 139 (4th Cir. 2002) (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). Here, the Government's assertion that Mr. Dallmann was not coerced to waive his *Miranda* rights, and has no basis to assert differently, is equally as false as its claim that Mr. Dallmann was not in custody. Under a totality-of-the-circumstances test, it is clear that Mr. Dallmann faced substantial coercion to comply with the FBI's demands. Moreover, the Government's version of the facts is rife with self-serving inaccuracies.

6

First, the Government claims *for the first time* that the FBI agent conducting the interview read the *Miranda* waiver form to Mr. Dallmann and confirmed his understanding of each right before Mr. Dallmann signed the waiver. Mr. Dallmann vehemently refutes this version of events as inaccurate. He was never explained his rights, no officer read him any *Miranda* warnings, and he was not given adequate time to review the document he was forced to sign. A hearing and determination of credibility are clearly necessary for the Court to make a factual determination on this issue.

The Government also alleges that there is no indication Dallmann was subjected to physical or psychological coercion. However, the Government has admitted that Mr. Dallmann broke down crying during the interview – a clear indication of psychological stress brought on in large part by the coercive tactics of the FBI. The Government has also admitted that prior to the interview, Mr. Dallmann and his husband were removed from their house in their underwear and forced to stand outside for a period of time while armed agents raided the house with his dogs inside. Mr. Dallmann was subsequently separated from his husband for hours. Accordingly, even under the Government's own heavily-edited version of events, there is clear evidence of physical and mental manipulation and coercion.

Moreover, the previously-discussed conversation wherein Mr. Dallmann asked if he could call an attorney and an FBI agent told him he didn't need one and they complicate things also impacts the analysis of whether Mr. Dallmann was coerced to sign the Miranda waiver. Because the FBI had already denied Mr. Dallmann his right to an attorney, Mr. Dallmann was under the legitimate impression that the FBI would not heed any subsequent requests for the same. Accordingly, he felt powerless to do anything but comply with the FBI agent's demands and sign

away his rights. The Government has failed to acknowledge this conversation and reconcile it with its claim that it used no coercive tactics to induce Mr. Dallmann to involuntarily waive his rights.

Finally, to establish admissibility, along with establishing that the waiver of rights was not coerced, a court must also find that the "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Hunter*, 63 F. Supp. 3d at 620 (citing *Cristobal,* 293 F.3d at 139). "The purpose of the 'knowing and voluntary' inquiry … is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez v. Moran*, 509 U.S. 389, 401 (1993). When a defendant waives his constitutional rights, he must be "made aware of the dangers and disadvantages … so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta v. California*, 422 U.S. 806, 835 (1975).

Here, the Government is attempting to stretch the alleged attorney waiver not only to the statements made during the interview, but also to Mr. Dallmann's right to attorney-client privilege as to the Confiscated Document (discussed *infra*) and to anything related to the subjects discussed during the interview. Assuming *arguendo* that Mr. Dallmann was not coerced to sign the Miranda waiver, there is no plausible way that Mr. Dallmann could have been aware that the Government intended that waiver to ripple so far down and have such far-reaching consequences. Mr. Dallmann could have only contemplated that he may have been waiving his right to an attorney at that moment, and not for all time in the future of the case with regard to these topics and issues. The Government cannot, therefore, establish that Mr. Dallmann's waiver was knowing. Accordingly, any alleged waiver must be rendered null and evidence collected therefrom suppressed.

IV. <u>The Confiscated Document is protected by attorney-client privilege, which Mr. Dallmann has never waived.</u>

Because the interview of Mr. Dallmann was improperly coerced, the Government cannot rely on statements made therein to argue that Mr. Dallmann waived his attorney-client privilege to the Confiscated Document. Consequently, the attorney-client privileged Confiscated Document must be suppressed. Similarly, assuming *arguendo* that Mr. Dallmann waived his right to counsel at the interview, he was unaware that such waiver would be imputed to the privilege attached to the Confiscated Document; thus any alleged waiver cannot extend to the Confiscated Document as such waiver was not knowingly made. The Confiscated Document remains privileged.

V. <u>The search of Mr. Dallmann's cellular phone was conducted pursuant to improperly coerced waiver of rights</u>

Once again, the Government manipulates the facts to make it appear as if Mr. Dallmann was not coerced into waiving his right to privacy regarding his cellular phone, when in fact, the FBI used a variety of tactics to compel Mr. Dallmann to sign over his rights to the phone. *See, e.g.*, *United States v. Burton*, No. 17-4524 (4th Cir. Dec. 19, 2018) (indicating, pursuant to *Riley v. California*, 134 S. Ct. 2473 (2014) that authority to search a cell phone is not encompassed by a warrant to search a house, and a second warrant must issue for such authority).

First, Mr. Dallmann never voluntarily gave the FBI agents his phone. Rather, the FBI agents used the early-morning raid to their advantage and confiscated the phone outside of Dallmann's presence.

Second, Mr. Dallmann ***repeatedly*** asked the FBI agents on ***multiple*** occasions to return his phone to him. The FBI refused to do so.

Third, the FBI lied to Mr. Dallmann and told him they would not need to confiscate his phone and would return it to him shortly if he provided the unlock code. Although Mr. Dallmann

complied, the FBI did not return the phone, but instead confiscated it with the other things they removed from the home during the execution of the warrant.

Finally, at the end of the almost eleven-hour ordeal, the FBI informed Mr. Dallmann that they needed him to sign a release document for his phone. Mr. Dallmann was emotionally defeated at this point. Considering that the phone had already been searched, he signed the document. The release was not signed prior to the phone being subject to the officers' initial search or at the same time as the Miranda form (as alleged by the Government), but instead was signed just before the FBI left. The phone was then taken from the premises for imaging and returned several days later. The delayed waiver, signed after the phone had been confiscated, unlocked, and searched establishes coercion.

At the very least, the Government was required to obtain secondary authority to later search the phone after it was seized, which they failed to do. *See, e.g.*, *Burton*, No. 17-4524, at *10 (noting that police were required to obtain second warrant after seizure of phone).

## **CONCLUSION**

For the foregoing reasons, as well as those reasons described in the corresponding Motion to Suppress, Defendant Kristopher Lee Dallmann respectfully requests that this Honorable Court enter an order suppressing as evidence Mr. Dallmann's statements made during the interview, the Confiscated Document, and cellular phone evidence, and granting Defendant any further such relief that this Court deems necessary and appropriate.

        Respectfully submitted,
        Kristopher Dallmann
        By Counsel

        /s/
        Vernida R. Chaney
        Chaney Law Firm PLLC
        4120 Leonard Drive
        Fairfax, VA 22030
        Tel. 703-879-6650
        Fax 703-776-9008
        vchaney@chaneylawfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2020, I will file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties.

              /s/
Vernida R. Chaney
Chaney Law Firm PLLC
4120 Leonard Drive
Fairfax, VA 22030
Tel. 703-879-6650
Fax 703-776-9008
vchaney@chaneylawfirm.com