IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | **Criminal No. 1:19-cr-253** |
| | ) | |
| KRISTOPHER LEE DALLMANN, *et al.*, | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

At issue in this criminal copyright infringement prosecution are (i) Defendant Kristopher Dallmann's and Defendant Jared Jaurequi's (collectively "Defendants") Motions to Suppress Statements and Evidence, and (ii) the government's Renewed Motion Requesting Confirmation of Waiver of Attorney-Client Privilege. Defendants' motions seek to suppress evidence obtained during a November 16, 2017 Federal Bureau of Investigations ("FBI") search of Dallmann's home conducted pursuant to a warrant, and Defendants' statements made in the course of interviews during the search. The government seeks a ruling that Dallmann, in the course of the interview during the search, made statements that effectively waived attorney-client privilege as to legal advice Dallmann said he received from an attorney.

The parties' positions on these motions have been fully briefed and argued. In addition, an evidentiary hearing was held on September 17, 2020, at which time the government elicited testimony from five witnesses: FBI Special Agents Curtis Cox, Timothy Lynch, and Alexis Brown, as well as Criminal Investigator Tracey Todd Tumbleson of the Nevada Attorney General's Office and FBI Forensic Examiner John Kern. For their part, Defendants, by counsel, elicited testimony from two witnesses, Carol Fultz and Jacob Donnenberg, Defendants' neighbors in Las Vegas, Nevada. For the reasons that follow, Defendants' Motions to Suppress must be denied, and the

government's Renewed Motion Requesting Confirmation of Waiver of Attorney-Client Privilege

must be granted in part and denied in part.

## I.

The testimony of the seven witnesses at the September 17, 2020 Hearing establishes

convincingly the following facts pertinent to the disposition of the pending motions:

- On August 27, 2019, a nineteen-count indictment issued charging Defendants and six others with conspiracy to commit criminal copyright infringement, in violation of 18 U.S.C. Section 371, surrounding their operation of Jetflicks.[1] The indictment describes Jetflicks as an online service where Defendants obtained infringing digital copies of copyrighted television shows from pirate sites, processed and renamed those works, and then streamed and distributed them on an unlimited basis to paying subscribers.

- On November 15, 2017, a search warrant was obtained for two properties owned by Dallmann located on the same street. One house was the residence of Defendants, and the other was rented by Dallmann to co-defendants in this case. The search warrant for Defendants' residence allowed, *inter alia*, for the search of electronic media on the property, including wireless telephones for evidence of copyright infringement related to Jetflicks.

- On November 16, 2017, the search warrant was executed at both properties.

- The search of Dallmann and Jaurequi's residence began just after 6:00 a.m. Around nine FBI agents approached the front door of Defendants' residence, knocked on the door, and announced their presence.[2]

---

[1] In addition to Defendants, the grand jury charged Darryl Julius Polo a/k/a djppimp, Douglas M. Courson, Felipe Garcia, Peter H. Huber, Yoany Vaillant a/k/a Yoany Vaillant Fajardo, and Luis Angel Villarino. On December 12, 2019, Polo pled guilty to criminal copyright infringement and money laundering charges including the conspiracy count that involves Jetflicks. On December 13, 2019, Villarino also pled guilty to the conspiracy count that involves Jetflicks.

In addition to the conspiracy to commit copyright infringement charge, the grand jury charged Dallmann with several counts of criminal copyright infringement and money laundering.

[2] Although Defendants assert that the search was conducted by a SWAT team, witness testimony conclusively contradicts the assertion. At the Hearing, government witnesses credibly testified that there was no SWAT team present during the search. Defendants' neighbors, Carol Fultz and Jacob Donnenberg, testified that they saw a SWAT team during the search. However, neither Fultz nor Donnenburg were certain, and the neighbors admitted that their knowledge was based on watching TV. The Court finds the evidence presented by the governments' witnesses that there was no SWAT team present to be credible, as there was no evidence presented to the contrary beyond Defendants' neighbors' inexperienced and uncertain observations.

2

- When the FBI agents approached and knocked on the door of Defendants' residence, the FBI agents, in accordance with FBI policy, wore bulletproof vests, had available a shield and battering ram, and had weapons drawn.

- In response to the FBI's knocking, Defendants came to the door and were told by the FBI agents that the FBI agents were there to execute a search warrant. Defendants were not fully dressed when Defendants came to the door. Defendants were directed to Special Agent Lynch, who spoke with them in the front yard while the security sweep of the house was conducted, for a period of five or ten minutes. Defendants were not restrained at any time. Once Defendants were directed to Special Agent Lynch no weapons were drawn or pointed at Defendants at any time.

- While the security sweep took place inside the house, Special Agent Lynch told Defendants that the FBI was investigating Jetflicks. Special Agent Lynch also told Defendants that Defendants were not under arrest nor were they in custody, and that Defendants were free to leave if they wished to do so, but that Special Agent Lynch would be interested in speaking to Defendants if they were interested in doing so. Special Agent Lynch further explained that the FBI was doing a security sweep of the residence and asked Defendants whether there were any other individuals in the home. Dallmann indicated that Defendants had dogs, which Special Agent Lynch communicated to the search team, and Defendants indicated their desires to stay and speak with the FBI agents.[3]

- Once the FBI agents completed the security sweep, Defendants were permitted to go to their bedroom to finish dressing themselves. FBI agents remained in the room while Defendants finished dressing themselves as required to ensure agent safety and prevent potential destruction of evidence. Afterwards, Defendants and Special Agent Lynch went to the living room with Special Agent Lance Shakespear.

- The living room was part of an open floor plan, with no partition between the room, the dinette, and the kitchen. The room was plainly visible to anyone coming and going through the house, including the other FBI agents in the house.

- Dallmann and Jaurequi selected a couch to sit on and Special Agents Lynch and Shakespear sat down on nearby furniture. Defendants' dogs remained with the Defendants, on their laps, for most of the interview.

- Special Agent Lynch explained to Defendants that the FBI was looking for evidence relating to the allegation in the indictment that Defendants were conducting illegal criminal copyright infringement. Special Agent Lynch reiterated that Defendants were not under arrest, were not in custody, and were free to leave the house at any time. Special Agent Lynch also told Defendants that if Defendants wished to leave the house, Defendants could provide Special Agent Lynch with a phone number, and Special Agent Lynch could call

---

[3] In his Motion to Suppress, Dallmann contends that he was never told that he was free to leave. No testimony or evidence was presented to support that contention. As such, and in face of credible testimony from Special Agents Lynch and Brown that both Dallmann and Jaurequi were told they could leave multiple times, Dallmann's contention that he was never told he was free to leave is not credible.

them when the search was completed. Defendants indicated they preferred to stay at the house.

- Special Agent Lynch again asked Defendants if they would be interested in speaking with the FBI agents, and Defendants indicated they would be interested in doing so. The FBI agents did not pressure Defendants to speak with the FBI agents.[4]

- Special Agent Lynch then placed two FD-395 forms with *Miranda* warnings on the table in front of Jaurequi and Dallmann. The forms listed Defendants' rights, including the rights to remain silent, to have an attorney present, and to stop answering questions at any time. Special Agent Lynch explained to Defendants that Defendants were not in custody, but that Special Agent Lynch wanted to make sure Defendants were fully aware of their rights.

- Special Agent Lynch next explained to Defendants their rights, line by line, as set forth in the form. Special Agent Lynch asked Defendants to mark their initials next to each line if Defendants understood the right. Special Agent Lynch told Defendants that the initials did not mean Defendants were waiving the right, only that they understood it. After going through the rights, Special Agent Lynch then asked Defendants if Defendants wished to waive their rights, and, if so, to sign the forms. Special Agent Lynch told Defendants that Special Agent Lynch could not interview Defendants unless they signed the form. Both Dallmann and Jaurequi signed the forms acknowledging and waiving each of the rights listed on the form, and both Dallmann and Jaurequi consented to interviews.[5]

- About an hour into the interview with Defendants, Special Agent Lynch told Defendants that it would expedite matters if they conducted separate interviews simultaneously. Special Agent Lynch then asked Jaurequi if Jaurequi would be willing to be interviewed separately in order to expedite matters. Jaurequi agreed to do so.[6]

---

[4] Although Defendants did not testify, they claim that the FBI agents threatened them and stated that Defendants' cooperation would impact how possible future criminal proceedings would turn out. Not a scintilla of evidence in support of this contention was presented at the Hearing. In the face of credible testimony to the contrary from Special Agents Lynch and Brown, Defendants' claim is not credited.

[5] Defendants claim—without any evidence or testimony in support—that the FBI agents pressured Defendants to sign waivers of their *Miranda* rights, and that the *Miranda* rights were not explained. This claim is conclusively contradicted by Special Agent Lynch's credible testimony that Special Agent Lynch reviewed the contents of the waiver with Defendants and made sure that Defendants understood the waiver, as confirmed by Defendants' initials and signatures on the FD-395 forms. Accordingly, Defendants' claim that Defendants were pressured or coerced into signing the waiver is not credible.

[6] In his motion to suppress, Dallmann claims that Defendants were not permitted to leave the bedroom until they agreed to conduct separate interviews. This claim is flatly contradicted by the testimony. Special Agent Lynch stated in his testimony that Special Agent Lynch asked Defendants at the beginning of the interview whether they would be willing to be interviewed separately. Jaurequi originally indicated that Jaurequi wished to remain with Dallmann, and Special Agent Lynch allowed Jaurequi to do so. After an hour, Special Agent Lynch asked Jaurequi if he would be willing to consent to a separate interview to expedite matters, and Jaurequi agreed to do so. Thus, Dallmann's unsupported claim is not credible.

4

- During the execution of the search warrants, FBI agents seized two iPhone Xs belonging to Defendants. John Kern, a forensic examiner with the FBI Computer Analysis Response Team received the two cellphones. Forensic Examiner Kern needed the phones' passcodes to extract the data from the phones on-site in order to be able promptly to return the phones to Defendants. Forensic Examiner Kern asked the FBI agents interviewing Defendants whether the FBI agents could obtain the passcodes for the phones.

- Special Agent Lynch explained to Defendants that the search warrant authorized the FBI agents to seize the phones. Special Agent Lynch also told Defendants that the FBI agents might be able image the phones on-site and not have to seize the phones if the Defendants were willing to provide their cellphone passcodes. Defendants agreed, and Dallmann signed a consent form providing passcodes for several devices owned by Dallmann and Jaurequi. Special Agent Lynch acted as a witness for this consent, which was signed by both Dallmann and Lynch in front of Jaurequi.[7]

- Forensic Examiner Kern testified that, if he had not received passcodes for the phones, he would have sent the phones to FBI headquarters or the phone vendors to gain access to the devices' contents. Although Defendants provided their passcodes, Forensic Examiner Kern had difficulty extracting the data from the phones, so the FBI agents took Defendants' phones from the residence to the forensic lab to complete the extraction. The cellphones were returned to Defendants four days later, on November 20, 2017.

- After Jaurequi left to be interviewed in the bedroom, Special Agents Lynch and Shakespear continued interviewing Dallmann in the living room. After the search team finished searching the rest of the house, they came to search the living room, and the FBI agents and Dallmann finished the interview in chairs by the pool in the backyard.

- During the interview, Dallmann described creating Jetflicks.com, an aviation services business which converted personal DVD collections for customers who wanted to watch movies on their private planes. Dallmann also described Jetflicks.mobi, a second business for streaming television shows. Dallmann initially claimed that Jetflicks did minimal streaming services and mainly made money from the aviation services business, which Dallmann claimed grossed about $30,000 a month. When asked about specifics, Dallmann admitted that the aviation services business had only two customers who had paid a total of $80,000.

- At about 8:17 a.m., the interview paused to allow Dallmann to use the restroom. During a break of about thirty minutes, Dallmann went to the bathroom and made himself coffee in the kitchen. When Dallmann returned, Special Agent Lynch asked to use the bathroom and

---

[7] Although Defendants did not testify, Defendants claim in their Motions to Suppress that Defendants asked to speak to their attorneys and were rebuffed, and that Defendants were coerced into providing their cellphone passcodes. There arguments are without evidentiary support, and the government persuasively and conclusively refutes these claims. Special Agents Lynch and Brown credibly testified that Defendants never asked to speak to a lawyer and freely and willingly provided their cellphone passcodes. In the face of this credible testimony from Special Agents Lynch and Brown, Defendants' unsupported claims are not credible.

left the room. While Special Agent Lynch was gone, Dallmann spoke to Special Agent Shakespear, who mostly remained silent. When Special Agent Lynch returned to the room, Dallmann was crying. Special Agent Lynch asked Dallmann if he had been truthful during the interview to that point, and Dallmann indicated he had not.[8]

- Upon restarting the interview, Dallmann admitted that Jetflicks was committing copyright infringement and illegally streaming television shows without permission. Dallmann stated that he started with the idea of conducting the aviation services business, but that the business was not successful, leading Dallmann to turn to streaming television shows illegally. Dallmann then described the process of torrenting television shows and streaming them on Jetflicks.mobi.

- Dallmann also described paying $3,000 to consult an attorney for legal advice on what Dallmann could and could not do to operate Jetflicks's streaming services. Dallmann stated that the attorney identified three categories in which Dallmann could operate. Dallmann described one category as follows: if you stream content owned by someone else, they may ask you to remove it, and if you remove it you will not get in trouble. Dallmann stated that the FBI agents were likely to seize the attorney memorandum detailing the three categories in the search, but that Dallmann was willing to point it out if it would be helpful.

- Dallmann told Special Agent Lynch that Dallmann had received two cease-and-desist letters regarding Jetflicks. Early in the interview, Dallmann described receiving such a letter from Home Box Office ("HBO"), and explained that Dallmann removed the three shows listed in the letter from Jetflicks. Later in the interview, Dallmann stated that he had received a second cease-and-desist letter, this time from the Motion Picture Association of America. Dallmann claimed that he showed the letter to his attorney, who told Dallmann it looked like it had been written by an amateur, and that Dallmann should just ignore the letter.

- Dallmann also said that PayPal contacted him in 2016 about Jetflicks committing copyright infringement and froze Jetflicks' account as a result. Dallmann failed to resolve matters with PayPal, and instead switched payment service providers to Stripe. Dallmann admitted that he misled Stripe in directing them to Jetflicks.com instead of the real source of the revenue, Jetflicks.mobi.

- Dallmann also told Special Agent Lynch that Dallmann had a printout of the 1978 federal copyright code but had not read it, and that Dallmann assumed that he needed licenses to be permitted to stream shows legally but did not really know.

---

[8] In his Motion to Suppress, Dallmann claims without evidence that his movement was restricted at all times and that he was required to leave the door open while using the bathroom. The evidence on the record unequivocally contradicts these claims. Special Agent Lynch described a generally cordial interview atmosphere in which Dallmann took breaks to use the bathroom and make coffee. Special Agent Lynch described the general FBI policy of always having someone remain with a subject to ensure the subject does not access any weapons or destroy evidence, but no testimony was adduced to support Dallmann's claim of complete restriction of movement. Dallmann's claim is therefore not credible.

- Dallmann spoke extensively about working with Darryl Polo, a co-defendant in this case who has pleaded guilty. Dallmann claimed that he received significant help from Polo in getting Jetflicks up and running, but that there was also substantial tension between them, resulting in Polo starting up a competitor website called iStreamItAll.

- Around 9:20 a.m., Dallmann took another bathroom break. The interview resumed roughly ten minutes later.

- Near the end of the interview, Dallmann took Special Agent Lynch into his home office and pointed out his file cabinet as the likely location of the attorney memo Dallmann had previously mentioned. Criminal Investigator Tracey Todd Tumbleson of the Nevada Attorney General's Office was a member of the search team and saw Special Agent Lynch and Dallmann enter the office to search for a document, and Criminal Investigator Tumbleson told Special Agent Lynch that the document had already been seized.[9]

- An hour into the interview with Defendants, Special Agents Alexis Brown and Jessica Marrone were called from the residence being searched next door and were asked to come to Defendants' residence. When Special Agent Brown arrived at Defendants' residence, the demeanor appeared conversational, cordial, and relaxed.

- Special Agent Brown and Marrone asked Jaurequi if he would like to speak with them, and Jaurequi agreed. Special Agent Brown asked if Jaurequi could suggest a spot to talk, and Jaurequi led the FBI agents to the bedroom.

- Jaurequi chose to sit on the bed. Special Agent Brown sat on the other side of the bed, and Special Agent Marrone sat in the corner of the room. Neither FBI agent ever blocked the doors during the interview.

- Special Agents Brown and Marrone confirmed with Jaurequi that Jaurequi had waived his *Miranda* rights. Jaurequi told the FBI agents that he had waived his *Miranda* rights and that he understood his rights. The FBI agents reminded Jaurequi he was not under arrest, was not detained, and was free to leave if he wished.

- The atmosphere of the interview was friendly, but Jaurequi became emotional at times and cried. At no time during the interview did Special Agents Brown and Marrone ever raise their voices, yell, threaten, or insult.

- In the interview, Jaurequi first described Jetflicks as being in the airline services industry. Later, Jaurequi told the FBI agents that Jetflicks was in fact a streaming service. Jaurequi said that he knew that Jetflicks was illegal, but that one does not think of such things when one is trying to make ends meet. Jaurequi also told the FBI agents that he knew that Jetflicks had received letters from HBO and PayPal that Jaurequi understood to be about copyright

---

[9] Dallmann claims in his Motion to Suppress that he was never permitted to enter his home office at any time during the execution of the search warrant. Defendants offered no evidence in support of this claim at the hearing. His claim, directly contradicted by credible testimony from Tumbleson and Special Agent Lynch, is therefore not credible.

infringement. Jaurequi also mentioned a Drobo drive,[10] which the FBI agents mentioned they would be interested in locating.

- After the interview, which lasted about an hour, Jaurequi rejoined Dallmann in the main area of the house.

- Late in the evening following the search, Jaurequi emailed Special Agent Clay Chase to say that the Defendants had taken "care in looking for any other information or items that could aid in [the] investigation," and to share the "[v]ery good news" that Defendants had located the Drobo drive that Defendants had discussed with Special Agents Brown and Marrone. Hearing Gov't Ex. 12. Defendants offered to provide the Drobo drive to the FBI and invited the FBI agents to "stop by at anytime." *Id*. The email was forwarded by Jaurequi to Special Agent Brown.

- After Special Agent Chase responded, Jaurequi replied and asked when they could expect the return of the cellphones taken during the search. Jaurequi wrote: "We were also wondering about our phones. We . . . are a little worried as to why they weren't returned today as we had agreed to." *Id*. Special Agent Chase responded and informed Jaurequi that there was a delay with the copying and that the phones would be returned the following Monday. On November 20, 2017, FBI agents returned the two iPhone Xs to Defendants. At the same time, Defendants gave the FBI agents the Drobo drive and other evidence Defendants had located.

On February 19, 2020, the government filed a Renewed Motion Requesting Confirmation of Waiver of Attorney-Client Privilege.[11] On April 2, 2020, Dallmann filed a Motion to Suppress statements and evidence obtained in the search of his residence. On June 5, 2020, Jaurequi filed a Motion to Suppress statements and evidence obtained in the same search, and Defendants adopted and joined each other's motions. On September 17, 2020, arguments were heard and an evidentiary hearing was held on the motions.

## II.

In their Motions to Suppress, Defendants argue that they were subjected to custodial

---

[10] A Drobo drive is an external storage device manufactured by Drobo, Inc.

[11] On January 15, 2020, the government's motion to confirm waiver of attorney-client privilege with respect to an attorney memorandum was denied without prejudice. *See United States v. Dallmann*, 433 F. Supp. 3d 804 (E.D. Va. 2020).

interrogation, that their requests to speak with an attorney were denied, and that any statements they made were involuntary. Defendants next contend that they did not knowingly, intelligently, or voluntarily waive their *Miranda* rights. Defendants also argue that they were coerced to consent to the search of and reveal the passcodes for their cellphones. Jaurequi further contends that the search and seizure of his cellphone was done without any lawful warrant. Finally, Dallmann argues that the attorney memorandum seized by the FBI was beyond the scope of the warrant and that any waiver of privilege as to the document was the product of coercion. Defendants arguments are contradicted by the facts and unsupported in the law, and thus the motions to suppress must therefore be denied.

To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* adopted a series of procedural rules that must be followed during custodial interrogations. 384 U.S. 436, 444 (1966). It is well-settled that any statement elicited from a suspect in violation of these rules is inadmissible in the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298 (1985); *Harris v. New York*, 401 U.S. 222, 224 (1971). It is also settled that *Miranda* applies only to custodial interrogations, that is interrogations conducted after a suspect has been formally arrested or "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

For a defendant not under formal arrest during questioning, the custodial inquiry turns on whether, "under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest." *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013) (internal quotation marks and citations omitted). This objective inquiry asks whether a reasonable person in the suspect's position would have understood that he or she was in custody. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

Facts bearing on the custodial inquiry include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Hashime*, 734 F.3d at 283 (quoting *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010)). Other relevant factors include a suspect's isolation, separation from family, and physical restrictions. *Id*. at 283.

These principles, applied to the record in this case, point convincingly to the conclusion that Defendants were not in custody during the November 16, 2017 search and interviews. Significantly, at the commencement of the search and again throughout the day, Defendants were told repeatedly that they were not under arrest, were not detained, and were free to leave if they wished to do so. Defendants were not pressured to stay or to speak with the FBI agents, nor were Defendants promised anything in return for their cooperation. Defendants' movements were not restricted other than those restrictions required to ensure the safety of the agents conducting the search and the integrity of evidence seized during the search. Defendants chose where to sit and even had their dogs with them during the interviews. Defendants were not separated from each other until later in the day, when Jaurequi agreed to be interviewed separately. Dallmann's interview took place in the open concept living room until FBI agents began their search there, when the interview moved outside to chairs by the pool. Jaurequi's interview took place in the living room together with Dallmann until Jaurequi agreed to be interviewed separately to expedite matters. At that time, Jaurequi suggested having his interview in the bedroom, and the interview was conducted there. During the interviews, Defendants took at least two bathroom breaks and left to make coffee during the interviews. After the initial entry into the residence, weapons were never unholstered or pointed at Defendants. Although Defendants were anxious and became emotional

10

at times, the atmosphere was generally cordial and friendly. Finally, after the interview concluded and the FBI agents had left the house, Defendants reached out to the FBI agents to inform them that Defendants had located additional evidence that had not been seized during the search.[12] All these factors make clear and confirm that, under the totality of the circumstances, Defendants' freedom of action was never "curtailed to a degree associated with formal arrest." *Hashime*, 734 F.3d at 282.

Attempting to avoid this conclusion, Defendants argue that the situation here is analogous to that in *Hashime* and *Colonna*, where the Fourth Circuit found the defendants to have been in custody during interviews conducted amidst the execution of search warrants. *Hashime*, 734 F.3d at 278; *United States v. Colonna*, 511 F.3d 431 (4th Cir. 2007). These cases involved circumstances quite different from those present here. In *Hashime* and *Colonna*, the defendants were isolated from their families in small spaces with multiple agents—in a small storage room in *Hashime* and in the backseat of a car in *Colonna*. *Hashime*, 734 F.3d at 285; *Colonna*, 511 F.3d at 436. Here, Defendants stayed together, with their dogs, until Defendants freely and willingly agreed to separate interviews in order to expedite matters. Defendants were then interviewed in an open floor plan living room, a room of Jaurequi's choosing, and outside by a pool. In *Colonna*, the defendant was never told he was free to leave. *See Colonna*, 511 F.3d at 436. Here, Defendants were told multiple times throughout the day that they were not under arrest and were free to leave. In *Hashime* and *Colonna*, defendants were guarded and had their movements restricted. *See id.*; *Hashime* 734 F.3d at 285. In this case, Defendants chose where to sit during the interviews and took breaks to use the bathroom and to make themselves coffee. In short, *Hashime* and *Colonna*

---

[12] The tone of the email to Special Agent Chase confirms the testimony by government witnesses that the interactions were cordial and friendly. *See* Hearing Gov't Ex. 12.

do not support a finding that Defendants were in custody in this case.

Moreover, even if Defendants were in custody—they were not—Dallmann and Jaurequi knowingly, intelligently, and voluntarily waived their *Miranda* rights.

It is well-settled that, in the event a defendant is advised of his rights under *Miranda*, a defendant's confession during a custodial interrogation will not be suppressed if the defendant knowingly, intelligently, and voluntarily waives his *Miranda* rights. *See United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017). A defendant's statement made after a waiver of *Miranda* rights may be suppressed as involuntary under the Due Process Clause where the statement was "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). As the Fourth Circuit has made clear, "[t]he proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination is critically impaired" based on the totality of the circumstances surrounding the interview, including the "characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Braxton*, 112 F.3d 777, 780–81 (4th Cir. 1997). The government bears the burden of proving by a preponderance of the evidence that a defendant waived *Miranda* and that a statement was voluntary. *See id.* (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

Here, the government has established by convincing evidence that Defendants' waivers of *Miranda* rights were valid and that Defendants' statements were voluntary. At the beginning of the interview with Defendants, Special Agent Lynch gave each defendant *Miranda* waiver forms. Special Agent Lynch read through each *Miranda* right and asked Defendants to mark their initials next to each right on the form if they understood the right. Special Agent Lynch also asked if Defendants had any questions about the rights. Finally, Special Agent Lynch asked if Defendants

waived their rights and, if so, Defendants should sign the forms. Both Dallmann and Jaurequi signed the forms acknowledging and waiving their rights. During this process, there is no evidence that Defendants' "will[s] [had] been overborne or [that their] capacity for self-determination [was] critically impaired." *Braxton*, 112 F.3d at 780–81. Thus, the record makes clear that Defendants' waivers of their *Miranda* rights were voluntary, knowing, and intelligent, and therefore valid and effective. Thus, even assuming that Defendants were in custody—they were not—suppression is not warranted.

Defendants—who did not testify—further argue in their briefs that they both requested to speak with an attorney and were denied the opportunity to do so.[13] There is no record evidence to support this contention. On the contrary, the record clearly reflects that Defendants never asked to speak to an attorney during the execution of the search warrant. Defendants' argument in this respect is therefore meritless.

### III.

Defendants next contend that they were coerced into providing their cellphone passcodes and that they never gave voluntary consent to a search of their cellphones. Defendants also argue that the FBI did not have a warrant to search and seize Defendants' cellphones. Finally, Defendants argue that there was no probable cause to search and seize Jaurequi's cellphone. There is no evidence on the record to support any of Defendants' arguments, and thus Defendants' motions to suppress for these rationales must be denied.

---

[13] If true, this contention would support the suppression of any statements made after defendant requested an attorney only if the defendant were found to be in custody. *See Grueninger v. Dir., Virginia Dep't of Corr.*, 813 F.3d 517 (4th Cir. 2016) ("[O]nce a suspect invokes his right to counsel under *Miranda*, he is 'not subject to further interrogation' by the police. . . . If the police do interrogate a suspect in custody after he asserts his right to counsel, then any statements they elicit are per se inadmissible, even if the suspect is again advised of his Miranda rights.") (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)); *see also United States v. Holness,* 706 F.3d 579, 594 (4th Cir. 2013) (stating that the Fifth Amendment right to counsel applies only to custodial interrogation) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)).

The record makes clear that Defendants were not coerced, threatened, or pressured to provide their cellphone passcodes or to consent to the search of their phones. Special Agent Lynch told Defendants that the FBI agents might be able to image the phones on-site and therefore might not have to seize the phones if the Defendants were willing to give their consent and provide their passcodes. Both Defendants agreed, and Dallmann signed a consent form in which he provided passcodes for several devices,[14] including his and Jaurequi's cellphones.[15] This evidence clearly establishes that Defendants voluntarily provided their passcodes and voluntarily consented to the search of their phones.

Furthermore, even if Defendants did not consent to the search of their cellphones, the search warrant clearly authorizes the search and seizure of Defendants' cellphones and the data from the phones.[16] The search warrant specifically allows for the search and seizure of any "wireless telephone . . . that contains or in which are stored records or information that is otherwise called for by this warrant." *Id.* at Attachment B, at 3.[17] Thus, even absent consent, the FBI could

---

[14] Although Jaurequi argues that he did not sign the consent form and therefore did not consent, the evidence at the hearing conclusively establishes that both Defendants consented to the search and the provision of their passcodes.

[15] In the end, Forensic Examiner Kern was unable to image the cellphones on-site and had to take the phones back to the lab. It should be noted that the fact that Kern was unable despite his best effort to image the phones on site and that the FBI agents thus were unable to return the phones for a few days does not make the exchange in any way coercive.

[16] Defendants cite the inapposite cases of *Riley v. California*, 573 U.S. 373 (2014) and *United States v. Burton*, 756 F. App'x 295 (4th Cir. 2018) to support the argument that the FBI had to get a second warrant to search the cellphones. These cases are inapplicable here. In *Riley*, the Supreme Court held that law enforcement must apply for a second warrant to search a cellphone seized incident to an arrest. *Riley*, 573 U.S. at 403. No arrest took place in this case. Contrary to *Riley*, the search warrant here specifically authorized the search and seizure of cellphones at the property, including the data contained on the phones. *Burton* is also clearly distinguishable. There, the Fourth Circuit made no decision as to whether separate home and cellphone search warrants were overbroad, but instead determined only that even if the warrants were overbroad, the good faith exception applied to save the search. *Burton*, 756 F. App'x at 303-04. Contrary to Defendants' argument, the Fourth Circuit did *not* hold that the search of a cellphone is not encompassed by a warrant to search a house. In any event, the search warrant in this case specifically included the search and seizure of cellphones and their contents.

[17] Indeed, the search warrant also establishes a protocol for searching electronic data seized pursuant to the warrant. *Id.* at Attachment C.

have searched and seized Defendants' cellphones consistent with the Fourth Amendment.[18]

Finally, probable cause to search Jaurequi's cellphone clearly exists. The affidavit in support of the search warrant set forth ample evidence for the magistrate judge to conclude that there was a fair probability that contraband or evidence of criminal copyright infringement would be found on electronic devices in the residence, including Jaurequi's cellphone. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). The search warrant affidavit describes Jaurequi as "assist[ing] with the management of [Jetflicks]," among other specific tasks related to criminal copyright infringement. Hearing Gov't Ex. 1, ¶ 35. Combined with the ample evidence provided in the affidavit describing Jetflicks as infringing copyright on a massive scale and the use of electronic devices to perpetrate that infringement, there was more than sufficient evidence for the magistrate judge to conclude that there was a fair probability that contraband or evidence of criminal copyright infringement would be found at Defendants' residence generally and on Jaurequi's phone specifically.[19]

## IV.

Defendants next argue that a January 2008 attorney memorandum was improperly seized during the search of Defendants' residence because it was beyond the scope of the search warrant. Defendants' argument fails. Although the seized document was outside the date range of documents permitted to be seized by the search warrant, the document was properly seized under the plain view exception.

---

[18] If Defendants had not provided their passcodes and their consent to the search, the FBI would have used other methods to extract the cellphone data. The search and seizure of the cellphone data was thus inevitable. *See United States v. Bullete*, 854 F.3d 261, 265 (4th Cir. 2017) (stating that the inevitable discovery doctrine allows the government to use information obtained from an otherwise unreasonable search if the government can establish by a preponderance of the evidence that the evidence would inevitably have been discovered by lawful means).

[19] Indeed, considerable evidence was found on Jaurequi's cellphone relating to Defendants' management of Jetflicks. *See* Gov't Resp. to Jaurequi Mot. to Suppress, at 14-15, Dkt. 320.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures," and provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment's particularity requirement "protects against 'exploratory rummaging in a person's belonging . . . by requiring a particular description of the things to be seized.'" *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)). To satisfy the particularity requirement, a warrant must identify the items to be seized by their relation to the designated crimes and must describe the item in a manner that leaves nothing to the discretion of the officer executing the warrant. *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (citing *Andresen v. Maryland*, 427 U.S. 463, 480–82 (1976)). A search conducted pursuant to a warrant "is limited in scope by the terms of the warrant's authorization." *United States v. Phillips*, 588 F.3d 218, 223 (4th Cir. 2009).

It is well-settled that unless an exception applies, the Fourth Amendment requires law enforcement officers to obtain a warrant before they conduct a search. The plain view doctrine is one such exception. *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997). Under the plain view doctrine, incriminating evidence may be seized without a warrant when:

(i) the officer is lawfully in a place from which the object may be plainly viewed;

(ii) the officer has a lawful right of access to the object itself; and

(iii) the object's incriminating character is immediately apparent.

*United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).

Applied here, the plain view exception to the warrant requirement clearly allows for the

seizure of the attorney memorandum. The scope of the search warrant at issue authorized seizure of "records and information from October 1, 2011 to present" relating to offenses including conspiracy and criminal copyright infringement. Hearing Gov't Ex. 1, Attachment B, at 1. Although the January 2008 attorney memo is outside the scope of the warrant, it clearly fits within the plain view exception to the warrant requirement. The FBI agents (i) were authorized by a lawful search warrant to be in Defendants' residence, (ii) were authorized to search the filing cabinet in Defendants' office and examine all documents within for evidence of criminal copyright infringement,[20] and (iii) were able to identify the incriminating character of the memorandum immediately.[21] Thus, the FBI's seizure of the attorney memorandum did not violate Defendants' Fourth Amendment rights.[22]

## V.

The Defendants next argue that the attorney memorandum is protected by attorney-client privilege. Because Dallmann voluntarily disclosed substantive legal advice he received from his attorney, Dallmann waived attorney-client privilege with respect to attorney communications

---

[20] *See*, *e.g. United States v. Gray*, 78 F. Supp. 2d 524, 528 (E.D. Va. 1999) ("[R]ecords searches require that many, and often all, documents in the targeted location be searched because few people keep documents of their criminal transactions in a folder marked 'crime records.' Thus, agents authorized by warrant to search a home or office for documents containing certain specific information are entitled to examine all files located at the site to look for the specified information. . . . If an agent sees, in plain view, evidence of criminal activity other than that for which she is searching, this does not constitute an unreasonable search under the Fourth Amendment.") (internal quotations and citations removed).

[21] Government counsel has not viewed the document as it awaits decision on the government's motion to confirm waiver of attorney-client waiver and on whether the Defendants will assert advice-of-counsel defense. *See* Gov't Renewed Mot. Requesting Confirmation of Waiver of Att'y-Client Privilege (Dkt. 197). However, it is clear from the Court's *in camera* review of the document and from Dallmann's statements regarding the memorandum that the incriminating character of the document is apparent on its face.

[22] It should be noted that even if the document were improperly seized under the warrant and the plain view exception, Dallmann consented to the search and seizure of the attorney memo. *See Schenckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). During a voluntary interview with FBI agents, Dallmann volunteered information about the memorandum, described its location, and led Special Agent Lynch to find it.

related to those specific subject areas.

The standard for application of the attorney-client privilege is well-settled.[23] As the Fourth Circuit has made clear, "[b]ecause the attorney-client privilege exists for the benefit of the client, the client holds the privilege." *In re Grand Jury Proceedings #5*, 401 F.3d 247, 250 (4th Cir. 2005). A client can therefore waive the attorney-client privilege, either "expressly or through his own conduct." *Hanson v. U.S. Agency for Intern. Dev.*, 372 F.3d 286, 293–94 (4th Cir. 2004) (citing *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355–56 (4th Cir. 1984)). As the Fourth Circuit has explained, "[i]mplied waiver occurs when a party claiming the privilege has *voluntarily* disclosed confidential information on a given subject matter to a party not covered by the privilege." *Hanson*, 372 F.3d at 294 (emphasis in original). A disclosure of this nature "vitiates the confidentiality that constitutes the essence of the attorney-client privilege." *Hawkins v. Stables*, 148 F.3d 379, 384 n. 4 (4th Cir. 1998).

Here, Dallmann voluntarily disclosed the substance of legal advice that Dallmann received from an attorney. Specifically, Dallmann told Special Agent Lynch that an attorney had advised Dallmann that Jetflicks could operate legally in three categories, and that the attorney had authored a memorandum for Dallmann detailing the three categories in which Jetflicks could operate

---

[23] The Fourth Circuit has held that the attorney client privilege applies if:

(1) the asserted holder of the privilege is or sought to become a client;

(2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer;

(3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and

(4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982).

legally. Dallmann also told Special Agent Lynch that the FBI agents would find that memorandum among the records in the residence, and later led Special Agent Lynch to the office to find the memo. These statements revealed information protected by the attorney-client privilege, namely the legal advice Dallmann received from his attorney.[24] As addressed *supra*, Dallmann's statements to the FBI were voluntary and uncoerced. Thus, Dallmann's voluntary statements constitute an implied waiver of attorney-client privilege.

Seeking to avoid this result, Dallmann argues that the statements were not sufficiently detailed to result in any waiver of attorney-client privilege. Defendant's argument is unpersuasive. Importantly, Dallmann did not merely state to the FBI that he consulted with an attorney or that he was acting on the advice of counsel. *Cf. In re Grand Jury Subpoena Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986) ("[T]he assertion that the corporation was acting upon the advice of counsel does not establish without more . . . that the attorney client privilege was waived."). Rather, Dallmann disclosed the substance of an attorney's advice and described how Dallmann sought, received, and followed that advice.

As the Fourth Circuit has explained, a voluntary disclosure of a confidential communication to a third party waives the privilege as to the specific information revealed and "as to the subject matter of the disclosure." *Hawkins*, 148 F.3d at 384 n. 4; *see also Jones*, 696 F.2d at 1072 ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter.") (citing *In re Sealed Case*, 676 F.2d 793, 808–09 (D.C. Cir. 1982)). Put another

---

[24] *See United States v. Under Seal* (*In re Grand Jury Proceedings*), 102 F.3d 748, 750 (4th Cir. 1996) ("No doubt exists that, under normal circumstances, an attorney's advice provided to a client, and the communications between attorney and client are protected by the attorney client privilege.") (citing *Upjohn v. United States*, 449 U.S. 383, 389 (1981)).

way, a waiver resulting from a voluntary disclosure is not "confined to the particular words used to express the communication's content but extends to the substance of a communication." *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984) (quotation marks removed).

Here, Dallmann's disclosure of the legal advice he received waived attorney-client privilege as to documents and communications related to the following subject matters:

> (i) Communications related to the legal advice the attorney provided regarding requests to remove content from Jetflicks and potential liability for not removing content;
>
> (ii) the attorney memorandum describing the ability of Jetflicks to operate legally in three categories; and
>
> (iii) the legal advice the attorney provided regarding the Motion Picture Association of America's cease-and-desist letter.

Seeking a broader waiver of attorney-client privilege, the government argues that Dallmann's overall operation of Jetflicks is the subject matter of Dallmann's disclosure. The government's argument as to the scope of waiver appears to rely on Dallmann's statement that Dallmann had paid $3,000 to an attorney for legal advice on "what I can do, what can't I do" with respect to streaming television shows on Jetflicks. However, this statement does not determine the scope of Dallmann's subject matter waiver because "[a] general assertion lacking substantive content that one's attorney has examined a certain matter is not sufficient to waive the attorney-client privilege." *United States v. White*, 887 F.2d 267, 270–71 (D.C. Cir. 1989). Rather, Dallmann's statements disclosing the substantive legal advice he received determine the scope of the waiver.[25] Thus, the waiver is not as broad as the government seeks and is limited to the three categories identified above.

---

[25] Fourth Circuit precedent supports this holding. *See*, *e.g.*, *Hawkins*, 148 F.3d at 379 (finding waiver of attorney-client privilege in defendant's statement that the defendant had not discussed a wiretap with defendant's attorney, but limiting waiver to the wiretapping issue, stating that the waiver "does not open up the possibility of a fishing expedition of all confidential communications").

## VI.

In conclusion, Defendants were never in custody during their interviews with the FBI because, under the totality of the circumstances, Defendants' freedom of action was never "curtailed to a degree associated with formal arrest." *Hashime*, 734 F.3d at 282. Furthermore, even if Defendants were found to be in custody, Dallmann and Jaurequi knowingly, intelligently, and voluntarily waived their *Miranda* rights. Defendants motions to suppress statements made in their interviews with the FBI therefore must be denied.

Additionally, the search and seizure of Defendants' cellphones was lawful, permitted by the search warrant, and voluntarily consented to by Defendants. The attorney memorandum was lawfully seized because it was in plain view during a lawful search and was incriminating on its face. Finally, Dallmann waived attorney-client privilege as to the attorney memo and related attorney communications because Dallmann voluntarily disclosed the substance of the legal advice he received related to those matters.

An appropriate Order will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
December 11, 2020

/s/

T. S. Ellis, III
United States District Judge

21