IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

UNITED STATES OF AMERICA

v.

KRISTOPHER LEE DALLMANN,

DOUGLAS M. COURSON,

FELIPE GARCIA,

JARED EDWARD JAUREQUI,
    a/k/a Jared Edwards,

PETER H. HUBER,

YOANY VAILLANT,
    a/k/a Yoany Vaillant Fajardo,

                        *Defendants.*

Crim. No. 1:19-CR-253

The Honorable T.S. Ellis, III

Trial: January 11, 2022

## GOVERNMENT'S SECOND TRIAL BRIEF

For years, Defendant Kristopher Dallmann and his co-defendants ran an online streaming service known as Jetflicks that amassed an enormous catalog of pirated television series and, for a fee, made those works available for streaming and, at times, downloading to thousands of subscribers around the United States.  Dallmann and five of his co-conspirators will be tried on January 11, 2022, on various criminal offenses arising from their agreement to reproduce television episodes without permission from the copyright owners.  The United States, in an effort to simplify and shorten the trial, filed a combined trial brief and motions *in limine* on March 26, 2021.  The Court has committed to rendering as many pretrial rulings on the

admissibility of the government's exhibits as possible, and has directed the government to file a second trial brief to aid that effort.  Accordingly, we file this second trial brief.[1]

## I.     Elements of the Charged Offenses

Each of the six defendants who are proceeding to trial have been charged by indictment with one count of conspiracy to commit criminal copyright infringement, in violation of 18 U.S.C. § 371 (Count One).  In addition, Dallmann has been charged with two counts of misdemeanor criminal copyright infringement by distribution or aiding and abetting, in violation of 17 U.S.C. §§ 506(a)(1)(A), 106(1), and 106(3) and 18 U.S.C. §§ 2319(b)(3) and 2; two counts of misdemeanor criminal copyright infringement by public performance or aiding and abetting, in violation of 17 U.S.C. §§ 506(a)(1)(A) and 106(4) and 18 U.S.C. §§ 2319(b)(3) and 2; three counts of money laundering by promotion or concealment, or aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i), and 2; and one count of money laundering by promotion or concealment, or aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(3)(A), (B), and 2.

We briefly summarize below the elements applicable to each of these offenses, beginning with the substantive criminal copyright infringement offenses.

### A.     Criminal Copyright Infringement

To convict Dallmann of the misdemeanor counts of criminal copyright infringement, we must prove three elements.  It is our burden to establish that a particular work was copyrighted, that Dallmann willfully infringed that copyright, and Dallmann did so for the purpose of commercial advantage or private financial gain.  17 U.S.C. § 506(a)(1)(A); 18 U.S.C. § 2319(b)(3).

---

[1] This brief exceeds the page limits set forth in the Local Rules.  On August 13, 2021, we moved orally in open court to file an oversized brief, and the Court granted that request.

Proving that any given work was copyrighted is a straightforward endeavor. This is because any original work with some minimal degree of creativity becomes copyrighted the moment it is fixed in a tangible medium of expression. 17 U.S.C. § 102(a); *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). Indeed, the Copyright Act specially protects audiovisual works like television episodes, 17 U.S.C. § 102(a)(6). In addition, if a copyright owner registers a work with the U.S. Copyright Office before or within five years after publication of the work, then the resulting certification of registration provides additional *prima facie* evidence that the work is protected by a copyright. *Id.* §§ 410(c) & 411

Equally straightforward is establishing infringement of a copyrighted work for purposes of commercial advantage or private financial gain. The Copyright Act gives owners of copyrighted works six exclusive rights, including reproduction, distribution, and public performance.[2] *Id.* § 106(1) (reproduction), (3) (distribution), & (4) (public performance). Infringement, accordingly, occurs when someone violates an exclusive right of a copyright owner, such as by making an unauthorized copy of a copyrighted work or distributing or streaming a copyrighted work without authorization. *Id.* Further, we can show that the infringement was for commercial advantage or private financial gain without proving that the infringement resulted in an actual financial benefit. That is, it is sufficient to show the infringement was done in hopes of making a profit. *United States v. Cross*, 816 F.2d 297, 301 (7th Cir. 1987); *United States v. Shabazz*, 724 F.2d 1536, 1540 (11th Cir. 1984).

---

[2] Streaming a copyrighted work implicates the public performance right. 17 U.S.C. § 101; *see also, e.g., American Broadcasting Companies, Inc. v. Aereo*, 573 U.S. 431, 451 (2014); *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 910-13 (D.C. Cir. 2018); *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002), *aff'd*, 342 F.3d 191 (3d Cir. 2003), *as amended* (Sept. 19, 2003).

As for the willfulness element, we have adopted the Ninth Circuit's formulation of the applicable *mens rea* and are prepared to prove a "voluntary, intentional violation of a known legal duty." *United States v. Anderson*, 741 F.3d 938, 948-49 (9th Cir. 2013); *United States v. Liu*, 731 F.3d 982, 989-90 (9th Cir. 2013); *see also United States v. Moran*, 757 F. Supp. 1046, 1050–51 (D. Neb. 1991). The upshot is that we must prove an intent to infringe on copyrighted works knowing that such conduct was against the law. We do not have to prove, however, knowledge of a specific provision of law. *See Anderson*, 741 F.3d at 948 (stating that the applicable *mens rea* standard is that the defendant generally knew that he was violating a legal duty, not that he specifically knew that his actions constituted "copyright infringement"); *cf. United States v. Reichert*, 747 F.3d 445, 451 (6th Cir. 2014) (declining to define the "reach" of the willfulness requirement for the Digital Millennium Copyright Act, 17 U.S.C. § 1204(a), but observing that the parties' agreement that the government had to prove a voluntary and intentional violation of a known legal duty was consistent with the principle that "a defendant need not be aware of the specific provision of law that his conduct violates, as long as he is aware that his act is illegal." (citing *Bryan v. United States,* 524 U.S. 184, 196 (1998))).

Alternatively, we can establish willfulness by proving deliberate ignorance. To do so, we must prove awareness of a high probability that copyrighted works were being infringed upon in violation of the law and deliberate disregard of that probability. *See United States v. Hale*, 857 F.3d 158, 171 (4th Cir. 2017); *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017); *United States v. Suado Mohamed Ali*, 735 F.3d 176, 187-88 (4th Cir. 2013). Establishing willful blindness instead of actual knowledge is particularly appropriate where warning signs of illegality are ignored. Otherwise, "[t]o allow the most clever, inventive, and sophisticated wrongdoers to hide behind a constant and conscious purpose of avoiding knowledge of criminal

4

misconduct would be an injustice in its own right." *United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012).

**B.      Conspiracy to Commit Criminal Copyright Infringement**

To obtain convictions for conspiring to commit copyright infringement, we must prove three elements beyond a reasonable doubt.  Specifically, it is our burden to "establish an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy."  *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004).

With respect to the agreement element, we must prove a "'tacit or mutual understanding' between conspirators" to commit the object of the conspiracy.  *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997) (quoting *United States v. Chorman*, 910 F.2d 102, 109 (4th Cir. 1990)). "[A]ctual achievement of the object is not required," however, "because the essence of a conspiracy is the agreement to commit a crime or crimes."  *United States v. Johnson*, 149 F. Supp. 3d 678, 684 (E.D. Va. 2016) (Brinkema, J.); *see also United States v. Gitarts*, 341 F. App'x 935, 941 (4th Cir. 2009) (per curiam) (explaining in the context of a criminal copyright conspiracy prosecution that "the Government need not prove 'that the object of the conspiracy was achieved or could have been achieved, only that the parties agreed to achieve it.'" (quoting *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004))).  The agreement element also requires proof beyond a reasonable doubt that each charged co-conspirator entered into the conspiracy "'with knowledge of the criminal purpose of the scheme and with the specific intent to aid in the accomplishment of those unlawful ends.'"  *Id.* (quoting *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003)).

The Indictment alleges that the object of the charged conspiracy was to infringe copyrighted works by reproduction or distribution.  We, however, have advised the Court and the

defendants that we will seek to prove at trial only that the defendants conspired to infringe copyrighted works by reproduction.  (Gov't Proposed *Voir Dire* Questions at 2, Dkt. 603.)  The upshot of our decision to focus on reproduction rather than distribution for the conspiracy count is that we must establish beyond a reasonable doubt that each defendant agreed with at least one other person to willfully download or copy works that were copyrighted for the purposes of commercial advantage or private financial gain.  *See United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010) (stating that "when the Government charges in the conjunctive, and the statute is worded in the disjunctive, the district court can instruct the jury in the disjunctive.").

We also must quantify at trial the number of infringed television episodes reasonably foreseeable to each co-conspirator as a necessary or natural consequence of the unlawful agreement.  *United States v. Collins*, 415 F.3d 304, 314 (4th Cir. 2005).  This is because conspiring to commit criminal copyright infringement constitutes a felony offense if the object of the conspiracy was to reproduce during any 180-day period at least 10 copies of 1 or more copyrighted works having a total retail value of more than $2,500.  18 U.S.C. § 2319(b)(1).  Retail value in this context "refers to the value of copies of the copyrighted material at the time the defendant committed the violation . . . ."  *United States v. Armstead*, 524 F.3d 442, 443 (4th Cir. 2008) (citing 18 U.S.C. § 2311).  Moreover, "retail value is determined by taking the highest of the 'face value,' 'par value,' or 'market value' of copies of the copyrighted material in a retail context."  *Id.*

### C.    Elements of Money Laundering Under § 1956(a)(1)

Dallmann also is charged with three counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i).  Sections 1956(a)(1)(A)(i) and (a)(1)(B)(i) share three

common elements.  To convict Dallmann of either or both statutory provisions, the government

must prove each of the following beyond a reasonable doubt:

a.        Dallmann conducted or attempted to conduct a financial transaction having at least a minimal effect on interstate commerce or involving the use of a financial institution which is engaged in, or the activities of which have at least a minimal effect on, interstate or foreign commerce;

b.        The property that was the subject of the transaction involved the proceeds of the alleged specified unlawful activity; and

c.        Dallmann knew that the property involved represented the proceeds of some form of unlawful activity

For purposes of § 1956(a)(1)(A)(i), we also must prove a fourth element: Dallmann engaged in

the charged financial transactions with the intent to promote the carrying on of the conspiracy to

commit criminal copyright infringement.[3]  *United States v. Wilkinson*, 137 F.3d 214, 220 (4th

Cir. 1998).  Whereas, for purposes of § 1956(a)(1)(B)(i), the fourth element we must prove is

that Dallmann knew the transaction was designed in whole or in part to conceal or disguise the

nature, the location, the source, the ownership, or the control of the proceeds of the alleged

specified unlawful activity.  *Id.* at 221.

### D.      Elements of Money Laundering Under § 1956(a)(3)

The Indictment also alleges that Dallmann unlawfully laundered monetary instruments in

violation of 18 U.S.C. §§ 1956(a)(3)(A) or (a)(3)(B).  Again, each provision constitutes an

independent basis on which Dallmann can be convicted of money laundering.

Sections 1956(a)(3)(A) and (a)(3)(B) share one common element.  To convict Dallmann

of either or both of these statutory provisions, we must prove beyond a reasonable doubt that

---

[3] Although the government must prove that the illegal proceeds were spent in furtherance of the specified unlawful activity, the government is not required to trace the proceeds to a particular illegal transaction.  *United States v. Stewart*, 256 F.3d 231, 249 (4th Cir. 2001).

Dallmann conducted or attempted to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity.  Section 1956(a)(3)(A) also requires us to prove beyond a reasonable doubt that Dallmann conducted or attempted to conduct the financial transaction with intent to promote the carrying on of the alleged specified unlawful activity.  And § 1956(a)(3)(B) obligates us to establish that Dallmann conducted or attempted to conduct the financial transaction with intent to conceal or disguise the nature, the location, the source, the ownership, or the control of property believed to be the proceeds of the alleged specified unlawful activity.

### E.      Elements of Aiding and Abetting

Another theory of liability alleged for the substantive counts of the Indictment is that Dallmann aided and abetted the commission of those offenses.  Section 2(a) of Title 18 of the U.S. Code provides that a person who aids, abets, counsels, commands, induces, or procures the commission of a federal crime is punishable as a principal, and § 2(b) provides that a person who willfully causes an act to be done, which if directly performed by him or another would be a federal crime, is punishable as a principal.  The law, in other words, recognizes that ordinarily anything a person can do for himself may also be accomplished by him through direction of another person as his agent, or by acting in concert with, or under the direction of another person. *United States v. Chorman*, 910 F.2d 102, 108-15 & n.9 (4th Cir. 1990).  Consequently, Dallmann can be convicted of the substantive offenses alleged against him in the Indictment either as a principal or as an aider and abettor.

To establish Dallmann's guilt under either §§ 2(a) or 2(b), we must prove beyond a reasonable doubt each element of the corresponding offense.  In addition, for purposes of § 2(a), we must prove beyond a reasonable doubt that Dallmann knowingly and voluntarily aided,

abetted, counseled, commanded, induced, or procured the commission of the charged offenses. Similarly, for purposes of § 2(b), we must prove beyond a reasonable doubt that Dallmann willfully caused an act to be done which if directly performed by him or another would constitute an offense against the United States, namely the crimes charged in the Indictment.

## II.    Summary of Facts Expected to Be Proved at Trial Relating to Exhibits at Issue

We expect to prove at trial that Dallmann and his co-conspirators engaged in massive online piracy for commercial advantage or private financial gain, and did so despite knowing such conduct was illegal.  As explained below, the evidence introduced at trial will show that Dallmann and his co-conspirators used sophisticated computer scripts and software to scour pirate websites for television episodes, including episodes that had recently aired or were about to air, and download as much content as possible to servers that Dallmann and his co-conspirators controlled.  The evidence also will show that Dallmann and his co-conspirators subsequently processed and uploaded the stolen content to *jetflicks.mobi*, and permitted paid subscribers located in this District and elsewhere to stream and sometimes download the pirated episodes.  Further, we will prove that Dallmann and his co-conspirators used the illicit proceeds they generated to enrich themselves and to promote their piracy operation.[4]

### A.    The Failure of Jetflicks the Aviation Services Company, the Pivot to Piracy, and the Birth of a Cover Story

We will establish at trial the origins of the unlawful agreement to commit digital piracy, and we will show how Dallmann and his co-conspirators used an idea for an aviation-services business to disguise their illegal streaming operation.  As explained below, Dallmann initially pitched Jetflicks to owners of private aircraft as a service for digitizing personal DVD collections

---

[4] Part II is merely a summary of the primary facts we expect to prove at trial.  We reserve the right to establish additional facts at trial.

but there was little interest in such a service.  For clarity, we will refer to that business here as "Jetflicks the Aviation Services Company" or "JASC."

In spite of lack of interest from potential clients, JASC was not a complete failure. Dallmann realized a lot of money could be made by stealing television episodes and streaming them for a fee, and JASC provided a suitable cover story for recruiting conspirators and staving off scrutiny from payment processors, banks, or even law enforcement.

The jury will learn about the pivot to piracy from the testimony of FBI Supervisory Special Agent (SSA) Tim Lynch.  In November 2017, Dallmann agreed to be interviewed by SSA Lynch during the course of the FBI's execution of search warrants at Dallmann's two homes in Las Vegas, Nevada.  SSA Lynch's anticipated testimony will include the fact that Dallmann initially minimized his involvement in piracy and claimed JASC was his primary source of income.  Yet, SSA Lynch also is expected to testify that Dallmann admitted, among other things, that in 2007, he created JASC and turned to piracy because JASC was not profitable and illegal streaming provided a stream of income to grow JASC.  SSA Lynch further will testify that, beginning in 2007, Dallmann started streaming television episodes for a fee via *jetflicks.mobi*, and from 2007 to 2008, Dallmann worked with at least one unindicted co-conspirator he had known since 2004 to download television episodes from torrent sites.[5]

SSA Tim Lynch also is expected to testify that he confronted Dallmann with emails from two of Jetflicks's payment processors: PayPal and Stripe.  The PayPal email accused Jetflicks of copyright violations and requested proof that *jetflicks.mobi* was not being used to sell infringing

---

[5] SSA Lynch is expected to testify that, while Dallmann did not specify the dates that this individual helped download content from torrent sites, it can be inferred that this conduct occurred in 2007 or 2008 given that Dallmann indicated he sourced content from torrent sites for about a year and that the individual agreed to help Dallmann download content from torrent sites so that Dallmann could focus on other things.

items,[6] and Stripe requested access to *jetflicks.com*, which was the website that Dallmann gave Stripe when he created an account for Jetflicks.[7]  We anticipate SSA Lynch will testify that Dallmann admitted he responded to PayPal by providing documentation showing that Jetflicks was an aviation services company.[8]  SSA Lynch also is expected to testify that Dallmann admitted he sent an email to Stripe describing Jetflicks as an in-flight entertainment company,[9] which Dallmann admitted was a lie.

### B.       The Use of Criminal Proceeds to Support the Streaming Conspiracy

We will show at trial that, consistent with Dallmann's later statements to the FBI, the streaming conspiracy predominated.  Indeed, FBI Special Agent (SA) Clay Chase will testify that, unlike JSAC, thousands of people signed up to stream stolen television episodes through *jetflicks.mobi*.  SA Chase, for instance, will highlight a chat between Dallmann and Defendant Luis Villarino, who has already pled guilty to conspiring with Dallmann and Defendant Jared Jaurequi to commit criminal copyright infringement, in which Dallmann estimated that, in 2017, Jetflicks had 30,000 customers and had made $1,600,000 between 2014 and 2016.[10]  We,

---

[6] *See* Government's Exhibit (GX) 126 (Oct. 24, 2016 Email) at 1-2.

[7] *See* GX 134 (Nov. 9, 2016 Email) at 2-3.

[8] This effort to dupe PayPal did not work.  SA Chase will testify about GX 126A, which is an email from PayPal dated October 27, 2016.  The email indicates that Dallmann had contacted PayPal about the limitation on his account, but PayPal wanted access to *jetflicks.mobi* so that it could verify the legality of the sales through the site and "valid licensure or proof of authorisation from the relevant parties and owners of the movies that states you have permission to offer their movies on www.jetflicks.mobi."

[9] *See* GX 134 at 1-2.

[10] GX 161 (Mar. 12, 2017 Google Chat) at 1.

moreover, expect to call at trial three former subscribers of Jetflicks.[11]  This testimony will establish that there were individuals located in the Eastern District of Virginia who were making subscription payments to Jetflicks and streaming stolen content to this District since at least 2011.

We also will prove at trial how Dallmann and his co-conspirators used JASC's corporate facade to facilitate the transfer of money from individuals who subscribed to Jetflicks.  In this regard, we will focus on four legitimate businesses on which Jetflicks relied to acquire and move criminally derived proceeds: PayPal, Bank of America, Stripe, and Wells Fargo.  FBI SA Jeff Schurott will testify that Dallmann used a PayPal account to receive Jetflicks subscriber payments, which he then funneled to his Bank of America account.  After PayPal froze Dallmann's account as discussed above, Dallmann switched from PayPal to Stripe and moved from Bank of America to Wells Fargo.

SA Schurott and SA Chase will show that Dallmann sought to use JSAC to deceive all four companies.  According to PayPal records, in opening or maintaining a PayPal account, Dallmann did not mention *jetflicks.mobi* or his illegal streaming business.[12]  Nor did he do so in opening or maintaining a Bank of America account.[13]  With respect to Stripe, SA Schurott and SA Chase will note that the Stripe account for Jetflicks lists the applicable domain as "jetflicks.com," and Dallmann described the business as providing in-flight entertainment

---

[11] The identities of these individuals and all other potential civilian witnesses mentioned herein have been disclosed to the defendants as part of the discovery produced to date.

[12] GX 413 (setting forth subscriber information for the Jetflicks PayPal account ending in 1360).

[13] GX 418 (setting forth account opening information for an account ending in 4488).

services.[14]  Similarly, as for Wells Fargo, SA Schurott and SA Chase will testify that, even though Jetflicks was a subscription-based streaming service offering access to popular television episodes, Dallmann described Jetflicks in his Wells Fargo application quite differently.  He stated that Jetflicks offered "In Flight Entertainment for Private Jets."[15]

We anticipate calling at trial a witness from Stripe who will explain that Stripe relied on Dallmann's misrepresentations.  This witness is expected to testify that Stripe has anti-money laundering initiatives designed to ensure clients are engaged in legitimate business.  This witness, moreover, will testify that if Dallmann had told Stripe the true nature of Jetflicks, then Stripe would have closed the account and denied Dallmann access to the financial services that were critical to the execution of his criminal scheme.  Of course, Dallmann concealed the true nature of Jetflicks and the true source of the money that was to flow through Stripe precisely so he could use Stripe to launder the proceeds of his criminal conduct.

Furthermore, we will prove that, once Dallmann was in possession of the proceeds of his criminal copyright scheme, he kept a portion of the money for himself and used a portion of the money to conduct financial transactions to promote the carrying on of the criminal copyright scheme.  SA Schurott, for example, will testify about the following business records from Stripe, Wells Fargo, PayPal, and Bank of America:

- Purchases that Dallmann made with money in his Wells Fargo account from approximately October 2016 to April 2017,[16] which establish a payment to DNS Made Easy on January 11, 2017,

---

[14] GX 407A (setting forth account opening information for a Stripe account).

[15] GX 409 (setting forth account opening information for a Wells Fargo account).

[16] Wells Fargo is an FDIC insured financial institution.  Accordingly, transactions involving Wells Fargo affect interstate commerce.  *United States v. Peay*, 972 F.2d 71, 75 (4th Cir. 1992).

relating to Jetflicks's web servers,[17] a payment to Villarino on January 27, 2017, for computer programming and coding services to Jetflicks, and a payment to OVH in Canada on February 9, 2017, relating to the rental of servers for Jetflicks.[18]

- Payments made from Jetflicks subscribers to PayPal from about June 2016 to August 2016, which establish that shortly before the money laundering transaction alleged in Count Fifteen in the Indictment, the undercover agent in this District transferred money to PayPal to pay for a Jetflicks subscription.[19]

- Transfers of funds (including funds collected from Jetflicks subscribers in this District) from PayPal to the Jetflicks Bank of America account from approximately June 2016 to August 2016, which establish PayPal made payments to Jetflicks that coincided with the charged money laundering transactions.[20]

- Purchases that Dallmann made with money in his Bank of America account from about August 2016 to October 2016, which establish a payment to CenturyLink on October 3, 2016, for the lease of an IP address for use with Jetflicks.[21]

- Payments made from Jetflicks subscribers to Stripe from approximately November 2016 to February 2018, showing that, shortly before each of the money laundering transactions charged in

---

[17] GX 151 (Dec. 30, 2016 Texts) at 1 (Dallmann informs Villarino that he has "activated dnsmadeeasy.com" and that he would "like to setup vanity nameservers").

[18] GX 410 (Wells Fargo account statements for October 31, 2016, to March 31, 2017).

[19] GX 414A (PayPal records of payments received between June 29, 2016, and August 21, 2016). The undercover operation is discussed *infra*.

[20] GX 414B (PayPal records of withdrawals between June 29, 2016, and August 20, 2016).

[21] GX 420 (Bank of America account statements between August and October 2016). SA Chase, in addition, will discuss GX 123 and GX 918. The former are text messages between Dallmann and Vaillant dated October 13, 2016, in which Dallmann tells Vaillant that CenturyLink is providing a "static IP." The latter is a note found on Dallmann's Apple iPhone, the seizure and examination of which is discussed *infra*, that states the static IP provided by CenturyLink is 67.77.106.136.

Counts Twelve to Fourteen of the Indictment, subscribers located in this District transferred money to Stripe to pay for their Jetflicks subscriptions.[22]

- Transfers of funds (including funds collected from Jetflicks subscribers in this District) from Stripe to Dallmann's Wells Fargo account between about November 2016 and February 2018, which establish that Stripe made payments to Jetflicks that coincided with the charged money laundering transactions.[23]

Collectively, these records and the testimony accompanying them will show that streaming subscription money flowed from this District and elsewhere into Dallmann's pockets. Dallmann then used those illicit funds to promote the conspiracy to commit criminal copyright infringement. For instance, he paid co-conspirators for their services to the conspiracy, and he paid to access pirate websites and bought servers to store the content downloaded from such sites.[24] In addition, the aforementioned records prove that the transactions Dallmann made were designed, at least in part, to conceal the nature, location, source, ownership, or control of those proceeds given that Dallmann used accounts he had created without disclosing the true nature of Jetflicks.

---

[22] GX 407B (Stripe records of payments received).

[23] GX 407C (Stripe records of transfers to Dallmann).

[24] *See, e.g.*, GX 414C at 1 (PayPal records of payments sent between July 1, 2016, and August 20, 2016, to various services, including multiple Usenet sites); GX 919 (May 12, 2017 Google Chat) at 1-3 (Dallmann informs Villarino that he wants Villarino to program the "office server" to house "unpopular shows" and plans to purchase new computers to "handle processing in the office" of new content). *See also* GX 1301 (Apr. 22, 2014 Email) at 2 (Dallmann emails a company being paid to promote Jetflicks, and describes Jetflicks as "an international company that only has approximately 70 customers in the entire state of Nevada.").

### C.      The Theft of Content as a Competitive Advantage

At trial, we expect to establish that Dallmann and his co-conspirators strived to amass a huge library of television episodes.  One reason for this is that Dallmann and his co-conspirators sought to position Jetflicks as a competitor to legitimate streaming services such as Netflix and Hulu.  For instance, SA Chase will testify about text messages between Dallmann and Defendant Felipe Garcia in October 2013 in which Dallmann shared a message from an individual who had subscribed to Jetflicks since 2010.  The customer termed Jetflicks "hands down THE best streaming TV provider in the world," and complimented Jetflicks for posting television episodes to its website faster than Netflix.[25]  Likewise, SA Chase will testify about a text message exchange in December 2016 during which Jaurequi bragged to a friend that Jetflicks was "basically internet TV like HULU or NETFLIX, but we have WAY more content and are much much cheaper."[26]  SA Chase, moreover, will point out that Jaurequi bragged that Jetflicks not only had "all primetime TV and the major cable network shows," but also "netflix stuff."[27]

We will show at trial that Dallmann and his co-conspirators were able to compete with the likes of Netflix for two reasons.  First, unlike legitimate streaming services, Dallmann and his co-conspirators did not pay copyright holders for the right to reproduce, distribute, or stream their works.  To this end, we anticipate calling at trial representatives from NBCUniversal, WarnerMedia, ViacomCBS, and Netflix.  These witnesses will identify thousands of copyrighted television episodes listed in Sick Beard and SickRage printouts recovered from Dallmann's houses; those records showing the co-conspirators seeking to download and downloading

---

[25] GX 012 (Oct. 16, 2013 Texts) at 1.

[26] GX 152 (Dec. 30, 2016 Texts) at 2.

[27] GX 154 (Dec. 30, 2016 Text) at 1.

infringing episodes from pirate sites.  The witnesses will also confirm copyrights in television series and episodes observed and/or recorded by an FBI agent while the agent was using Jetflicks during an undercover operation.  These copyright owners will also testify that neither Jetflicks nor any of the defendants had paid royalties, or otherwise obtained permission, to reproduce, distribute, or stream those copyrighted works.[28]

Second, Dallmann and his co-conspirators automated the process for downloading, processing, and making content available to their paid subscribers.  FBI SA Michael Poston and SA Chase will establish that the conspiracy used scripts and specialized software programs (such

---

[28] *See, e.g.*, GX 008 (Forty-four-page printout of *jetflicks.mobi* from September 5, 2013 that lists television series available on the website in alphabetical order); GX 018 (Fifteen-page printout from Sick Beard that is dated April 7, 2014, lists numerous television episodes that had recently aired and that the co-conspirators were attempting to download through Sick Beard, and states that the co-conspirators had downloaded 424 of the 71,011 television episodes for which Sick Beard was searching); GX 027 (Forty-six-page printout from Sick Beard that is dated June 19, 2014, and lists thousands of television episodes for which Sick Beard was searching); GX 030 (Twenty-nine-page printout from Sick Beard that is dated June 27, 2014, and states that the co-conspirators had downloaded 6 of the 74,657 television episodes for which Sick Beard was searching); GX 056 (Sixteen-page printout from Sick Beard that is dated April 27, 2015, and lists several television episodes for which Sick Beard was searching); GX 060 (Fifty-six-page printout from *jetflicks.mobi* that is dated October 19, 2015, and lists television series available on the website in alphabetical order); GX 061 (Twenty-two-page printout from SickRage that is dated October 19, 2015, lists television series for which SickRage was searching, and states that the co-conspirators had downloaded over 58,000 episodes); GX 078 (Twenty-three-page printout from SickRage that is dated August 5, 2016, lists television series for which SickRage was searching, and states that the co-conspirators were seeking 788 shows and had downloaded over 56,000 episodes); GX 102 (Nine-page printout from SickRage that is dated August 25, 2016, lists television series for which SickRage was searching, and states that the co-conspirators were seeking 251 shows and had downloaded over 500 episodes); GX 103 (One-page printout from SickRage that is dated August 26, 2016, and lists television series for which SickRage was searching); GX 171 (Forty-eight-page printout from SickRage that is dated October 1, 2017, lists television series for which SickRage was searching, and states that the co-conspirators were seeking 1,696 shows and had downloaded 130,642 episodes).

as SickRage, Sick Beard, and SABnzbd),[29] which were "constantly running."[30]  These programs,

SA Poston will explain, were designed to locate and use hard-to-access websites dedicated to the

distribution of stolen media (such as torrent sites and Usenet NZB sites) to download particular

television episodes.  SA Poston also will testify that, in reviewing certain evidence recovered

from Dallmann's homes, he has concluded that the co-conspirators used Sick Beard and

SickRage to search for, and download, tens of thousands of television episodes between 2013

and 2017.[31]  SA Poston further will testify that, after downloading television episodes, co-

conspirators used software and computer code to convert the files into multiple video formats.

We also will prove that the content Dallmann and his co-conspirators downloaded was

obviously pirated.  For instance, SA Chase will testify about a screenshot found on Dallmann's

iPhone that depicts a list of media files that had been downloaded, and SA Poston will testify that

the file names include references to the following: (1) the piracy groups who had stolen and

uploaded the works to the internet (*e.g.*, "CROOKS," "KILLERS," or "LOL); (2) how the works

were stolen (*e.g.*, "WEBRip"); and (3) the piracy site from which the works were downloaded

(*e.g.*, RARBG, TorrentDay, or Torrenting.com).[32]

The co-conspirators, however, disregarded these red flags.  SA Chase, for example, will

testify about a text exchange in August 2016 in which Dallmann observed that episodes of

---

[29] GX 054 (Note from Dallmann's Apple iPhone) at 1-2.

[30] GX 122 (Oct. 12, 2016 Text) at 1.

[31] *See, e.g.*, GX 018, 027, 030, 056, 318, 319, 061, 078, 102, 171, 018, 027, 030, 056, 061, 078, 102, 171, 318, and 319.

[32] *See, e.g.*, GX 172 (Image from Dallmann's Apple iPhone) at 1; GX 318 (One-page printout of television episodes with handwritten notation that the "system should convert tonight"); GX 319 (One-page printout of television episodes with handwritten notation that if the episodes are not "in the system" then need to "redownload").

*Outlander* had not downloaded properly, noting that "[t]here's one line that says 'ENCRYPTED / Outlander.S02E04'" and "[a]nything with ENCRYPTED before it, usually has an issue."[33] Dallmann did not express concern about the legality of these files; instead, he directed another individual to "fix" them.[34]

### D.     Efforts by Copyright Owners in 2011 and 2012 to Stop the Conspiracy

We will prove that copyright owners tried to deter the streaming conspiracy by sending cease-and-desist (C&D) letters to Dallmann.  For example, we will elicit testimony from SA Chase about a C&D letter found in Dallmann's residence during the November 2017 searches.[35] The letter, which was from HBO (now owned by WarnerMedia) and was dated July 22, 2011, advised, in relevant part, that Jetflicks was "hosting and facilitating the streaming and/or downloading of" HBO programs and provided several examples of infringement, including *Game of Thrones*.[36]  The evidence will show that, despite the letter, Jetflicks was still offering *Game of Thrones* in 2017.[37]

Likewise, we expect to call at trial Jan van Voorn, the head of global content protection for the Motion Picture Association (MPA) (formerly the Motion Picture Association of America), who will testify about a C&D letter that the MPAA sent to Dallmann in 2012 on

---

[33] GX 084 (Aug. 9, 2016 Texts) at 3.

[34] *Id.*

[35] GX 001 (July 22, 2011 C&D Letter from HBO).

[36] *Id.* at 1.

[37] GX 503A (recording by undercover agent of *Games of Thrones* episodes available on Jetflicks as of April 24, 2017).

behalf of its members.[38]  The letter, which SA Chase will testify was seized from one of Dallmann's Las Vegas houses in 2017,[39] demanded that Jetflicks stop using *jetflicks.mobi* and an associated Android smartphone application to infringe the copyrights of MPAA's members.  The letter, moreover, listed several examples of copyrighted television episodes that Jetflicks was infringing, including one from *2 Broke Girls*.[40]

The evidence will show that the MPAA's letter was ignored, too.  SA Chase will testify that, based on his undercover work (which is discussed below) and his review of download reports and show lists recovered from Dallmann's residences, he determined that Jetflicks continued to acquire and stream MPAA members' shows and other television shows without authorization.  For example, SA Chase is expected to note that all 12 of the shows listed in the MPAA's Exhibit A to the C&D letter are within a list of shows that was recovered from Dallmann's house in November 2017 and had been printed out from *jetflicks.mobi* on September 5, 2013.[41]

E.      Operation of the Conspiracy from 2011 to 2013

We will establish that, by 2013, Dallmann had brought into the conspiracy at least Defendant Darryl Polo,[42] Defendant Peter Huber, Defendant Douglas Courson, and Garcia.  For

---

[38] GX 002 (Nov. 16, 2012 C&D Letter from MPAA).

[39] We also anticipate calling Roy Guill as a witness at trial.  He is expected to testify that the MPAA hired him to serve the C&D letter, and he is expected to identify Dallmann as the person to whom he hand-delivered the letter.

[40] GX 002 (Nov. 16, 2012 C&D Letter from MPAA) at 1, 4.

[41] GX 008.

[42] Polo previously pled guilty to various copyright and money laundering charges, including conspiring with Dallmann, Courson, Garcia, and Huber to commit criminal copyright infringement.

instance, SSA Lynch is expected to testify that Dallmann admitted during his November 2017 interview that from summer 2011 to summer 2013 or 2014, Dallmann paid Polo approximately $8,000 per month to source television episodes from the internet.  Dallmann explained that Polo taught him how to download content from NZB networks, and allowed Dallmann to download television episodes from *smackdownonyou.com*, an NZB indexer that Polo had created.[43]

Likewise, SA Chase will testify that he interviewed Huber in May 2018.  Among other things, Huber admitted that he worked as a programmer for Jetflicks from about May 2012 through late 2015 or early 2016.  SA Chase is expected to testify that, according to Huber, he was hired to work on JASC, but he soon found that the majority of Jetflicks's revenue came from streaming content.  It is anticipated that SA Chase will testify that Huber denied acquiring content for Jetflicks, but at the same time admitted knowing a lot about the process by which content was acquired.  For instance, Huber knew that Jetflicks obtained content from NZB sites and Sick Beard, knew how and where the downloaded television shows were stored, knew how the content was processed for purposes of streaming, and always kind of knew the content on Jetflicks was pirated.  Moreover, Huber admitted that Polo's creation of a process for automating the acquisition and posting of television episodes made Huber obsolete, although Huber did not explain why his position would have become obsolete if he truly was not involved in content acquisition.

We also expect to show that Garcia and Courson, who both had an intimate relationship with Dallmann,[44] were integral members of the Jetflicks conspiracy, too.  In this regard, SA

---

[43] SSA Lynch also is expected to testify that, according to Dallmann, Polo started a rival streaming service called iStreamItAll.  When SSA Lynch asked Dallmann if iStreamItAll was engaged in copyright infringement, Dallmann responded, "Well, yeah."

[44] We have offered to stipulate with the defense to the fact that Dallmann, Courson, and Garcia had intimate relationships with each other.  In the absence of such a stipulation, we will

Chase is expected to testify that, on August 19 and 20, 2013, Garcia exchanged texts with another individual about downloading and adding particular television episodes to Jetflicks that had just aired or were about to air.[45]  SA Chase also is expected to testify that, on November 18, 2013, Dallmann and Garcia exchanged texts about an update to Sick Beard causing shows to not launch properly for two days and how this failure was partially to blame on Courson and Huber.[46]

As a result of their collective efforts, as early as 2013, Dallmann and his co-conspirators were offering subscribers access to a massive catalog of stolen content.  In this regard, SA Chase will testify about a 44-page printout from *jetflicks.mobi* that was found at Dallmann's house and is dated September 5, 2013, and that lists television series available on the website, including *2 Broke Girls*.[47]  He also will testify about a six-page printout from an internal tool hosted on

---

seek to introduce GX 004D, 005, 015, 019, 031, and 038 to prove the existence of such relationships.  *See* GX 004D (July 18, 2013 Texts) at 1 (Garcia and Dallmann exchange texts during which Garcia writes, "Ok don't get frustrated with me baby . . . ."); GX 005 (Aug. 11, 2013 Texts) at 1 (Dallmann and Garcia exchange texts during which Garcia complains about being "in a controlled relationship," and Dallmann responds, "You're in a dependably [sic] relationship because you don't have a source of income other than Jetflicks."); GX 015 (Jan. 20, 2014 Texts) at 1-2 (Garcia and Courson discuss having sex after Huber completes a project); GX 019 at 1 (Apr. 26, 2014 Texts) (Garcia and Courson discuss having sex and Garcia suggests Courson could have sex with Dallmann and Garcia); GX 031 at 1 (July 3, 2014 Texts) (Dallmann and Garcia exchange texts in which they discuss "break[ing] up"); GX 038 at 1-2 (Aug. 26, 2014 Texts) (Garcia and Courson exchange texts about having sex, and Garcia indicates Courson can have sex with Garcia and Dallmann).

[45] GX 911 (May 27, 2013 Texts) at 1 (Garcia advises an individual that a particular episode of *The Apprentice* would not play); GX 006 (Aug. 19, 2013 Texts) at 1 (Garcia asks an individual to "add basketball season 5 episode 1," adding that "it aired today"); GX 007 (Aug. 20, 2013 Texts) (Garcia receives messages from an individual stating that he could not "find any downloadable episodes of marrying the game on the networks," that "News room and Donovan are all current," and that "7 & 9 are next weeks shows.")

[46] GX 013 (Nov. 18, 2013 Texts) at 1-2.

[47] GX 008.

*jetflicks.com* that was found at Dallmann's house and is dated September 24, 2013, and states that Jetflicks had over 16,000 customers and was offering access to over 4,300 seasons of television shows.[48]

Markedly, the evidence will show that, as early as 2013, the co-conspirators used JASC to hide the true nature of their unlawful activities.  Forensic Examiner Laura Peterson and SA Chase are expected to testify about GX 406, which is a draft letter to PayPal that was recovered from an Apple tower that SA Curtis Cox seized from Dallmann's house in November 2017 and that subsequently was denoted as 1B76.  Forensic Examiner Peterson will testify that GX 406 was found within a folder on 1B76 marked as an Apple iCloud archive, which is the same folder in which messages attributable to Garcia were located.[49]  The metadata for GX 406 indicates that the letter was drafted in December 2013.[50]  The letter, which seeks to convince PayPal that Jetflicks has a plan to reduce chargebacks, describes Jetflicks as a service that "provide[s] aircraft entertainment systems and services to the private aviation market."[51]

### F.        Operation of the Conspiracy in 2014

We expect to show at trial that, in 2014, Dallmann, Courson, Garcia, and Huber continued to work closely together to further their conspiratorial agreement.  SA Chase, for instance, will testify about GX 025.  These are text messages among Dallmann, Courson, and Garcia from June 2014 in which Courson asks Dallmann to "teach" him more about the

---

[48] GX 010.  This printout also listed the 20 most viewed seasons, stating that season three of *The Walking Dead* had been viewed 199,390 times and season two of *2 Broke Girls* had been viewed 92,384 times.  *Id.* at 5.

[49] We discuss the attribution of the Garcia text messages below at Part III.A.

[50] GX 406A (Metadata for GX 406) at 1.

[51] GX 406 at 1.

"automatic system" they are using to download television episodes.  Courson explains that he has "to request dozns [sic] of shows every week and [he] need[s] to learn how to set the parameters so that they get captured."  SA Chase will point out Dallmann's response: "Doug this is kris… There is nothing I can teach you if the system can't pick up a show it has to be done manually."

Jetflicks, in fact, had become central to the lives of at least Dallmann, Courson, and Garcia in 2014.  SA Chase will testify that Dallmann stated in a July 3, 2014 text message to Garcia that "Jetflicks pays for everything in our life [and] you can't say 'fuck you' to it and expect to live here."[52]  Likewise, SA Chase will highlight texts between Garcia and Courson in which Garcia remarked that they "eat[,] breath[e,] and shit Jetflicks."[53]

It also is anticipated that SA Chase will testify that, in 2014, the co-conspirators continued to use Sick Beard to download content from online networks and then stored the works they downloaded on servers that they controlled.  For instance, SA Chase is expected to establish the following facts:

- In January 2014, Courson emailed Dallmann that they had an episode of *Shameless* that had not yet aired,[54] and informed Dallmann by email that he would move two episodes of *The Haves and the Have Nots* to the correct server and that he would reupload an episode of *Black Sails* that was missing and would "forward to Peter to look into what might have happened to it."[55]

---

[52] GX 031 (July 3, 2014 Texts) at 1.

[53] GX 042 (Sept. 10, 2014 Texts) at 2.

[54] GX 014 (Jan. 7, 2014 Email) at 1.

[55] GX 016 (Jan. 22, 2014 Email) at 1.

- In April 2014, Sick Beard had been programmed to download thousands of television episodes, including episode nine of season two of *The Haves and the Have Nots*.[56]

- From May to December 2014, Dallmann, Garcia, and Courson exchanged communications about downloading television episodes from Sick Beard, processing those episodes to make them suitable for streaming to customers, and updating subscribers on the status of television episodes that they had requested.[57]

SA Chase, moreover, will highlight instances in which the co-conspirators discussed acquiring

television episodes that were about to air or were going to soon air.[58]

We will show that these numerous communications about downloading television

episodes were made at and around the time that Sick Beard and SickRage inventories were

---

[56] GX 018 (Apr. 7, 2014 Sick Beard Download List) at 14.

[57] GX 020 (May 8, 2014 Email) at 1 (Courson informs Dallmann of the various television shows for which he had "made the necessary requests to sickbeard"); GX 022 (May 29, 2014 Texts) at 1 (Garcia and Courson discuss downloading particular television shows, the speed by which they would be available to subscribers for streaming, and updating subscribers on the status of those shows); GX 024 (June 10, 2014 Texts) (similar); GX 028 (June 21, 2014 Texts) at 1 (Garcia and Courson discussing their inability to upload an episode of *Salem* that "kris said he downloaded and converted," which results in Courson concluding the issue "has something to do with the new NZB site."); GX 029 (June 23, 2014 Texts)at 1-3 (Garcia and Courson discussing the acquisition of particular television episodes that subscribers had requested and fixing issues with episodes already available to subscribers).

[58] GX 034 (July 23, 2014 Texts) at 1 (Garcia and Courson discuss whether Jetflicks was missing any episodes of *Bad Girls Club*, and Courson advises that he "looked everywhere" and the "[n]ext episode of bad girls club airs in the 29th"); GX 035 (Aug. 7, 2014 Texts) at 1-2 (Garcia and Courson discuss subscriber requests for particular television episodes, and Courson notes that an episode of *So You Think You Can Dance* just became "available 3 hours ago" and he would request it because their "system ha[d]n't requested it yet"); GX 040 (Sept. 2, 2014 Texts) at 1 (Garcia asks Courson to "add ink masters," which "airs tonight at 10," to which Courson responds, "Already have it."); GX 045 (Sept. 18, 2014 Email) at 1 (Courson informs Dallmann and Garcia of more than 20 television shows he had "added to the system" and were "waiting [for the] premiere"); GX 046 (Oct. 30, 2014 Email) at 1 (Garcia relays subscriber requests for particular television episodes, and Courson responds as to whether the requested content is available for download or is unavailable because it has not yet aired); GX 047 (Dec. 4, 2014 Email) (similar).

generated and subsequently maintained at Dallmann's homes.  For example, SA Chase and Poston may testify that the records recovered during the November 2017 searches show that on April 7, 2014, the co-conspirators used Sick Beard to search for 71,011 different television episodes,[59] and on June 27, 2014, they used Sick Beard to search for 74,657 different television episodes.[60]

We also expect SA Chase to testify that co-conspirator communications establish Huber's centrality to the conspiracy in 2014.  For example, SA Chase will highlight texts exchanged between Garcia and Courson in August 2014 regarding Jetflicks servers going down.[61]  These texts show that Garcia asked Courson to "call Peter," and Courson later advised that Huber is "out to dinner and will get here ASAP."[62]  Similarly, SA Chase will testify about GX 037, which are texts between Garcia and Courson regarding an episode of *The Honorable Woman* that would not "load."[63]  Courson indicates that Huber would be needed to solve the problem, writing that he would "have to deal with Peter in the morning."[64]  SA Chase also will highlight GX 044, which is an exchange of text messages between Garcia and Courson in September 2014 during which Courson states that an episode of *Bad Girls Club* will not "load for some reason" and he would "have to have peter look at the problem in the morning."[65]

---

[59] GX 018.

[60] GX 030.

[61] GX 036 (Aug. 14, 2014 Texts).

[62] *Id.* at 2.

[63] GX 037 (Aug. 14, 2014 iMessages) at 1.

[64] *Id.*

[65] GX 044 (Sept. 13, 2014 iMessages) at 1.

Moreover, we will prove that, by September 2014, Dallmann, Courson, Garcia, and Huber were concerned about preventing others from stealing the very content they had stolen. Specifically, SA Chase will testify that text communications show the co-conspirators learned around that time that Polo was using Jetflicks customer accounts to access and "copy [their] stuff."[66]  SA Chase will show that Courson responded by advising Dallmann that Huber would "write a program to block [Polo]," and both Courson and Garcia expressed the view that Polo was "a thief."[67]  These reactions are revealing of the co-conspirators' understanding that their scheme to download and sell access to thousands of television shows was illegal inasmuch as they thought it was theft for someone to download without permission the content that they had acquired.

### G.     Operation of the Conspiracy in 2015

We expect to show at trial that, in 2015, Dallmann and his co-conspirators persisted with their conspiracy.  To this end, it is anticipated that SA Chase will establish that the co-conspirators continued to use Sick Beard to download content,[68] and continued to troubleshoot problems with the content that the co-conspirators had downloaded from pirate sites.[69]  And, we

---

[66] GX 041 (Sept. 8, 2014 Texts) at 1.

[67] *Id.* at 1-2.

[68] GX 1304 (Jan. 17, 2015 Email) at 1 (Courson informs Garica that he goes "to Sickbeard Backlog" and "pull[s] . . . shows at least once a day until they come in"); GX 049 (Jan. 23, 2015 Email) at 1 (in response to a subscriber's complaint about particular television episodes not being available on Jetflicks within 24 hours of airing, Courson emails Garcia that, "[a]s soon as [he] see[s] a show hasn't updated on Sickbeard (first thing every morning) [he] update[s] if the files are available," and adds "[a]s a rule, no show files sit waiting for updates once they are ready.")

[69] GX 050 (Feb. 9, 2015 Email) at 1 (Courson emails Dallmann about "[s]how problems" and notes that an episode of *Marriage Boot Camp: Reality Stars* is on "kickass," "but [I] cant' get it to upload"); GX 051 (Feb. 12, 2015 Email) at 1 (Courson emails Garcia and Dallmann to provide a "heads up" that "there was some sort of problem with the system yesterday" that

will show that these communications about downloading television episodes correspond to hard-copy documents recovered from Dallmann's homes in November 2017 that detail the massive library of stolen content being amassed.[70]

SA Chase also will establish the ways in which Dallmann and his co-conspirators changed their operations in 2015.  For example, SA Chase will discuss GX 054, which is a note found on Dallmann's iPhone.[71]  The note, which is titled "SickRage Servers," lists user credentials for several NZB networks and Usenet sites.[72]  SA Chase also will highlight GX 061, which is a 22-page printout from SickRage dated October 19, 2015 that shows the co-conspirators had programmed SickRage to search for 757 television shows.  SA Chase will note that GX 061 shows that, as of October 2015, the co-conspirators had used SickRage to download 3,000 episodes and "snatch" (*i.e.*, partially download) another 2,210 episodes, which was only about five percent of the 58,169 individual episodes that they were seeking to download.

---

resulted in Courson having to "go[] through all the shows and re-request[] them."); GX 057 (July 5, 2015 Email) at 1 (Courson informs Dallmann that he is getting an error message indicating that there is insufficient free space "upon placing the file into 'Torrents' in the 'Downloads' folder."); GX 058 (Sept. 4, 2015 Email) at 1 (Courson emails Huber and Dallmann that he is "trying to upload shows and nothing is happening," provides episode 22 of season 1 of *America's Got Talent* as an example, and asks Huber to "take a look at this" because Courson "need[s] to get shows uploaded."); GX 059 (Sept. 17, 2015 Email) at 1 (Courson emails Huber and Dallmann about seasons of *The Exes*, which Courson states "does not work anymore" even after he "reloaded them," and asks Huber to "take a look at this" because Courson "want[s] to avoid customer complaints.").

[70] GX 056 (Sixteen-page printout from Sick Beard that is dated April 27, 2015, and lists several television episodes for which Sick Beard was searching); GX 060 (Fifty-six-page printout from *jetflicks.mobi* that is dated October 19, 2015, and lists television shows available on the website in alphabetical order, including *America's Got Talent* and *The Exes*).

[71] GX 054 (Nov. 16, 2015 iPhone Note) at 1.

[72] *Id.* at 1-2.

Moreover, SA Chase will testify about GX 048, which is a January 7, 2015 email from Courson to Dallmann regarding the storage of show content.  SA Chase is expected to draw two conclusions from GX 048.  First, the email shows that the co-conspirators had downloaded so many television episodes that they were using servers in Las Vegas and in Canada and were concerned about bandwidth problems.  Second, the email contradicts statements that Huber made to SA Chase during an interview.  Second, the email contradicts statements that Huber made to SA Chase during an interview.  Huber claimed that Dallmann had told him that it was legal for Jetflicks to stream television episodes between the time a show aired and the time it became available for purchase on DVD, yet GX 048 establishes that Huber was consulted in January 2015 about storing "current seasons [of television shows] on . . . servers in Canada, and moving the previous [seasons] to some new servers in the office" given that "previous seasons aren't accessed as much."  Courson's email states that Huber is concerned about this proposal, but the specified concern regards "band width problems."  Courson provides no indication that Huber expressed any concern about how this proposed division of Jetflicks content squared with the notion that Jetflicks was operating legally so long as it took down television episodes once they were available to purchase on DVD.

In addition, SA Chase will establish that, at the same time Dallmann was leading the Jetflicks conspiracy, he was concerned about being prosecuted for copyright infringement.  Specifically, SA Chase will testify about records provided by Google that show Dallmann used Google to search the internet for the phrase "Jetflicks congress."[73]  The evidence will show that this search returned a link to *regulations.gov* of a 2012 letter from the MPAA and others to the

---

[73] GX 062A (Dallmann's Google Search History for Nov. 4, 2015) at 1.

U.S. Intellectual Property Enforcement Coordinator (IPEC).[74]  The letter included a paragraph about Jetflicks' illegal streaming of television shows, and the FBI recovered a hard copy of this letter in one of Dallmann's houses in Las Vegas.  Significantly, the copy that the FBI found has brown stains on the front and a red Post-It flag on the page regarding Jetflicks.[75]  The evidence will show that, after clicking on the *regulations.gov* link, Dallmann inputted to Google's search engine the following search terms: "jetflicks indicted" and "jetflicks indictment."[76]

### H.    Operation of the Conspiracy in 2016

We will prove that, by July 2016, the conspiracy's membership had changed slightly.  SA Chase is expected to explain that Courson's involvement apparently lessened somewhat.[77]  SA Chase also will testify that, by July 2016, Garcia no longer was helping with the scheme nor was in a relationship with Dallmann.  SA Chase is expected to note that Jaurequi effectively took

---

[74] *Id.*; GX 062B (MPAA Letter to IPEC Dated Aug. 10, 2012).

[75] GX 062C (MPAA Letter to IPEC Found in Dallmann's House) at 15.

[76] GX 062A at 2-3.

[77] GX 065 (July 18, 2016 Text) at 1 (Dallmann informs Jaurequi that "because of the financial issues that Doug had lately, I gave him a little bit of work" that entailed having Courson "look[] over the three printed lists I had over the years of what content Jetflicks had.").

Garcia's place,[78] both in terms of aid rendered to the conspiracy and intimacy with Dallmann and Courson.[79]

SA Chase also will testify that Dallmann and his co-conspirators had become reliant on SickRage by July 2016.  He will explain that Dallmann taught his co-conspirators how to operate SickRage, too.  To this end, SA Chase will testify about GX 066, 067, and 083, which are text messages between Dallmann and another individual.  Dallmann instructs this person on "the process" for downloading television episodes and then processing them for distribution to subscribers, explaining that "sick rage . . . finds and snatches the info for the [desired television] episode[,] then… sab [SABnzbd] and/or utorrent . . . download the episodes . . . [t]hen the

---

[78] *See, e.g.*, GX 116 (Sept. 30, 2016 Note from Jaurequi Apple iPhone) at 1, 9 (draft of potential responses to customer questions, such as touting Jetflicks "plans to keep expanding" its library of shows while "some companies like Netflix have reduced their catalogs," discouraging cancellations because Jetflicks has "over 340,000 episodes of the hottest shows TV has to offer and . . . it would take 5 online subscriptions to various other streaming companies to try and match what Jetflicks! offers," bragging that Jetflicks is posting episodes "that just aired," and boasting that "the main difference between Jetflicks! and other similar companies is that the content we offer really has no limit.").

[79] *See* GX 082 (Aug. 9, 2016 Texts) at 2 (Dallmann informs another individual that he should "handle minor errors…and re-request shows as a first line of defense" and "send an email to Doug saying you re-requested X shows… and for him to check the system and verify they DID reconvert, upload, and are playing properly," and adding that "[i]f for any reason, you can't do support for a day… OR you are away from your computer… your fallback to get the job done is to communicate with Jared and have him do it for you."); GX 169 (July 11, 2017 Texts) at 1 (Dallmann inviting Courson to have sex with Jaurequi and himself); GX 173 (Nov. 10, 2017 Texts) at 1-4 (Dallmann inviting Courson to have sex with Jaurequi and himself); GX 1108 (Oct. 27, 2016 Texts) at 4-5 (Jaurequi invites Courson to have sex with Dallmann and him amid a conversation about PayPal locking Jetflicks's account due to copyright infringement concerns).

As noted previously, we have offered to stipulate to Dallmann, Jaurequi, and Courson having an intimate relationship.  The defense, to date, has not indicated whether they would enter into such a stipulation.

conversion script takes over…and converts and uploads."[80]  Dallmann also explains the formats for downloading television episodes and how the resolution of the files can affect the speed by which the episodes can be converted for streaming to subscribers.[81]

SA Chase further will testify that, in August 2016, Dallmann hired Vaillant as a computer programmer for Jetflicks.  Within days of hiring Vaillant,[82] Dallmann trained Vaillant on "the process . . . for doing shows."[83]  SA Chase will testify that Dallmann explained that process as follows:

> [F]irst.. in the admin, you add a show by clicking 'add show (sickrage)' . . . then you get the show ID number off of the TVDB.com and put that number in, and select a server you want the show to load on. . . . [T]hen it adds all the information for the show into the sickrage program . . . . [F]rom there… nothing shows up in the admin until we download, convert, and upload an episode, using the sickrage interface[.]  [T]hen… scripting on the conversion machine runs, and uploads the files, and launches the episodes using the scripts I was telling you about earlier…[84]

SA Chase also will testify that, by at least August 14, 2016, Vaillant knew the content for Jetflicks was being sourced from NZB sites given an exchange with Dallmann in which

---

[80] SA Poston is expected to testify that uTorrent is software that enables a user to download or share torrent files.

[81] GX 083 (Aug. 9, 2016 Texts) at 1-2.

[82] GX 068 (July 29, 2016 Texts) (Vaillant confirms he sent his resume to Dallmann); GX 069 (July 30, 2016 Email) (Vaillant sends his resume by email to Dallmann).

[83] GX 077 (Aug. 5, 2016 Texts) at 1.

[84] GX 086 (Aug. 12, 2016 Texts) at 1.

Dallmann asked Vaillant to remove Polo's access to customer accounts but wait to cutoff Polo's access to user accounts "until we are 100% independent from his NZB server."[85]

We expect to establish that Vaillant, over time, became more enmeshed in the Jetflicks conspiracy.  SA Chase is expected to highlight various texts exchanges between Dallmann and Vaillant that prove the following:

- Vaillant knew that Dallmann was using OVH servers to host content that was "currently airing," two servers in Las Vegas to host "ended shows," and only one of server for the "aircraft" side of Jetflicks.[86]
- Dallmann primarily wanted Vaillant to have "program" and he would have "lower paid people . . . add shows"[87] But, for Vaillant's coding tasks, he needed full access to Jetflicks' servers, SickRage application, and PayPal account, so Dallmann provided Vaillant with the relevant login credentials.[88]

- At times, Vaillant worked with Dallmann to find, download, and manage television episodes.[89]

---

[85] GX 088 (Aug. 14, 2016 Texts) at 1.

[86] GX 079 (Aug. 7, 2016 Texts) at 1.  SA Chase will note that GX 079 is another example of a text exchange contradicting statements Vaillant made to the FBI during an interview.  As SA Chase will explain, Vaillant likened Jetflicks during an interview to "Netflix for planes" and claimed he had been told that Jetflicks would soon be deployable to aircraft.  Yet, GX 079 shows that, within days of joining the Jetflicks conspiracy, Vaillant was aware that minimal resources were being put toward JASC.  Indeed, SA Chase will highlight GX 1006, which is an exchange of texts between Dallmann and Vaillant on August 14, 2016, and will note that when Dallmann referenced the "aircraft side" of Jetflicks, Vaillant had to ask Dallmann to explain what he meant.

[87] GX 092 (Aug. 22, 2016 Texts) at 1.

[88] GX 090 (Aug. 15, 2016 Texts) at 1-3 (Dallmann and Vaillant discuss adding a password to a server relating to SickRage); GX 107 (Sept. 5, 2016 Texts) at 1 (Dallmann emails to Vaillant the "keys" to SickRage); GX 115 (Sept. 29, 2016 Email) at 1 (Dallmann emails login credentials to Vaillant for PayPal).

[89] GX 093 (Aug. 22, 2016 Texts) at 1-2 (Vaillant informing Dallmann that he had "successfully" added *American Horror Story* to SickRage and "check[ed] video quality"); GX 117 (Oct. 4, 2016 Texts) at 1 (Dallmann listing particular television shows on certain servers and advising that he planned to "delete any show that has s1004 on it… because you're going to

- Vaillant knew the conspiracy was using SickRage to search for television episodes on a daily basis.[90]

- Vaillant was highly familiar with SickRage's integration into Jetflicks, and he came to pride himself on ensuring SickRage operated as intended.[91]

SA Chase will juxtapose these text exchanges with his interview of Vaillant in May 2018. SA Chase will testify that Vaillant admitted to working for about three months as a programmer at Jetflicks in 2016 and receiving between $5,000 and $10,000 in compensation, admitted that he thought something was strange about how content for Jetflicks was sourced, and admitted that he was not surprised if Jetflicks was in legal trouble. Yet, SA Chase also will testify that Vaillant claimed Jetflicks acquired its content by copying DVDs that had been purchased or rented; a claim that is plainly inconsistent with the aforementioned exhibits.

---

re-add[] when you add the server"); GX 118 (Oct. 4, 2016 Texts) at 1 (Vaillant advising that he could not "find 'law and order special victims unit' on sickrage"); GX124 (Oct. 13, 2016 Texts) at 1 (Vaillant adding *The Walking Dead* at Dallmann's request); GX 133 (Nov. 12, 2016 Texts) at 1 (Vaillant keeping track of episodes missing from Jetflicks' databases).

[90] GX 097 (Aug. 23, 2016 Texts) at 1 (Vaillant agrees to figure out why SickRage's "daily search isn't running"); GX 122 (Oct. 12, 2016 Text) at 1 (Dallmann informing Vaillant that "SickRage is constantly running")

[91] GX 100 (Aug. 25, 2016 Texts) at 1 (Vaillant responds to an issue with Jetflicks servers not connecting properly to SickRage by telling Dallmann he would "fix this problem" by "search[ing] inside the code," and later updates Dallmann that he had "found the problem" that was causing the site to "go very very slow."); GX 112 (Sept. 21, 2016 Texts) at 1-2 (Vaillant bragging that he is "the best programmer" and assuring Dallmann that "if sickrage can download the file don't worry I can handle."); GX 114 (Sept. 21, 2016 Texts) at 1 (Dallmann asks Vaillant for help in creating "an updated list of . . . shows in the admin" because Dallmann wants to give another person "the ability to manage SickRage from the Admin, requesting shows, re-requesting shows that don't work, and be able to add new Shows, etc."); GX 139 (Nov. 16, 2016 Texts) at 1 (Dallmann asking Vaillant to "try and fix something with SickRage and the post-processing scripting" that was preventing "failed downloads" from being "automatically. . . recognized").

And, we will show that the co-conspirators' communications about downloading and processing television episodes were made at and around the times the inventories that Dallmann and Jaurequi maintained.[92]

## I.    Threats in 2016 to the Continued Operation of the Jetflicks Conspiracy

We expect to prove that the Jetflicks conspiracy faced several challenges to its continued operation in 2016.  Ironically, one threat that Dallmann and his co-conspirators perceived could disrupt their conspiracy was Polo's theft of the content that the Jetflicks conspiracy had amassed. SA Chase will testify that Dallmann repeatedly complained to Vaillant about Polo stealing from Jetflicks and implored Vaillant to prevent Polo from doing so.[93]  Moreover, SA Chase will highlight GX 1104, which is a text message exchange between Jaurequi and Courson.  Jaurequi states that the "crap with Darryl is getting out of hand" and he plans "to pursue legal action for

---

[92] GX 078 (Twenty-three-page printout from SickRage that is dated August 5, 2016, lists television series for which SickRage was searching, and states that the co-conspirators were seeking 788 shows and had downloaded over 56,000 episodes); GX 102 (Nine-page printout from SickRage that is dated August 25, 2016, lists television series for which SickRage was searching, and states that the co-conspirators were seeking 251 shows and had downloaded over 500 episodes); GX 103 (One-page printout from SickRage that is dated August 26, 2016, and lists television series for which SickRage was searching); GX 121 (Oct. 14, 2016 Note from Jaurequi iPhone) at 1 (One-page list of television episodes and notes as to whether they are missing from Jetflicks); GX 149 (Dec. 22, 2016 Note from Jaurequi Apple iPhone) at 1-6 (Six-page list of television shows, including notations about missing episodes).

[93] GX 079 (Aug. 7, 2016 Texts) at 1 (Dallmann telling Vaillant that he "really want[s] to make sure Darryl isn't stealing our content anymore . . . ."); GX 080 (Aug. 8, 2016 Texts at 1 (Dallmann complaining to Vaillant that he had "found out that Darryl [was] basically using an exact duplicate of [Jetflicks'] database in what he stole from [them]," and said that, as a result, "pretty much the entire site, front end, back end, database, and security needs to be changed."); GX 091 (Aug. 15, 2016 Texts) at 1 (Vaillant remarking that Polo's website design for iStreamItAll was like Jetflicks' sites, and Dallmann responding that he was unsurprised because Polo "steals everything" and does not "have an original idea in his body."); GX 098 (Aug. 24, 2016 Texts) at 1 (Dallmann complaining that Polo's "site [was] basically mirroring Jetflicks," lamenting that he was "sick and tired of [Polo] benefiting from stealing from us," and asking Vaillant to "get some security in place so [Polo] can't get the files.").

his breach of contract and his theft of customer information and a bunch of other stuff."
Courson, markedly, discourages such action, writing that "as [he] explained to Kris before, since
Jetflicks is questionable with respect to it being a legal enterprise (because no royalties are paid
for the use of the material) . . . the legal system may invoke the theory of dirty hands and
therefore refuse to take any action on either side."

Another problem for Dallmann and his co-conspirators in 2016 was that outside entities
started to question Jetflicks. Special Agent Chase will testify about GX 126, which is an email
from PayPal dated October 24, 2016. PayPal's email advised Dallmann that PayPal had
"limited" Dallmann's account after "determin[ing] that [he] [was] in violation of PayPal's
Acceptable Use Policy regarding [his] sales or offers on www.jetflicks.mobi." PayPal explained
that Dallmann was prohibited from using PayPal to "send or receive payments for items that
infringe or violate any copyright, trademark, right of publicity or privacy, or any other
proprietary right under the laws of any jurisdiction." PayPal explained that, in order to unfreeze
the account, Dallmann had to provide "a valid licensure or proof of authorization to operate [his]
business or to conduct the sales on www.jetflicks.mobi."

SA Schurott and SA Chase are expected to explain that Dallmann and his co-conspirators
started scheming a response to PayPal. Through these witnesses, we will prove the following:

- On October 25, 2016, Jaurequi and Courson exchanged texts in which
  Jaurequi asked Courson if he knows the location of "that paper from
  2007 that the lawyer typed up saying that [Dallmann's] business is
  legal." Courson responded that he "never saw anything like that" and
  does "not believe [K]ris ever told [him] about something like that."[94]

- On October 26, 2016, Dallmann and Courson exchanged texts about
  PayPal limiting the Jetflicks account. Dallmann stated that he was
  "completely broke" and needed to find a legal memorandum "that says

---

[94] GX 1105 (Oct. 26, 2016 Texts) at 1.

what we can and cannot do" because "PayPal has locked our account indefinitely until we can provide them with documentation that allows us to conduct business with copyrighted material."  Dallmann added that he had "never had to use it before" and that "[i]t's nothing[,] [b]ut it's our only shot."[95]

- On October 27, 2016, Dallmann used Google to conduct the following searches: "kristopher dallmann warrant," "wire fraud punishment," "wire fraud jetflicks," and "fraud jetflicks."[96]  That same day, Jaurequi and Courson exchanged texts in which Jaurequi stated that "Kris has been obsessing over the thought of wire fraud and fraud."[97]

- Also on October 27, 2016, Dallmann and Courson exchanged texts in which Dallmann stated that "we are getting a different merchant" and will "continu[e] with Jetflicks as normal," but also proposed to "start moving forward with the real jetflicks model, storing people's dvds, charging monthly for it" and to "mov[e] away from the 'grey' area."[98]

- On October 28, 2016, Jaurequi forwarded the PayPal email to Courson and asked Courson to give Dallmann a "pep talk."[99]

- On October 29, 2016, Jaurequi drafted for Dallmann a proposed response to PayPal in which he falsely described Jetflicks as a company that "provides inflight entertainment for the private and executive aviation industry."  Jaurequi accused PayPal of asking

---

[95] GX 1106 (Oct. 26, 2016 Texts) at 1-4.  Markedly, the FBI recovered a legal memorandum from Dallmann's house that was six-pages long and concerned a "Mobile Movie Service."  GX 1101 (Jan. 4, 2008 Legal Mem.).  The memorandum warned copying movies from DVDs may violate U.S. copyright law.  *Id.* at 1, 5-6.  Dallmann disregarded this advice, however.  In this regard, SA Chase may testify about GX 1305, which are text messages Dallmann sent in August 2016 in which Dallmann states that Jaurequi's "main job is going to be to convert shows from DVD for any missing seasons and shows that we can't download."

[96] GX 182 (Oct. 27, 2016 Google Searches) at 1.

[97] GX 1108 (Oct. 27, 2016 Texts) at 1-6.

[98] GX 1107 (Oct. 27, 2016 Texts) at 1-4.

[99] GX 127 (Oct. 28, 2016 Texts) at 1-2.

them to "break the law," adding that PayPal could not have "free access to the copyrighted content on" Jetflicks because "we would be liable for providing you with free access to view copyrighted material with no royalties having been paid."[100]

By November 2016, Dallmann had decided to move to a new payment processor for Jetflicks subscriptions.  In this regard, SA Schurott and SA Clay will establish the following:

- On November 3, Dallmann submitted an application to Stripe, a payment processor located in California, for purposes of opening an account for Jetflicks.  However, the application stated that the website for Jetflicks was *jetflicks.com* instead of *jetflicks.mobi*, and falsely described Jetflicks as follows: "Private and Corporate aviation entertainment system sales, service, and subscription services.  We invited the first entertainment system for private aviation that is classified as carry-on equipment."[101]

- On November 6, 2016, Dallmann exchanged texts with Vaillant about Stripe's policies regarding processing payments and transferring them to the account holder's bank account.  Dallmann wrote, "And don't forget it has to go through jetflicks.com…"[102] Vaillant then responded, "I had forgotten that all payments have to be made through jetflicks.com."[103]

SA Chase, moreover, will highlight text messages that prove Vaillant knew his work with Jetflicks was for *jetflicks.mobi* and not *jetflicks.com*.[104]

---

[100] GX 128 (Oct. 29, 2016 Text) at 1.

[101] GX 407A (Stripe Application) at 1.

[102] GX 131 (Nov. 6, 2016 Texts) at 1.

[103] *Id.*

[104] *See, e.g.*, GX 099 (Aug. 25, 2016 Texts) at 1 (Dallmann and Vaillant troubleshooting an issue with *jetflicks.mobi*); GX 1009 (Oct. 10, 2016 Texts) at 1-2 (Dallmann and Vaillant discussing accessibility of *jetflicks.mobi*); GX 132 (Nov. 12, 2016 Email) at 1 (Dallmann emails Vaillant and Jaurequi the "Mobi Episode Design Update" and details a "New Design for Jetflicks

It is anticipated that a Stripe representative will testify that, shortly after receiving Dallmann's application, Stripe began its due diligence process and attempted to view the Jetflicks website.  Yet, as reflected in GX 134, to which SA Schurott and SA Chase will testify, Stripe could not access *jetflicks.com*.  Accordingly, on November 9, 2016, Stripe sent an email to Dallmann requesting access.  Stripe explained that the site appeared to be "password protected," and explained that it "need[ed] to be able to see the actual contents of [the] site before resuming transfers to [Dallmann's] bank account."[105]

We expect SA Schurott and SA Chase also will testify as to what happened next.  They are expected to establish that on November 13 and 14, 2016, Dallmann sent a series of emails and text messages to Vaillant regarding how he wanted Vaillant to construct *jetflicks.com*.  The upshot of these messages was that Dallmann and Vaillant designed *jetflicks.com* to display information relating only to JASC.  Dallmann, moreover, urged Vaillant to complete *jetflicks.com* as soon as possible so that Stripe would release the funds it had frozen.[106]

SA Schurott and SA Chase also will testify about GX 134, which was Dallmann's response to Stripe on November 15, 2016.  In that response, Dallmann doubled down on the false representation of Jetflicks' business, describing Jetflicks as "a hardware/software based solution" for "private, corporate, and executive aircraft" that "allows [airplane] passengers to use their mobile devices to control IFE [in-flight entertainment], order drinks from the in-flight

---

Shows."); GX 180 (Nov. 14, 2016 Texts) at 1 (Vaillant advising Dallmann that, in creating *jetflicks.com*, he is "not using anything that is related to jetflicks.mobi").

[105] GX 134 (Nov. 9, 2016 Email) at 2.

[106] GX 135 (Nov. 13, 2016 Email) at 1; GX 136 (Nov. 13, 2016 Email) at 1; GX 137 (Nov. 14, 2016 Email) at 1; GX 179 (Nov. 14, 2016 Texts) at 1-2; GX 180 (Nov. 14, 2016 Texts) at 1-2.

staff, communicate with the pilots, and even check flight status and statistics instantly." Dallmann claimed that Jetflicks had "3,500 active customers" and described *jetflicks.com* as a site that was still under construction.  He offered to create an account on *jetflicks.com* for Stripe and provided "mock-up[s] of what will be available on jetflicks.com" within the next day. Because Dallmann's email omitted any reference to Jetflicks' streaming service, Stripe was left with the false impression that the funds Stripe would process were customer payments for an "aircraft" business.

SA Schurott and SA Chase also will prove that Dallmann forwarded GX 134 to Vaillant the same day that Dallmann sent it to Stripe.  They also will show that Dallmann followed up by text message, writing that he understood Vaillant was working hard but he was frustrated with Vaillant's progress on *jetflicks.com*.[107]  Dallmann added that he understood Vaillant wanted to get paid, and noted that "if we don't get this shit figured out" soon, then there were "pretty severe consequences that will happen in less than a week."[108]  Dallmann explained that this is "why [he] made the decision to email Stripe prematutly [sic]" and "why [he] explained the shit out of what products we're offering, and why the site isn't completely online yet."[109]  Vaillant then confirmed that he was translating the email that Dallmann had sent to Stripe, but expressed no objection to Dallmann's description of Jetflicks' business.[110]

SA Schurott and SA Chase further will establish that Dallmann thereafter continued to press Vaillant to complete *jetflicks.com*.  For instance, on November 15, 2016, Dallmann told

---

[107] GX 181 (Nov. 15, 2016 Texts) at 1.

[108] *Id.*

[109] *Id.*

[110] *Id.* at 1-2.

Vaillant that he would not be paid until "a merchant approves sending us money."[111] Dallmann stated that he had "$13,000 sitting out there in payments on PayPal and Stripe," adding, "I mean, you do know we are not kidding when we say that the site on jetflicks.com being complete is the key to getting paid."[112] When Vaillant told Dallmann to tell Stripe that "jetflicks.com is working," Dallmann responded: "you do realize that they have to verify that we are 'selling' what we say we're selling… and test the functionality of the site…"[113] Dallmann then set out the specific features he needed to be displayed on *jetflicks.com*, and pointedly stated, "You do realize that every single aspect of how I've designed jetflicks.com has been thought through, and has been tied in together with the overall objective for us to get our account approved, and for us to get paid."[114]

Dallmann went on to explain his view of why he "ma[d]e over $750,000" through Jetflicks.[115] Dallmann bragged that he had built Jetflicks "from nothing" because he had "a very good understanding" of the "established systems set forth by other companies, and what's necessary to get past those systems so [Jetflicks] can thrive."[116] Dallmann added that he had an upcoming meeting at Wells Fargo regarding a merchant account and planned to "look put together, driv[e] up in a $200,000 car," and "technically" lie about "already having an

---

[111] GX 140 (Nov. 15, 2016 Texts) at 1.

[112] *Id.*

[113] *Id.* at 2.

[114] *Id.*

[115] GX 141 (Nov. 15, 2016 Texts) at 1.

[116] *Id.*

established merchant processor."[117]  Then, on November 16, 2016, Dallmann sent Vaillant

another message that Dallmann had sent to Stripe.[118]  The message, in relevant part, stated that

Dallmann had "applied and been  approved for 2 other merchant accounts," and Dallmann

threatened to "refund[] all transactions made through Stripe" if Stripe did not release Jetflicks'

funds "by tomorrow."[119]  Vaillant responded, "[N]ice you are a professional."[120]

SA Schurott and SA Chase also will testify that, a few days later, on November 19,

2016, Dallmann and Vaillant discussed Jetflicks' revenue.[121]  Dallmann stated that, "[b]efore

we had our issue with PayPal, we were making 20,000 to 30,000 per month" but Jetflicks was

now generating "less than $10,000 . . . each month."[122]  When Vaillant again complained to

Dallmann about not being paid, Dallmann chided Vaillant for "throw[ing] that in [his face]"

because Vaillant "kn[e]w the reasons why things went the way they did and [Vaillant] decided

to stick with [Jetflicks] through those issues."[123]  Then, on November 20, 2016, Dallmann sent a

lengthy email to Vaillant about the status of several projects.[124]  Dallmann complained that

there were problems with billing, television shows were not displaying correctly, "[t]he video

file security we developed for weeks[] still [did not] work, and [was not] being used at all to

---

[117] *Id.*

[118] GX 142 (Nov. 16, 2016 Texts) at 1.

[119] *Id.*

[120] *Id.*

[121] GX 144 (Nov. 20, 2016 Texts) at 1.

[122] *Id.*

[123] *Id.*

[124] GX 145 (Nov. 20, 2016 Email) at 1.

protect [Jetflicks'] content," and *Jetflicks.com* still was not "completely online," which could "raise questions with our merchant[] and may jeopardize us receiving funds."[125]  Vaillant responded the next day with an update on the status of these items.[126]

Finally, to remove any doubt that *Jetflicks.com* was a front, we will show at trial an April 2017 conversation between Dallmann and a friend that made clear that the site was a sham.  SA Chase will testify that Dallmann wrote to a friend, asking for feedback on a business idea and provided the following background:

> We had an issue a while back where PayPal wanted info that we couldn't give to them… so they cut off our account… and we moved to another payment processor[.]  Well, to avoid any issues… **I created a 'fake' website for Jetflicks… jetflicks.com[.]**  And made it seem like Jetflicks provided older aircraft with a software/hardware solution that integrated with older aircraft flight services systems… and allowed passengers to access them via their personal devices using their web browser[.] [B]ut… Here's the funny thing… I think this might be a viable product… and I wanted to run it by you[.][127]

## J.     Operation of the Conspiracy in Late 2016 and 2017

We will establish that the conspiracy's membership and roles changed again in late 2016.  SA Chase will testify that, by mid-December 2016, Dallmann brought into the conspiracy a new programmer, Villarino.  And, as with his other co-conspirators, Dallmann expressed concern to Villarino about people "steal[ing] our content, especially Darryl [Polo]" and asked Villarino to

---

[125] *Id.*

[126] *Id.*

[127] GX 164 (Apr. 21, 2017 Texts) at 1-2 (emphasis added).

"change and enhance the security" of the site.[128]  For example, in May 2017, Dallmann discussed with Villarino the need for a "license server" to secure the shows that Jetflicks was offering.[129]  Dallmann remarked, during this conversation, that Microsoft's license server PlayReady was not "an option" because "let's just say… the requirements are not aligned with [Jetflicks'] business model… 😉"[130]

In addition, SA Chase is expected to testify that Jaurequi, who previously had been helping answer customer emails, began taking a greater role in the conspiracy.  Jaurequi described himself in January 2017 as Jetflicks' "direct[or] of programming/ operations and service." [131]  A few months later, Jaurequi stated that he was in charge of "programming, billing, and general [sic] everything."[132]  SA Chase will explain that this was not puffery.  A review of Jaurequi's cellphone reveals that he had bookmarked the Jetflicks servers on which SickRage and SABnzb were running.[133]

Unchanged in 2017, however, were the efforts to misdirect outsiders on the true nature of Jetflicks.  SA Chase will testify about GX 162, which was an email Dallmann and Jaurequi sent to BMW in March 2017 in an effort to stave off repossession of their BMW 650i.  Dallmann provided, among other things, a screenshot from Dallmann's PayPal account that indicated the

---

[128] GX 160 (Feb. 18, 2017 Google Chat) at 1.

[129] GX 167 (May 5, 2017 Google Chat) at 1.

[130] *Id.* at 1-2.  SA Chase is expected to testify that PlayReady is a digital rights management technology developed by Microsoft and is intended to prevent the unauthorized copying of media files.

[131] GX 156 (Jan. 24, 2017 Texts) at 1.

[132] GX 166 (Apr. 28, 2017 Texts) at 1.

[133] GX 176 (Web Bookmarks from Jaurequi's Apple iPhone) at 1-2.

account had over $6,500 in funds but "account access [was] limited."  Dallmann claimed

PayPal's hold "was placed on 10-24-16 to cover any disputed charges made by our

customers . . . because the payment processor is the one liable for all monies exchanged."  SA

Chase, however, will testify that, as the above emails and text messages show, this was a lie.

**K.**      **The FBI's Investigation in 2016 and 2017**

In 2016, the FBI launched an undercover operation with respect to Jetflicks.  SA Chase is

expected to testify that, using an undercover account, he used a computer located in this District

to obtain a paid subscription to Jetflicks and to access and explore the site.[134]  SA Chase also

streamed and downloaded numerous television shows.[135]  SA Chase is further expected to testify

that he observed numerous television shows available on Jetflicks.

SA Chase used an application to screen capture his undercover activity on Jetflicks.  As a

result, he is expected to testify about the following exhibits:

- GX 502, 503, 504, and 505, which are undercover recordings of Jetflicks.

- GX 503A, which is an undercover recording of Jetflicks from April 2017, that depicts the streaming of a *Game of Thrones* episode.

- GX 505A, which is an undercover recording of Jetflicks from April 2017, that depicts the streaming of an *NCIS: Los Angeles* episode.

---

[134] GX 501 (screenshot of *Jetflicks.mobi* landing page); GX 507 (screenshot of television shows available for viewing on Jetflicks, including *2 Broke Girls*); GX 508 (screenshot of television shows available for viewing on Jetflicks, including *Game of Thrones*); GX 512 (screenshot of television shows available for viewing on Jetflicks, including *Ray Donovan*).

[135] GX 509 (undercover recording of *12 Monkeys* episodes "Blood Washed Away" and "Memory of Tomorrow" being streamed in this District); GX 510A (copy of *12 Monkeys* episode "Blood Washed Away" downloaded into this District); GX 510B (copy of *12 Monkeys* episode "Memory of Tomorrow" downloaded into this District"); GX 511 (undercover recording of *The OA* episode "Paradise" being streamed into this District); GX 511A (copy of *The OA* episode "Paradise" downloaded into this District).

- GX 505B, which is an undercover recording of Jetflicks from April 2017, that depicts the availability of *Ray Donovan*.

- GX 513, which is an undercover recording of Jetflicks from April 2017, that depicts the landing page for *Jetflicks.mobi* and the process for logging into the site.

- GX 514, which is an undercover recording of Jetflicks from April 2017, that depicts the availability of 18 seasons of *Law & Order: Special Victims Unit* and shows the streaming of an episode in which a watermark for NBC 4 New York is visible.

And, through the testimony of van Voorn, we expect to prove that the retail value of each television episode that Dallmann and his co-conspirators downloaded during the course of the conspiracy could not have been less than $2.00 and was in fact significantly more.

As stated previously, we will prove that, in November 2017, the FBI executed search warrants in Las Vegas at two homes owned by Dallmann. We may introduce through SA Cox the photographs taken by the FBI and the sketches made during those searches.[136] And, we will highlight SA Brown's interview of Jaurequi, who, like Dallmann, initially claimed Jetflicks was an aviation-services business. SA Brown will testify that Jaurequi subsequently admitted that Jetflicks was violating the law. Jaurequi stated that the conspiracy utilized SickRage to download content (which he likened to Napster), and conceded that Jetflicks had started out innocent but greed had come into play.

## III.   Admissibility of Certain Exhibits

As this Court knows, the admissibility of evidence requires the application of several evidentiary rules. The proponent of evidence consequently must clear "a series of hurdles."

---

[136] *See* GX 201A; 201B; 201F; 201H; 201J; 201L; 201N; 201O; 201R; 201T; 201V; 201W; 201X; 201Y; 201Z; GX 201AA; GX 202; GX 203A; 203C; 203E; 203G to 203K; 203M to 203P; 203R to 203U; 203W; and GX 204.

*Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 538 (D. Md. 2007).  For instance, the proffered evidence must be relevant pursuant to Rule 401 of the Federal Rules of Evidence and must be self-authenticating or otherwise authentic.  *See* Fed. R. Evid. 901 *et seq.* and 902 *et seq.*  In addition, if offered for its substantive truth, the proponent of the evidence must show the item does not contain hearsay or falls within an exclusion from or exception to the hearsay rule.  *See* Fed. R. Evid. 801 *et seq.*  We endeavor in Part III, accordingly, to detail the admissibility of discrete categories of exhibits.[137]

### A.    Attribution of Electronic Communications to Particular Defendants

We will establish that electronic communications were sent to or from the defendants proceeding to trial in several ways.  This section, accordingly, provides an overview of how we will do so.

***First***, the evidence shows that Dallmann, Jaurequi, and Courson sent and received the text messages found within the Apple iPhones for which Dallmann and Jaurequi provided passcodes to the FBI (designated by the FBI as 1B65 and 1B87).  This is evident in several ways, including based on the following: GX 070 (device information for 1B65 showing the Apple ID for the device was kristoph@jetflicks.com); GX 188 (a text from Dallmann to Jaurequi in which he refers to himself as "Kris" and includes the very phone number that he told SSA Lynch was his); GX 189 (a selfie-style photograph of Dallmann from 1B65); GX 190 (selfie-style photographs of Jaurequi from 1B87); GX 920 (a selfie-style photograph of Dallmann and Garcia from 1B65); GX 914 (device information for 1B87 showing the Apple ID for the device was

---

[137] To streamline our discussion of the admissibility of exhibits, we have grouped exhibits within Part III based on their primary relevance.  Some exhibits, as indicated by Part II, have multiple purposes, and we reserve the right to admit and use such exhibits for more than one purpose.

jaredjedwards@gmail.com); GX 916 (contacts found within 1B65 for Courson, Garcia, and

Jaurequi); GX 917 (contacts found within 1B87 for Courson and Dallmann).[138]   Moreover, SSA

Lynch and SA Alexis Brown interviewed Dallmann, Jaurequi, and Courson, who each identified

their telephone numbers and those telephone numbers match the telephone numbers associated

with the relevant text messages that we plan to introduce at trial.

     ***Second***, the evidence shows that Garcia sent or received the messages found within two

files recovered from an iCloud Drive that had been backed up to a computer tower seized from

Dallmann's house.  The proof of this fact includes:[139]

- Text messages that show Dallmann and Garcia had a close, personal relationship, such as those in GX 004D.[140]

---

[138] For purposes of authenticating these exhibits, we will elicit testimony from SSA Lynch, Forensic Examiner John Kern, and Forensic Examiner Dan Ogden.  We expect the sum and substance of this testimony will be that the FBI found 1B65 and 1B87 in Dallmann's residence during the execution of the November 2017 search warrants, Dallmann provided passwords for 1B65 and 1B87, Forensic Examiner Kern extracted data from 1B65 and 1B87, and Forensic Examiner Ogden later processed the extracted data and identified the 1B65-related exhibits discussed herein.  At trial, we will mark but not seek to admit GX 207.

[139] We expect to call SA Curtis Cox and Forensic Examiner Peterson to establish the authenticity of the exhibits bulleted below.  Specifically, SA Cox will testify that he seized an Apple tower, which the FBI designated as 1B76, and Forensic Examiner Peterson will testify that she later forensically examined 1B76 and located, among other things, an Apple iCloud archive with spreadsheets containing the text messages that comprise the bulleted exhibits.

The metadata associated with these messages is depicted within GX 004F, and also will be authenticated by Forensic Examiner Peterson.  The metadata does not constitute hearsay because it is computer-generated.  *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018) (spreadsheets reflecting point-of-sale data were machine-generated records falling outside of the hearsay rule); *United States v. Washington,* 498 F.3d 225, 230-31 (4th Cir. 2007) (printed result of computer-based test was not the statement of a person and thus would not be excluded as hearsay); *United States v. Hamilton,* 413 F.3d 1138, 1142-43 (10th Cir. 2005) (computer-generated header information was not hearsay as "there was neither a 'statement' nor a 'declarant' involved here within the meaning of Rule 801").

[140] The relevant communications are set forth above at Footnote 44.

- GX 004A, which is a short code message sent on March 23, 2013, that states, in relevant part, "Great news, Felipe Garcia! Your federal return was accepted by the IRS."

- GX 004B, which are texts to and from a telephone number ending in 0629. This telephone number is associated with a contact titled "Kris Dallmann," and is the same telephone number Dallmann told SA Lynch was his telephone number. And, one of the messages sent to Dallmann states: "Send it to Felipe82garcia@ yahoo."

- GX 004C, which are a series of texts in which the sender labeled as "me" states that his email address is "Felipe82garcia@icloud.com."

- GX 004D, which are texts to and from the telephone number ending in 0629 that Dallmann told SSA Lynch was his. The upshot of these communications is that Dallmann and Garcia discuss making a hotel reservation and Dallmann states that his email is kris@jetflicks.com.

- GX 004E, which are a series of texts to and from Dallmann's telephone number. One of the messages Dallmann sent states: "Relax Garcia!!"

- GX 062D, which are Google searches conducted by kristopher.dallmann@gmail.com in June 2015. The search terms include "felipe garcia, nevada 1982" and "felipe garcia, nevada 33," which can be used to infer felipe82garcia@icloud.com contains not only Garcia's name but also his birth year.

- GX 019, which are a series of intimate texts between Courson and Garcia in which Courson writes, "Good morning Filiepe."

Garcia frequently communicated with Courson, which is evident by, among other things, texts like those within GX 025 that were exchanged with a telephone number ending in 3656, which is the telephone number that Courson told SA Brown was his telephone number.[141] We further will establish that Garcia controlled fgarcia@jetflicks.com through GX 047 and 050 and eliciting testimony from Forensic Examiner Peterson and SA Chase that the display name for the account

---

[141] GX 025 can be authenticated in the manner set forth above in Footnote 139.

is Felipe Garcia, the messages concern Jetflicks, there was only one Felipe Garcia who worked at Jetflicks, and Courson refers to Garcia by his first name in GX 051.[142]

**Third**, the evidence proves that Dallmann used 1B65 to text with Vaillant. SA Chase interviewed Vaillant, who identified as his telephone number the one Dallmann texted with and denoted within his iPhone as belonging to Vaillant. In addition, GX 068 are texts between Dallmann and Vaillant in which Dallmann asks Vaillant to send his resume to kristoph@jetflicks.com,[143] GX 081 are texts between Dallmann and Vaillant in which Vaillant states that he has created yvaillant@jetflicks.com as an email and made "copxerkiller" his password, GX 069 is an email from copxer@gmail.com that was provided by Google,[144] and GX 108 are texts between Dallmann and Vaillant in which Vaillant provides his full name and mailing address.

**Fourth**, the evidence shows that Dallmann sent and received emails from kristopher.dallmann@icloud.com, kristopher.dallmann@gmail.com, kris@jetflicks.com, and kristoph@jetflicks.com. For example, Dallmann admitted to SSA Lynch that kristopher.dallmann@icloud.com is his email address. We also will introduce subscriber records obtained from Google (GX 702), which show kristopher.dallmann@gmail.com was registered to "Kristopher Dallmann" and the recovery email address was kristopher.dallmann@icloud.com. Likewise, GX 704, which was provided by Google in connection with its production for

---

[142] We expect to call SA Cox and Forensic Examiner Peterson to establish the authenticity of GX 047. Specifically, we anticipate that the sum and substance of their testimony is that SA Cox seized 1B76, and Forensic Examiner Peterson later forensically examined 1B76 and located a number of emails, including GX 047.

[143] We expect to authenticate GX 068 in the manner set forth above in Footnote 138.

[144] The body of the email is signed "Yoany Vaillant Fajardo" and attached to the email is a resume for Vaillant that lists the aforementioned telephone number that Vaillant told SA Chase was his.

kris@jetflicks.com, shows that kristoph@jetflicks.com was registered to "Kristopher Dallmann," the recovery email for the account was kristopher.dallmann@gmail.com, and an alternate email for the account was kris@jetflicks.com.[145]

*Fifth*, the evidence proves that doug@jetflicks.com belonged to Courson.  Consider, for instance, GX 058.[146]  The email is from doug@jetflicks.com and is signed by "Doug."  We will elicit testimony that the display name for the email was "Douglas Courson," and that there was nobody else named Douglas Courson who worked at Jetflicks.  Similarly, in GX 127, Courson exchanges texts with Jaurequi in which Courson states his email address is doug@jetflicks.com.

*Sixth*, we will establish that prjreply@gepard.net is Huber's email address by eliciting testimony from SA Chase that Huber identified that email address as his during an interview.  We also will point out that GX 058 is addressed to "Peter."  Moreover, we will elicit testimony from Forensic Examiner Peterson and SA Chase that Huber also controlled phuber@jetflicks.com based on the display name (*i.e.*, "Peter Huber") and the fact Huber was the only "Peter" who worked at Jetflicks.

### B.   Exhibits Relating to Roles and Membership in the Conspiracy

To prove the conspiracy count, we must show that a conspiracy existed, and may do so through direct or circumstantial evidence.  *United States v. Capers*, 61 F.3d 1100, 1107 (4th Cir. 1995).  A trier of fact is given substantial latitude in its effort to determine whether a person is guilty of participation in a conspiracy.  *United States v. Heater*, 63 F.3d 311, 323 (4th Cir. 1995).  Moreover, the trier of fact may infer the agreement necessary for a conspiracy conviction

---

[145] At trial, we will mark GX 701, which is the Google return for kristopher.dallmann@gmail.com, and 703, which is the Google return for kris@jetflicks.com, but not seek to admit either.

[146] We expect to authenticate GX 025 in the manner set forth above in Footnote 142.

through the totality of circumstances shown by the government.  *United States v. Bell*, 954 F.2d 232, 236 (4th Cir. 1992).

Below we summarize the exhibits that we are seeking to admit that will establish roles and membership in the charged conspiracy.  This summary addresses the relevance and authenticity of the exhibits, as well as hearsay issues.

### 1.  *Text Messages Obtained from an Apple Tower (1B76)*

We seek to admit GX 004D, 005, 006, 007, 012, 013, 015, 019, 022, 024, 025, 028, 029, 031, 034, 035, 036, 037, 038, 040, 041, 042, 044, and 911, which are text messages dated between May 27, 2013, and September 14, 2014, that were obtained from an Apple Tower with RAID seized from Dallmann's residence.  (This is the device that the FBI designated as 1B76.[147])  These exhibits are relevant because they demonstrate the roles played by different defendants during the conspiracy, demonstrate certain defendants' membership in the conspiracy, and/or demonstrate intimate relationships between co-conspirators.[148]  The exhibits are particularly described as follows:

| Exhibit | Date | Description[149] |
|---|---|---|
| 004D | July 18, 2013 | Garcia states to Dallmann "don't get frustrated with me baby," indicating that Garcia and Dallmann have an intimate relationship. |

[147] At trial, we will mark GX 205 but not seek to admit it.

[148] The exhibits discussed herein may be relevant for other reasons and may illustrate other roles than the ones discussed below, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

[149] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

| 005 | Aug. 11, 2013 | Dallmann states Garcia does not have another source of income other than Jetflicks, demonstrating, among other things, Dallmann and Garcia's membership in the conspiracy. This exhibit also indicates that Dallmann and Garcia are involved in an intimate relationship. |
| 006 | Aug. 19, 2013 | Garcia asks another person to add a show that had aired that day, demonstrating Garcia's role managing content requests. |
| 007 | Aug. 20, 2013 | Garcia is informed that all shows on Garcia's list have been uploaded, demonstrating Garcia's role managing content requests. |
| 012 | Oct. 16, 2013 | Dallmann informs Garcia about a Facebook post stating that Jetflicks is "THE best streaming TV provider in the world," demonstrating Dallmann and Garcia's membership in the conspiracy. |
| 013 | Nov. 18, 2013 | Dallmann informs Garcia about a huge Sickbeard update causing shows not to launch properly, which is partly Huber and Courson's fault, demonstrating Dallmann's role managing co-conspirators and Courson and Huber's roles obtaining content. |
| 015 | Jan. 20, 2014 | Courson informs Garcia that he will see if Huber can work without Courson for a while so Courson can meet Garcia, demonstrating, among other things, collaborative work between Courson and Huber.  This exhibit also indicates that Courson and Garcia are involved in a personal relationship. |
| 019 | Apr. 26, 2014 | Courson and Garcia discuss having sex and Garcia suggests Courson could have sex with Dallmann and Garcia, demonstrating that Courson, Garcia, and Dallmann have an intimate, personal relationship. |
| 022 | May 29, 2014 | Garcia asks whether Courson has obtained shows requested by subscribers and Courson provides a status update, demonstrating Garcia's role of managing content requests and Courson's role obtaining content. |
| 024 | June 10, 2014 | Garcia asks whether Courson has obtained certain shows and Courson provides a status update, demonstrating Garcia's role of managing content requests and Courson's role obtaining content. |

| 025 | June 18, 2014 | Garcia asks whether Courson has obtained certain shows, Courson provides a status update, and Courson indicates he needs instruction from Dallmann, demonstrating Garcia's role of managing content requests, Courson's role obtaining content, and Dallmann's role instructing co-conspirators. |
|---|---|---|
| 028 | June 21, 2014 | Garcia requests that Courson add a show then indicates that Dallmann is doing it, demonstrating Garcia's role managing content requests and Dallmann and Courson's roles obtaining content. |
| 029 | June 23, 2014 | Garcia requests that Courson address issues with content and Courson indicates that he used to perform Garcia's job, demonstrating Garcia's role managing content requests and Courson's role obtaining content and former role managing content requests. |
| 031 | July 3, 2014 | Dallmann tells Garcia that Jetflicks pays for everything in their lives, indicating, among other things, Dallmann and Garcia's membership in the conspiracy. This exhibit also demonstrates that Dallmann and Garcia are involved in a personal relationship. |
| 034 | July 23, 2014 | Garcia and Courson discuss whether they have the most recent episode of a television show, demonstrating Garcia's role managing content requests and Courson's role obtaining content. |
| 035 | Aug. 7, 2014 | Garcia asks whether Courson has obtained certain content and Courson provides a status update, demonstrating Garcia's role of managing content requests and Courson's role obtaining content. |
| 036 | Aug. 14, 2014 | Courson tells Garcia that he has tried to fix a problem with the server but has requested that Huber assist him, demonstrating Courson and Huber's roles in providing technical support regarding the Jetflicks servers. |
| 037 | Aug. 14, 2014 | Courson informs Garcia that he has requested episodes of certain shows, but needs Huber's help regarding a problem with loading a show, indicating Courson and Huber's roles in obtaining content. |
| 038 | Aug. 26, 2014 | Garcia indicates he left information on Courson's desk, demonstrating collaborative work between Garcia and Courson. This exhibit also demonstrates that Courson and Garcia are involved in a personal relationship. |

| 040 | Sept. 2, 2014 | Garcia requests that Courson add a show and indicates he will provide a list of show errors and Courson indicates they already have the show, demonstrating Garcia's role managing content requests and Courson's role obtaining content. |
| 041 | Sept. 8, 2014 | Courson informs Garcia that he is taking Huber off a project to work on securing the Jetflicks files, indicating Courson's role managing the activities of co-conspirators and Huber's role developing security protocols. |
| 042 | Sept. 10, 2014 | Garcia advises Courson of a customer complaint, and Garcia discusses how their lives revolve around Jetflicks, demonstrating Garcia's role managing customer requests and Courson and Garcia's membership in the conspiracy. |
| 044 | Sept. 14, 2014 | Garcia and Courson discuss a show episode that will not upload properly and Courson indicates he will seek Huber's help, demonstrating Garcia's role managing content requests and Courson and Huber's roles obtaining content. |
| 911 | May 27, 2013 | Garcia informs another person that a show episode is not playing properly, indicating Garcia's role advising of content errors. |

The Government's evidence establishes the authenticity of these exhibits pursuant to Rules 901(b)(1) and (b)(4). During the execution of the search warrant at Dallmann's principal residence on November 16, 2017, SA Cox seized an Apple Tower with RAID that had a serial number ending in 120G. The FBI designated this device as 1B76, and it was imaged by the CCIPS Cybercrime Lab. Forensic Examiner Peterson examined the image and located an Apple iCloud archive from it under the username "jetflicks." The archive would have been generated as a result of a user backing up an Apple iPhone to the Apple Tower. The archive contained all the text messages that are listed in the two spreadsheets that constitute GX 004.[150] One

---

[150] We will mark, but not introduce, GX 004 at trial.

spreadsheet includes iMessages and the other includes SMS messages.  All the text message exhibits that are listed in the table above are excerpts of GX 004.

As described above in Part III.A, our evidence demonstrates that the above exhibits are messages sent to or from Garcia.  The distinctive characteristics of the messages are more than sufficient to authenticate them. Rule 901(b)(4) provides that evidence may be authenticated based entirely on its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  The Fourth Circuit, moreover, has approved repeatedly the admission of records under Rule 901(b)(4).  For example, in *United States v. Vidacak*, 553 F.3d 344 (4th Cir. 2009), the Fourth Circuit approved the admission of military personnel records seized overseas based, in part, on the records' internal patterns and distinctive characteristics, *id.* at 350-51.  Likewise, in *United States v. Reed*, 780 F.3d 260 (4th Cir. 2015), the Fourth Circuit held that the "the government proffered evidence that the jury could use to attribute" a particular phone to a defendant, despite offering "no testimony about how this phone was seized," because there was evidence of "photos of [the defendant] on the phone and text messages attributing the number to [the defendant], including several that used . . . his first name."  *Id.* at 265-267; *see also United States v. Fluker*, 698 F.3d 988, 998-1000 (7th Cir. 2012) (finding messages properly authenticated in light of the email addresses and content of the communications); *United States v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (similar).

Further, since the above exhibits are messages sent to or from Garcia, they constitute party opponent and co-conspirator statements and are excluded from the hearsay rule.  Fed. R. Evid. 801(d)(2)(A) & (E).  To admit evidence as a co-conspirator's statement, a court must conclude "(1) that there was a conspiracy involving the declarant and the party against whom

admission of the evidence is sought and (2) that the statements at issue were made during the course of and in furtherance of that conspiracy." *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992) (*citing Bourjaily v. United States,* 483 U.S. 171 (1987)).  The district court must find "'the existence of and the [defendant's] participation in the conspiracy' by a fair preponderance of independent evidence." *United States v. Chindawongse*, 771 F.2d 840, 844 (4th Cir. 1985) (*quoting United States v. Scott*, 730 F.2d 143, 148 (4th Cir. 1984)). Although independent evidence is required, it may be supplemented by the hearsay statements.  *United States v. Osiomwan*, No. WDQ-12-0265, 2013 WL 2458459, at *8 (D. Md. May 22, 2013), *aff'd*, 593 F. App'x 194 (4th Cir. 2014). Statements or admissions by the defendant against whom such out of court declarations are offered may constitute the additional independent evidence required.  *United States v. Kelly*, No. 98-13-1, 1998 WL 221040, at *1 (E.D. Pa. May 6, 1998); *see also United States v. Sutton*, 732 F.2d 1483, 1489 (10th Cir. 1984) (concluding that defendant's own statements on tape that he wanted a co-conspirator to prevent individuals from going to the FBI, along with the co-conspirator's statements agreeing to comply with the request, constituted substantial independent evidence of conspiracy).

Here, our evidence demonstrates that there was a conspiracy that began in approximately 2007.  As noted above, the statements of the individual defendants, in conjunction with their co-conspirators' statements, provides substantial independent evidence that there was a conspiracy and that these statements were made during the course of, and in furtherance of, this conspiracy. Furthermore, we will introduce other independent evidence relating to the conspiracy from this time frame such as GX 008 and 010 which are 2013 Jetflicks show lists and GX 018 and 030 which are 2014 printouts of Sick Beard downloads that demonstrate the existence of the conspiracy at this time.  These documents can be analogized to drug inventory lists found in a

stash house that provide evidence of a drug conspiracy.  *See United States v. Vieira*, 280 F. App'x 26, 28 (2nd Cir. 2008) (summary order) (concluding that it was not plain error to admit co-conspirator statements as non-hearsay when, among other things, the government presented independent evidence of defendant's involvement in the conspiracy including a drug ledger that indicated an ongoing drug-related relationship between defendant and a co-conspirator).  Here, these lists show the inventory of pirated content obtained by the defendants during this time frame.

Finally, the text messages listed in the table above are admissible pursuant to Rule 403. The evidence that demonstrates membership in the conspiracy and the roles that the defendants played in the conspiracy is more probative than prejudicial as it explains how each defendant fit into the operation of the conspiracy.  *See United States v. McMillan*, 14 F.3d 948, 955 (4th Cir. 1994) (holding that evidence "elicited as part of the groundwork that the government needed to lay to explain to the jury how [] individuals fit into the operation of [the] conspiracy . . . . helped 'explain to the jury how the illegal relationship between participants in the crime developed'" and thus the trial court did not abuse its discretion in allowing the evidence under Rule 403). Furthermore, the evidence regarding the intimate relationships between certain co-conspirators is also more probative than prejudicial because it speaks to a central issue in the case: whether the co-conspirators were knowing participants in the scheme.  *See United States v. Brockenborrough*, 575 F.3d 726, 736-37 (D.C. Cir. 2009) (concluding evidence about intimate relationship among co-conspirators was more probative than prejudicial when, among other things, it addressed whether the defendant was a knowing participant in the fraud scheme or an innocent real estate investor); *see also United States v. Mateos*, 623 F.3d 1350, 1365 (11th Cir.

2010 (finding an intimate relationship among conspirators may be probative of knowing, voluntary participation in a conspiracy).[151]

Finally, the evidence that demonstrates who was sending and receiving the text messages is clearly more probative than prejudicial. *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) ("relevant evidence should only be excluded under Rule 403 when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence") (internal quotations and citation omitted). [152]   For the foregoing reasons, we respectfully request that the Court admit GX 004D, 005, 006, 007, 012, 013, 015, 019, 022, 024, 025, 028, 029, 031, 034, 035, 036, 037, 038, 040, 041, 042, 044, and 911.

### 2.      *Emails Obtained from the Apple Tower with RAID*

We also seek to admit GX 014, 016, 020, 045, 046, 047, 048, 049, 050, 051, 057, 058, 059, 107, 115, 132, 145, and 1304 which are emails dated between January 7, 2014, and November 21, 2016, that were obtained from 1B76.  These exhibits are relevant because they demonstrate the roles played by different defendants during the conspiracy.[153]  The exhibits are particularly described as follows:

---

[151] As noted above, we have offered to stipulate to the fact that Dallmann, Courson, and Garcia had intimate relationships with each other; however, at present, none of these defendants has agreed to such a stipulation.

[152] As noted above, we have offered to stipulate to the fact that Dallmann, Courson, and Garcia had intimate relationships with each other; however, at present, none of these defendants has agreed to such a stipulation.

[153] The exhibits discussed herein may be relevant for other reasons and may illustrate other roles than the ones discussed below, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

| Exhibit | Date | Description[154] |
|---|---|---|
| 014 | Jan. 7, 2014 | Courson informs Dallmann that they have an episode of a show that has not aired yet, demonstrating Courson's role obtaining content and Dallmann's role managing co-conspirators. |
| 016 | Jan. 22, 2014 | Courson informs Dallmann of the status of problems related to content and advises that Huber will have to determine why an episode is missing, demonstrating Courson and Huber's roles obtaining content and Dallmann's role managing co-conspirators. |
| 020 | May 8, 2014 | Courson informs Dallmann of the status of obtaining certain episodes, demonstrating Courson's role of obtaining content and Dallmann's role managing co-conspirators. |
| 045 | Sept. 18, 2014 | Courson informs Dallmann and Garcia about new shows added to the system, demonstrating Courson's role obtaining content. |
| 047 | Dec. 4, 2014 | Garcia asks about the status of updates for certain shows and Courson responds, demonstrating Garcia's role of managing content and Courson's role obtaining content. |
| 046 | Oct. 30, 2014 | Garcia sends Courson content requests and Courson responds with updates, demonstrating Garcia's role of managing content and customer requests and Courson's role obtaining content. |
| 048 | Jan. 7, 2015 | Dallmann and Courson discuss strategy for managing server loads and Courson states he has discussed this with Huber, demonstrating Dallmann, Courson, and Huber's roles developing strategy regarding how to store shows on servers. |
| 049 | Jan. 23, 2015 | Garcia sends Courson a request regarding a show and Courson responds, demonstrating Garcia's role of managing content requests and Courson's role obtaining content. |
| 050 | Feb. 9, 2015 | Courson informs Dallmann of the status of obtaining certain episodes, demonstrating Courson's role obtaining content. |
| 051 | Feb. 12, 2015 | Courson informs Garcia and Dallmann about the status of certain show requests, demonstrating Courson's role obtaining content. |

---

[154] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion. The full exhibits have been provided to the Court and to defense counsel.

| 057 | July 5, 2015 | Courson informs Dallmann of a problem regarding obtaining content, demonstrating Courson's role obtaining content and Dallmann's role managing co-conspirators. |
| 058 | Sept. 4, 2015 | Courson informs Huber and Dallmann that he is having trouble uploading shows that he believes is due to a change Huber made to the system, demonstrating Courson and Huber's roles obtaining content and Dallmann's role managing co-conspirators. |
| 059 | Sept. 17, 2015 | Courson informs Huber and Dallmann about a problem relating to a particular show episode and asks Huber to fix it, demonstrating Courson and Huber's role obtaining content and Dallmann's role managing co-conspirators. |
| 107 | Sept. 5, 2016 | Dallmann emails Vaillant four Jetflicks application programming interface (API) keys for SickRage and one API key for SABnzbd, which are Jetflicks' unique log-in credentials for SickRage and SABnzbd, demonstrating Dallmann and Vaillant's role acquiring content for Jetflicks. |
| 115 | Sept. 29, 2016 | Dallmann emails Vaillant Jetflicks' API credentials for PayPal, giving him full access to Jetflicks' PayPal account, demonstrating Dallmann and Vaillant's role regarding customer billing. |
| 132 | Nov. 12, 2016 | Dallmann emails Jaurequi and Vaillant a new design for the Jetflicks mobi site, demonstrating Dallmann's role designing components of the Jetflicks website. |
| 145 | Nov. 21, 2016 | Dallmann emails Vaillant a list of tasks to complete including making sure that jetflicks.com is working, fixing an overbilling problem, repairing issues with seasons and episodes, and developing video file security, and Vaillant responds, demonstrating Dallmann's role managing co-conspirators and Vaillant's role writing computer scripts and fixing technical problems. |
| 1304 | Jan. 17, 2015 | Garcia asks about the status of updates for certain shows and Courson responds, demonstrating Garcia's role of managing content and Courson's role obtaining content. |

Like the text messages from 1B76 discussed above, we can establish the authenticity of these exhibits pursuant to FRE 901(b)(1) and (b)(4). Again, SA Cox seized 1B76 during the execution of the search warrant Dallmann's principal residence on November 16, 2017. Forensic

Examiner Peterson was provided this device designated as 1B76 for digital analysis.  She

examined this device and extracted the emails discussed above from the device.  As previously

explained, our evidence establishes that the emails were sent to or from the defendants by

highlighting their distinctive characteristics.  For instance, some of the emails include a signature

with a co-conspirator's name or the co-conspirator's name in the email alias.[155]  Likewise some

of the defendants are addressed by name in the emails.[156]

These emails constitute party opponent and co-conspirator statements and are excluded

from the hearsay rule.  Fed. R. Evid. 801(d)(2)(A) & (E).  As noted above, the statements of the

individual defendants, in conjunction with their co-conspirators' statements provides substantial

independent evidence that there was a conspiracy and that these statements were made during the

course of, and in furtherance of, the conspiracy.  Furthermore, the Government will introduce

other independent evidence relating to the conspiracy from during this time frame such as GX

018, 030, 056, 060, 061, 078, 102, and 103, which are printouts relating to the acquisition and/or

distribution of television shows from in and around the time of the aforementioned emails.

Moreover, again, these emails, which relate to the co-conspirators roles in the conspiracy, are

more probative than prejudicial and are thus admissible pursuant to Rule 403.  For the foregoing

reasons, we respectfully request that the Court admit GX 014, 016, 020, 045, 046, 047, 048, 049,

050, 051, 057, 058, 059, 107, 115, 132, 145, and 1304.

### 3.      *Texts Messages Obtained from Dallmann's iPhone*

We seek to admit GX 065, 066, 067, 068, 077, 079, 081, 082, 083, 084, 086, 088, 090,

092, 093, 097, 098, 100, 112, 114, 117, 118, 122, 123, 124, 125, 139, 141, 144, 151, 1006, and

---

[155] *See, e.g.*, GX 014 – Courson Email to Dallmann (Jan. 7, 2014).

[156] *See, e.g.*, GX 058 – Courson Email to Huber and Dallmann (Sept. 4, 2015).

1305, which are text messages dated between July 3, 2016 and July 11, 2017 that were extracted from an iPhone belonging to Dallmann that the FBI designated as 1B65. These exhibits are relevant because they demonstrate the roles played by different defendants during the conspiracy, demonstrate certain defendants' membership in the conspiracy, demonstrate intimate relationships between co-conspirators, and/or demonstrate who sent and received these messages.[157] The exhibits are particularly described as follows:

| Exhibit | Date | Description[158] |
|---|---|---|
| 065 | July 18, 2016 | Dallmann informs Jaurequi that Courson is reviewing lists of content in order to give Courson some work to do, demonstrating Dallmann's role managing co-conspirators and Courson's role managing content. |
| 066 | July 28, 2016 | Dallmann explains the process for acquiring shows, demonstrating Dallmann's role of managing co-conspirators and informing them how Jetflicks operated. |
| 067 | July 28, 2016 | Dallmann explains what happens after a show is downloaded, demonstrating Dallmann's role of managing co-conspirators and informing them how Jetflicks operated. |
| 068 | July 29, 2016 | Vaillant informs Dallmann that he has sent Dallmann his resume, demonstrating Dallmann's role of managing and hiring co-conspirators. |
| 077 | Aug. 5, 2016 | Dallmann explains that he wants to show Vaillant how Jetflicks works and requests Vaillant's advice about how to improve the process, demonstrating Dallmann and Vaillant's roles in obtaining content and developing strategy. |

[157] The exhibits discussed herein may be relevant for other reasons and may illustrate other roles or relationships than the ones discussed below, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

[158] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion. The full exhibits have been provided to the Court and to defense counsel.

| 079 | Aug. 7, 2016 | Dallmann informs Vaillant about how he wants to divide content between the Jetflicks' servers and that he wants to secure the content, demonstrating Dallmann's role in managing content and developing security protocols. |
|---|---|---|
| 080 | Aug. 8, 2016 | Dallmann tells Vaillant he has an idea to improve the site which involves writing a new database and that he wants to improve security, demonstrating Dallmann's role managing co-conspirators and Vaillant's role writing computer scripts. |
| 081 | Aug. 9, 2016 | Dallmann indicates he is setting up Vaillant's work computer, demonstrating Dallmann's role managing co-conspirators. |
| 082 | Aug. 9, 2016 | Dallmann states how he wants the company to work and describes the roles of co-conspirators, stating that Courson will check and verify the content and Jaurequi can cover customer support, demonstrating Dallmann's role managing co-conspirators, Courson's role obtaining and managing content, and Jaurequi's role responding to customer requests. |
| 083 | Aug. 9, 2016 | Dallmann explains the different formats of shows available on Jetflicks, demonstrating Dallmann's role of managing co-conspirators and informing them of how Jetflicks operated. |
| 084 | Aug. 9, 2016 | Dallmann explains to another individual how to fix improper downloads of television episodes, noting that that "[a]nything with ENCRYPTED before it, usually has an issue...," demonstrating Dallmann's role managing and instructing co-conspirators. |
| 086 | Aug. 12, 2016 | Dallmann explains to Vaillant a problem with the computer scripts and Vaillant looks at the problem, demonstrating Dallmann's role of managing co-conspirators and Vaillant's role writing computer scripts. |
| 087 | Aug. 13, 2016 | Dallmann and Jaurequi ask Courson for erotic pictures, demonstrating that Dallmann, Jaurequi, and Courson are involved in an intimate relationship. |
| 088 | Aug. 14, 2016 | Dallmann and Vaillant discuss removing Polo's account but Dallmann states he does not want to remove everything until they are independent from Polo's NZB server, demonstrating Dallmann and Vaillant's roles managing access to Jetflicks. |

| 090 | Aug. 15, 2016 | Dallmann and Vaillant discuss setting a password for the SickRage server to prevent Polo from removing content, demonstrating Dallmann and Vaillant's roles developing security protocols. |
|---|---|---|
| 091 | Aug. 15, 2016 | Dallmann and Vaillant discuss Polo stealing their content, demonstrating membership in the conspiracy. |
| 092 | Aug. 22, 2016 | Dallmann tells Vaillant to focus on programming instead of adding shows and indicates that Dallmann can do the show conversations, indicating Dallmann's roles managing co-conspirators and performing show conversions and Vaillant's role writing computer scripts. |
| 093 | Aug. 22, 2016 | Dallmann asks Vaillant to fix a problem with the computer scripts, indicating Dallmann's role managing co-conspirators and Vaillant's role writing computer scripts. |
| 097 | Aug. 23, 2016 | Dallmann informs Vaillant about problems with SickRage and asks Vaillant to fix them, indicating Dallmann's roles obtaining content and managing co-conspirators and Vaillant's roles obtaining content and writing computer scripts. |
| 098 | Aug. 24, 2016 | Dallmann asks Vaillant for help securing the content and tells Vaillant he fixed a problem with SickRage, demonstrating Dallmann's role managing co-conspirators and Dallmann and Vaillant's roles developing security protocols. |
| 099 | Aug. 25, 2016 | Dallmann and Vaillant discuss figuring out a problem with SickRage, demonstrating their roles fixing technical problems arising with acquiring content. |
| 100 | Aug. 25, 2016 | Dallmann and Vaillant discuss fixing a problem with SickRage, demonstrating their roles fixing technical problems arising with acquiring content. |
| 108 | Sept. 11, 2016 | Vaillant discusses purchasing a vehicle from Dallmann and Jaurequi and provides his full name and address, indicating that the person that Dallmann is texting is Vaillant. |
| 111 | Sept. 21, 2016 | Dallmann tells Courson that he has been working on show updates, demonstrating Dallmann's role managing content. This exhibit also demonstrates that Dallmann, Courson, and Jaurequi are involved in an intimate relationship. |

| 112 | Sept. 21, 2016 | Vaillant assures Dallmann that he can solve the problem that occurs when SickRage downloads, converts, and uploads a television episode to Jetflicks but it will not launch for a subscriber because there is a special character in the filename, and states, "[Y]ou have the best programmer, lol", demonstrating Vaillant's role writing computer scripts and Dallmann's role managing co-conspirators. |
| 114 | Sept. 21, 2016 | Dallmann tells Vaillant that he wants a way to track shows for SickRage, demonstrating Dallmann's role managing the co-conspirators and Vaillant's role developing computer scripts. |
| 117 | Oct. 4, 2016 | Dallmann and Vaillant discuss adding shows and managing the servers, demonstrating Dallmann and Vaillant's roles managing the content. |
| 118 | Oct. 4, 2016 | Vaillant informs Dallmann he cannot find a certain show on SickRage and Dallmann instructs Vaillant on how to locate it, demonstrating Dallmann and Vaillant's roles obtaining the content. |
| 122 | Oct. 12, 2016 | Dallmann tells Vaillant that SickRage is constantly running and tells Vaillant there is a problem with the show naming process, demonstrating Dallmann's role managing co-conspirators and Vaillant's role writing computer scripts to fix technical problems. |
| 123 | Oct. 13, 2016 | Dallmann asks Vaillant what he is working on and Vaillant indicates he is fixing a computer script, demonstrating Dallmann's role managing co-conspirators and Vaillant's role writing computer scripts. |
| 124 | Oct. 13 to 14, 2016 | Dallmann asks Vaillant if SickRage is working and to add The Walking Dead back to Jetflicks, which Vaillant does, demonstrating Dallmann's role managing co-conspirators and Vaillant's role acquiring content. |
| 125 | Oct. 24, 2016 | An individual discusses, among other things, that Dallmann sent him an offer to work at Jetflicks, demonstrating Dallmann's role managing and hiring co-conspirators. |
| 139 | Nov. 16, 2016 | Dallmann asks Vaillant to fix a problem with SickRage and Jetflicks scripts where SickRage does not automatically download another version of a television episode after the episode fails to download, demonstrating Vaillant's role writing computer scripts and Dallmann's role managing co-conspirators. |

| 141 | Nov. 16, 2016 | Dallmann tells Vaillant that he is going to go to Wells Fargo the next day to convince them to approve a merchant account for Jetflicks, showing up in professional business attire with a $200,000 car and lying that Jetflicks already has a merchant processor; Dallmann states that he makes $750,000 from Jetflicks and knows "what's necessary to get past ... systems so we can thrive and run a business...", demonstrating Dallmann's role managing and supervising the conspiracy. |
|---|---|---|
| 144 | Nov. 20, 2016 | Dallmann tells Vaillant that before Jetflicks had problems with PayPal, they were making $20,000-$30,000/month and now it is less than $10,000/month; he states, "[Y]ou know the reasons why things went the way they did  [a]nd you decided to stick with us through those issues... you can't throw that in my face at all", demonstrating Dallmann's role managing the conspiracy. |
| 151 | Dec. 30, 2016 | Dallmann and Villarino discuss setting up domain names for Jetflicks, demonstrating Dallmann's role managing domain names. |
| 169 | Jul. 11, 2017 | Dallmann discusses having sex with Courson while Jaurequi is present and indicates that Jaurequi is his husband, demonstrating an intimate relationship between Dallmann, Jaurequi, and Courson. |
| 173 | Nov. 10, 2017 | Dallmann and Courson discuss having sex, indicating an intimate relationship between Dallmann and Courson. |
| 188 | Jul. 17, 2016 | Dallmann informs Jaurequi that he has contacted someone about a potential job as a web application developer, demonstrating Dallmann's role managing and hiring co-conspirators. |
| 1006 | Aug. 14, 2016 | Dallmann and Vaillant discuss a video file security system, demonstrating their roles in developing security protocols. |
| 1009 | Oct. 10, 2016 | Dallmann asks Vaillant to determine why subscribers are using an old login script developed by Huber, demonstrating Dallmann's role managing co-conspirators and Vaillant and Huber's roles writing computer scripts. |
| 1305 | Aug. 9, 2016 | Dallmann states that Jaurequi's main job is to convert shows from DVD that they cannot download, demonstrating Jaurequi's role in obtaining content. |

Our evidence establishes the authenticity of these exhibits pursuant to Rules 901(b)(1) and (b)(4).  SA Cox seized an Apple iPhone that the FBI designated as 1B65 during the execution of the search warrant at Dallmann's principal residence on November 16, 2017. Digital Forensic Examiner John Kern extracted data from 1B65 and Digital Forensic Examiner Dan Ogden received the extracted data, processed it, and identified the text messages set forth above. Furthermore, as discussed earlier in this brief, our evidence demonstrates that Dallmann sent or received these communications.

Like the other text messages discussed above, these messages are excluded from the hearsay rule because they constitute party opponent and co-conspirator statements.  Fed. R. Evid. 801(d)(2)(A) & (E).  Again, the statements of the individual defendants, in conjunction with their co-conspirators' statements, provides substantial independent evidence that there was a conspiracy and that these statements were made during the course of, and in furtherance of, the conspiracy.  Furthermore, we will introduce other independent evidence relating to the conspiracy during this time frame such as GX 78, 102 and 103, which are download lists. Finally, these exhibits that illustrate the roles individuals played in the conspiracy, membership in the conspiracy, intimate relationships between the co-conspirators, and who sent and received the text messages on this device are more probative than prejudicial and are thus admissible pursuant to Rule 403.  As such, we respectfully request that the Court admit GX 065, 066, 067, 068, 077, 079, 081, 082, 083, 084, 086, 088, 090, 092, 093, 097, 098, 100, 112, 114, 117, 118, 122, 123, 124, 125, 139, 141, 144, 151, 1006, and 1305.

### 4.   *Notes and Text Messages Obtained from Jaurequi's iPhone*

We seek to admit GX 116, 121, 149, 152, 154, 156, 166, 190, and 1108.  These exhibits are notes and text messages dated between September 30, 2016, and April 28, 2017, that were

extracted from an iPhone belonging to Jaurequi that the FBI designated as 1B87.  These exhibits are also relevant because they demonstrate the roles played by Jaurequi during the conspiracy, his membership in the conspiracy, his intimate relationships with co-conspirators, and that Jaurequi sent, received, and drafted the content on this device.[159]  The exhibits are particularly described as follows:

| Exhibit | Date | Description[160] |
|---|---|---|
| 116 | Sept. 30, 2016 | This document contains canned responses drafted by Jaurequi to send to subscribers regarding various issues, demonstrating Jaurequi's role managing customer support. |
| 121 | Oct. 8, 2016 | This document contains Jaurequi's notes, including which television shows and episodes are missing, demonstrating Jaurequi's role in managing content. |
| 149 | Dec. 22, 2016 | This document contains Jaurequi's notes, including which television shows and episodes are missing and canned responses drafted by Jaurequi to send to subscribers, demonstrating Jaurequi's role managing customer support and content. |
| 152 | Dec. 30, 2016 | Jaurequi complains about all of the responses he needs to send to subscribers, demonstrating Jaurequi's role managing customer support. |
| 154 | Dec. 30, 2016 | Jaurequi states that his company offers all primetime TV, major cable network shows, and Netflix stuff, demonstrating Jaurequi's membership in the conspiracy. |
| 156 | Jan. 24, 2017 | Jaurequi states that he works for his boyfriend as director of programming/operations at a company like Netflix but better, demonstrating Jaurequi's roles in the conspiracy and intimate relationship with Dallmann. |

---

[159] The exhibits discussed herein may be relevant for other reasons and may illustrate other roles than the ones discussed below, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

[160] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

| 166 | Apr. 28, 2017 | Jaurequi states that he is in charge of customer support, managing Jetflicks content, as well as programming, billing and generally everything, demonstrating Jaurequi's multiple roles in the conspiracy. |
| 190 | May 4, 2017 | Jaurequi states that all of the pictures on his phone are selfies and then sends three selfies, demonstrating that Jaurequi is the individual who sent, received, and drafted the content on this device. |
| 1108 | Oct. 27, 2016 | Jaurequi and Courson discuss viewing explicit photographs of Courson amid a conversation about the conspiracy. |

Our evidence establishes the authenticity of these exhibits pursuant to Rules 901(b)(1) and (b)(4). SA Cox seized an Apple iPhone that the FBI designated as 1B87 during the execution of the search warrant at Dallmann's principal residence on November 16, 2017. Kern extracted data from 1B87 and Ogden received the 2extracted data, processed it, and identified the items set forth above. Furthermore, as discussed earlier in this brief, our evidence establishes these items were created by Jaurequi.

Like the other text messages discussed above, these text messages are excluded from the hearsay rule because they constitute party opponent and co-conspirator statements. Fed. R. Evid. 801(d)(2)(A) & (E). Again, the statements of the individual defendants, in conjunction with their co-conspirators' statements, provides substantial independent evidence that there was a conspiracy and that these statements were made during the course of, and in furtherance of, the conspiracy. Furthermore, the Government will introduce other independent evidence relating to the conspiracy during this time frame such as GX 78, 102 and 103 which are download lists from this time frame. Finally, these exhibits which illustrate, among other things, the roles individuals played in the conspiracy, the intimate relationships between co-conspirators, and the individual who sent, received, and drafted the content on the device are more probative than prejudicial and

are thus admissible pursuant to Rule 403.  As such, we respectfully request that the Court admit

GX 116, 121, 149, 152, 154, 156, 166, 190, and 1108.

### 5.    *Emails and Chats Provided by Google*

GX 069, 131, 160, 161, 162, 163, 167, 702, 704, and 919 are emails, excerpts from

Google chats, and other information obtained from Google dated between July 30, 2016, and

May 12, 2017.  These exhibits are relevant because they demonstrate the roles played by

different defendants during the conspiracy and/or who sent and received the communications

associated with this email account. [161]  The exhibits are particularly described as follows:

| Exhibit | Date | Description[162] |
|---|---|---|
| 069 | July 30, 2016 | Vaillant sends Dallmann his resume, demonstrating Dallmann's role managing and hiring co-conspirators. |
| 133 | Nov. 12, 2016 | Vaillant sends Dallmann a list of missing shows, demonstrating Dallmann and Vaillant's roles managing content. |
| 160 | Feb. 18, 2017 | Dallmann discusses with Villarino options to secure the Jetflicks content, demonstrating Dallmann's role developing security protocols. |
| 161 | Mar. 12, 2017 | Dallmann discusses with Villarino identifying a problem with programming and billing errors that Dallmann believes will generate more revenue, demonstrating Dallmann's role fixing problems related to the company. |

[161] The exhibits discussed herein may be relevant for other reasons and may illustrate other roles than the ones discussed below, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

[162] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

| 162 | Mar. 13, 2017 | Dallmann sends an email to BMW to prevent repossession of a car, linking the email addresses kristopher.dallmann@gmail.com and kristoper.dallmann@icloud and a phone number belonging to Dallmann.  Moreover, Dallmann provides, among other things, a screenshot from his PayPal account that indicated the account had over $6,500 in funds but "account access [was] limited."  Dallmann falsely claims that PayPal's hold "was placed on 10-24-16 to cover any disputed charges made by our customers . . . because the payment processor is the one liable for all monies exchanged." |
| --- | --- | --- |
| 163 | Apr. 3, 2017 | Dallmann asks Villarino what salary Villarino will need to become a full-time employee, demonstrating Dallmann's role managing coconspirators. |
| 167 | May 5, 2017 | Dallmann discusses with Villarino options to secure the Jetflicks content, demonstrating Dallmann's role developing security protocols. |
| 919 | May 12, 2017 | Dallmann communicates with Villarino about purchasing equipment that will improve operations, demonstrating Dallmann's role as a manager of the conspiracy. |

The authenticity of these records is established, in part, by Rule 902(11) of the Federal Rules of Evidence.  Under Rule 902(11), an original or a copy of a domestic record is self-authenticating and requires no extrinsic evidence of authenticity if it meets the requirements of Rule 803(6), and is accompanied "by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court."  Rule 803(6), in turn, provides that business records are admissible if they are accompanied by a certification of their custodian or other qualified person that satisfies three requirements: (a) that the records were "made at or near the time by – or from information transmitted by – someone with knowledge; (2) that they were "kept in the course of a regularly conducted activity of business;" and (3) that "making the record was a regular practice of that activity."

The FBI obtained these exhibits during its investigation, and we provided these records to the defense during discovery.  Google, moreover, provided certifications of business records,

which have been provided to defense counsel and are marked as GX 707 and 708.  Because those certificates comply with Rules 803(6) and 902(11), the records to which they relate are *prima facie* authentic.  *See United States v. Hassan*, 742 F.3d 104, 133 n.25 (4th Cir. 2014) (rejecting as "entirely unpersuasive" the contention that Facebook and Google certifications were insufficient).  Furthermore, as discussed above, the Government's evidence establishes that the email addresses kristopher.dallmann@gmail.com and kristoph@jetflicks.com were registered to Kristopher Dallmann.  *See* Fed. R. Evid 901(b)(1) and (b)(4).

These exhibits are excluded from the hearsay rule because they constitute party opponent and co-conspirator statements.  Fed. R. Evid. 801(d)(2)(A) & (E).  Independent evidence including the statements of the individual defendants, in conjunction with their co-conspirators' statements, along with GX 78, 102, and 103, which are downloads lists, indicate that there was a conspiracy and that these statements were made during the course of, and in furtherance of, the conspiracy.  Moreover, the content of these documents demonstrating the co-conspirators' roles in the conspiracy and the identity of the individual who sent or received the messages, is more probative than prejudicial and thus these exhibits are admissible pursuant to Rule 403.  As such, we respectfully request that the Court admit GX 069, 131, 160, 161, 162, 163, 167, 702, 704, and 919.

### 6.        *Hard Copy Document Obtained from Dallmann's Secondary Residence*

GX 1301 is a hard copy of an email dated April 22, 2014 that was seized from Dallmann's secondary residence during the execution of a search warrant on November 16, 2017.  We seek to admit this exhibit, too.

GX 1301 is relevant because it discusses Dallmann's role in the conspiracy developing marketing ideas for Jetflicks and shows that Dallmann knew that Jetflicks had subscribers outside of Nevada.[163]

In addition, this document is authentic.  SA Neal Umphress seized this document during the execution of the search warrant, and the FBI designated this document, along with some other documents, as 1B52 Part 15.  Special Agent Umphress has reviewed the documents contained in 1B52 Part 15 and confirmed that this document is included with those documents.

Moreover, like the other emails discussed above, this email is excluded from the hearsay rule because it constitutes a party opponent and co-conspirator statement.  Fed. R. Evid. 801(d)(2)(A) & (E).  Independent evidence including the statements of the individual defendants, in conjunction with their co-conspirators' statements, along with GX 8 and 10, which are 2013 Jetflicks show lists, and GX 18, which is a 2014 download list, proves that there was a conspiracy and that these statements were made during the course of, and in furtherance of, the conspiracy.  Further, the fact that these show lists and download lists were stored at Dallmann's residences means that they qualify as adopted statements and thus are not hearsay under rule 801(d)(2)(B).  *See United States v. Merritt*, 145 F.3d 1327, *1 (4th Cir. 1998) (per curiam) ("[A] document found in a defendant's possession may be admissible as an 'adoptive admission' under Fed. R. Evid. 801(d)(2)(B)."); *see also United States v. Pulido-Jacobo*, 377 F.3d 1124, 1132 (10th Cir. 2004) (finding a receipt for a speaker constituted an adoptive admission because the defendant kept the receipt for over two months after purchasing the speaker and law enforcement found speakers in the trunk of the defendant's car that matched those described in the receipt);

---

[163] The exhibits discussed herein may be relevant for other reasons and may illustrate other roles than the ones discussed below, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

*United States v. Paulino*, 13 F.3d 20, 24 (1st Cir. 1994) ("[S]o long as the surrounding circumstances tie the possessor and the document together in some meaningful way, the possessor may be found to have adopted the writing and embraced its contents.").

Finally, the content of this document demonstrates one of Dallmann's roles in the conspiracy, and thus is more probative than prejudicial. As such, we respectfully request that the Court admit GX 1301.

### C.   Exhibits Relating to the Operation of the Conspiracy

Below we summarize the exhibits that we seek to admit that will establish the existence and operation of the charged conspiracy.[164]  This summary addresses the relevance and authenticity of the exhibits, as well as hearsay issues.  We do not provide an analysis pursuant to Rule 403 of the Federal Rules of Evidence for each of the exhibits discussed below.  This is because none of the below exhibits is unfairly prejudicial.  Rather, each exhibit is probative of how the operation of the conspiracy worked, and not prejudicial except to the extent that it shows the defendants' guilt.  *United States v. Tillmon*, 954 F.3d 628, 643 (4th Cir.), *cert. denied*, 140 S. Ct. 91, 205 L. Ed. 2d 83 (2019) (stating that "damage to a defendant's case is not a basis for excluding probative evidence" under Rule 403 because "[e]vidence that is highly probative invariably will be prejudicial to the defense." ((internal quotation marks and citation omitted)).

#### 1.   *Jetflicks Show / Download Lists*

We seek to admit GX 008, 010, 018, 027, 030, 056, 060, 061, 078, 102, 103, 171, 310, 310A, 318, and 319.  These exhibits are lists of television series offered through Jetflicks and episodes downloaded by the Jetflicks co-conspirators for that purpose.

---

[164] The exhibits discussed herein may be relevant for other reasons and may illustrate operations of the conspiracy other than the ones discussed below, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

On November 16, 2017, FBI agents seized GX 008, 010, 060, 061, 078, 102, 103, 171, and 310 from Dallmann's primary residence, and GX 18, 27, 30, 56, 318, and 319 from Dallmann's secondary residence.

| Exhibit | Date | Description[165] |
|---|---|---|
| 008 | Sept. 5, 2013 | List of television series offered on Jetflicks, printed from *jetflicks.mobi*. |
| 010 | Sept. 24, 2013 | Partial osCommerce printout for Jetflicks listing data for business including 4,318 television show seasons and indicating millions of views for the 20-best-viewed television shows and seasons. |
| 018 | Apr. 7, 2014 | Sick Beard backlog printout indicating search for 71,011 television episodes and the downloading of 424 episodes. |
| 027 | June 19, 2014 | Sick Beard partial show list indicating search for thousands of television episodes. |
| 030 | June 27, 2014 | Sick Beard show list indicating search for 74,657 television episodes and the downloading of 6 episodes. |
| 056 | April 27, 2015 | Sick Beard partial show list indicating search for thousands of television episodes/. |
| 060 | Oct. 19, 2015 | List of television series offered on Jetflicks, printed from *jetflicks.mobi*. |
| 061 | Oct. 19, 2015 | SickRage show list indicating search for 58,169 television episodes, the downloading of 3,000 episodes, and the "snatching" (partial downloading) of 2,210 episodes. |
| 078 | Aug. 5, 2016 | SickRage show list indicating search for 56,077 television episodes, the downloading of 6,617 episodes, and the "snatching" of 2456 episodes. |
| 102 | Aug. 25, 2016 | SickRage show list indicating search for 548 television episodes, the downloading of 6 episodes, and the "snatching" of 154 episodes |
| 103 | Aug. 26, 2016 | First page of SickRage show list listing television episodes. |

---

[165] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

| 171 | Oct. 1, 2017 | SickRage show list indicating search for 130,642 television episodes, the downloading of 22,491 episodes, and the "snatching" of 181 episodes. |
| 310 | Nov. 16, 2017 | Jetflicks SickRage database listing 1,641 television series (with show ids through 1,755) and 143,248 television episodes (with episode ids through 155,094) as well as a history of tens of thousands of downloads from pirate sites. |
| 318 | Undated | List of filenames for pirated television episodes with the note "System should convert tonite." |
| 319 | undated | List of filenames for pirated television episodes with the note "Are these in the system? If not, redownload." |

All of these exhibits are authentic pursuant to Rules 901(b)(1) and (b)(4) of the Federal Rules of Evidence.

> a.  **GX 008, 010, 060, 061, 078, 102, 103, and 171**.  On November 16, 2017, SA Cox seized GX 008, 010, 060, 061, 078, 102, 103, and 171 from Dallmann's primary residence.  SA Poston and SA Chase reviewed the exhibits and determined that they are lists of television episodes Jetflicks downloaded and tried to download through Sick Rage at different points in the conspiracy as well as lists of television series available on Jetflicks through *jetflicks.mobi* in various years.  Subsequently, several copyright owners reviewed these exhibits and identified numerous television series and episodes listed on these printouts to which they own the copyright and confirmed that Jetflicks did not have authorization to reproduce, distribute, or stream those works.

> b.  **GX 310 and 310A**.  On November 16, 2017, SA Cox seized an Apple tower computer with a RAID from Dallmann's primary residence, and the FBI subsequently designated this device 1B76.[166]  Forensic examiners at the Cybercrime Lab imaged

---

[166] A RAID is an array of multiple independent hard drives.

this device and other seized devices.  Subsequently, Forensic Examiner Joe Varani examined the image of 1B76, found a Jetflicks database and exported it to Microsoft Excel.  That export is GX 310, and GX 310A is an excerpt of GX 310.  SA Poston examined GX 310 and determined that it is the Jetflicks SickRage database.  The database shows tens of thousands of downloads of infringing television episodes from specific pirate sites in 2016 and 2017 as well as a list of Jetflicks' library of television series and television episodes.

> c.   **GX 018, 027, 030, 056, 318, and 319**.  On November 16, 2017, SA Neal Umphress seized GX 018, 027, 030, 056, 318, and 319 from Dallmann's secondary residence.  SA Poston and SA Chase reviewed the exhibits and determined that they are lists of television episodes that Jetflicks downloaded and tried to download through Sick Beard at different points in the conspiracy as well as lists of specific filenames of pirated television episodes.  Subsequently, several copyright owners reviewed these exhibits and identified numerous copyrighted television series and episodes that they own are on these printouts and confirmed that Jetflicks did not have authorization to reproduce, distribute, or stream those works.

None of the exhibits listed above constitutes inadmissible hearsay.  GX 008, 010, 018, 027, 030, 056, 060, 061, 078, 102, 103, 171, 310, 318, 319, and 405 are computer-generated output.  Output generated by a computer is not hearsay because it is not a statement.  *BMG Rights Mgmt. (US) LLC v. Cox Comm'ns, Inc.*, 881 F.3d 293, 313 (4th Cir. 2018) (copyright infringement notices generated by a computer are not "statements" and thus not hearsay); *United States v. Channon*, 881 F.3d 806, 810-11 (10th Cir. 2018) (spreadsheets reflecting point-of-sale data were machine-generated records falling outside of the hearsay rule); *United States v. Washington*, 498 F.3d 225, 230-31 (4th Cir. 2007) (printed result of computer-based test was not

the statement of a person and thus would not be excluded as hearsay); *United States v. Hamilton*, 413 F.3d 1138, 1142-43 (10th Cir. 2005) (computer-generated header information was not hearsay as "there was neither a 'statement' nor a 'declarant' involved here within the meaning of Rule 801"). And, even if some of these exhibits also reflect or incorporate some information originally inputted by the user, the exhibits remain admissible. In the case of information inputted by non-defendants, the government does not offer the inputted information for its truth and, in the case of information inputted by co-conspirators, the government offers it as a statement of a party opponent and/or as a statement in furtherance of the conspiracy. Fed. R. Evid. 802(d)(2)(A) & (E). Further, the fact that these show lists and download lists were stored at Dallmann's residences means that they qualify as adopted statements and thus are not hearsay under rule 801(d)(2)(B). *See United States v. Merritt*, 145 F.3d 1327, *1 (4th Cir. 1998) (per curiam) ("[A] document found in a defendant's possession may be admissible as an 'adoptive admission' under Fed. R. Evid. 801(d)(2)(B)."); *see also United States v. Pulido-Jacobo*, 377 F.3d 1124, 1132 (10th Cir. 2004) (finding a receipt for a speaker constituted an adoptive admission because the defendant kept the receipt for over two months after purchasing the speaker and law enforcement found speakers in the trunk of the defendant's car that matched those described in the receipt); *United States v. Paulino*, 13 F.3d 20, 24 (1st Cir. 1994) ("[S]o long as the surrounding circumstances tie the possessor and the document together in some meaningful way, the possessor may be found to have adopted the writing and embraced its contents.").

### 2.   *Jetflicks NZB Log-In Credentials*

We seek to admit GX 54, which consists of notes from the "Notes" application on Dallmann's iPhone. This exhibit consists of a note created in February 2015 and last modified in

November 2016 with the title "SickRage Servers," listing log-in information for various NZB services Jetflicks used to obtain pirated television episodes.  The second note was created in February 2015 and last modified in November 2015 with the title "SickRage Servers" and listing similar log-information for various NZB servers.

GX 54 is authentic pursuant to Rule 901(b)(1) and (b)(4).  On November 16, 2017, SA Cox seized an Apple iPhone from Dallmann's principal residence, which the FBI later designated as 1B65.  Forensic Examiner John Kern extracted data from the phone and Forensic Examiner Dan Ogden processed that data.  GX 54 was identified, as a result.  SA Poston and Chase determined that Jetflicks was using many of the sites listed in GX 54 to search for and download pirated television episodes, and these sites are referenced in numerous other exhibits. *See* GX 143, 174, 176, 178, 308A, 309A, 314, 310, 317, 414C, 420, 1503, 1504, and 1510.

GX 54 does not constitute inadmissible hearsay either.  This is because it consists of statements of a party opponent and/or statements in furtherance of the conspiracy.  Fed. R. Evid. 802(d)(2)(A) & (E).

### 3.     *Undercover Screenshots*

We seek to admit GX 501, 507, 508, and 512, which are screenshots of Jetflicks taken by SA Chase, who acted as an undercover agent in the case.

| Exhibit | Description[167] |
|---------|------------------|
| 501 | Screenshot of Jetflicks from April 24, 2017 stating that the service has 37,245 users and 183,285 episodes |
| 507 | Screenshot of Jetflicks showing television series in alphabetical order, including the WarnerMedia show, *2 Broke Girls* |

---

[167] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

| 508 | Screenshots of Jetflicks, showing the WarnerMedia/HBO show, *Game of Thrones* |
| 512 | Screenshots of Jetflicks, showing the ViacomCBS show, *Ray Donovan* |

These exhibits are authentic.  FBI SA Chase opened an undercover operation into Jetflicks, subscribed to the service, and in 2016 and 2017 streamed and downloaded numerous television episodes from Jetflicks.  He recorded his activity on Jetflicks, and the screenshots within GX 501, 507, 508, and 512 are taken from those recordings.  These screenshots thus are authentic.  *See* Fed. R. Evid. 901(b)(1); *Melo v. Zumper, Inc*., 439 F. Supp. 3d 683, 695 (Novak, J.)  (E.D. Va. 2020) (holding that witness with personal knowledge can authenticate screenshots).

These exhibits do not contain inadmissible hearsay.  The information displayed within GX 501 constitutes statements of a party opponent and/or as statements in furtherance of the conspiracy.  Fed. R. Evid. 802(d)(2)(A) & (E).  Moreover, GX 507, 508, and 512 just depict images and text found on *jetflicks.mobi* and so they are not statements at all.  Fed. R. Evid. 801 (defining "hearsay" as a "statement" and defining "statement" as an "assertion"); *see also Marten Transport, Ltd. v. Plattform Advertising, Inc*., 184 F. Supp. 3d 1006, 1010 (D. Kan. 2016); *Abu-Lughod v. Calis*, No. CV 13-2792, 2015 WL 12746198, at *3 (C.D. Cal. May 20, 2015); *Perfect 10, Inc. v. Cybernet Ventures, Inc*. 213 F. Supp. 2d 1146, 1155 (C.D. Cal. 2002).  In addition, even if these exhibits contained statements, the statements would still be admissible as statements of a party opponent and/or as statements in furtherance of the conspiracy.  Fed. R. Evid. 802(d)(2)(A) & (E).

### 4.    *Undercover Recordings of Jetflicks and Downloads*

We seek to admit GX 502, 503, 503A, 504, 505, 505A, 505B, 509, 510A, 510B, 511, 511A, 513, and 514, which are videos taken by SA Chase, who acted as an undercover agent in the case.[168]

| Exhibit | Description[169] |
|---------|-------------|
| 502 | Undercover recording of Jetflicks |
| 503 | Undercover recording of Jetflicks |
| 503A | Clip of undercover streaming of *Game of Thrones* |
| 504 | Undercover recording of Jetflicks |
| 505 | Undercover recording of Jetflicks |
| 505A | Clip of undercover streaming of *NCIS: Los Angeles* |
| 505B | Clip of undercover recording of *Ray Donovan* episodes |
| 509 | Clip of undercover streaming of "Blood Washed Away" and "Memory of Tomorrow" |
| 510A | Undercover download of "Blood Washed Away" |
| 510B | Undercover download of "Memory of Tomorrow" |
| 511 | Clip of undercover streaming of "Paradise" |
| 511A | Undercover download of "Paradise" |
| 513 | Clip of undercover recording of Jetflicks |

---

[168] Because the video clips are in an electronic format, we have provided copies to the defense but not the Court. It is our intention to play these clips at a pretrial hearing, if such a hearing is needed. If the Court would like to review the clips prior to a pretrial hearing, then we will need to seek leave of the Court to file electronic exhibits through the Clerk's Office. Accordingly, we hereby move for such leave.

[169] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion. The full exhibits have been provided to the Court and to defense counsel.

| 514 | Clip of undercover streaming of *Law & Order: Special Victims Unit* |
| --- | --- |

As noted above, SA Chase opened an undercover operation into Jetflicks, subscribed to the service, and in 2016 and 2017 streamed and downloaded numerous television episodes from Jetflicks.  He recorded some of this activity, and GX 502, 503, 503A, 504, 505, 505A, 505B, 509, 510A, 510B, 511, 511A, 513, and 514 are those screen captures and downloads.  Subsequently, several copyright owners reviewed the exhibits and identified television series and episodes to which they own the copyright, and they confirmed that Jetflicks did not have authorization to reproduce, distribute, or stream those works.  These exhibits, accordingly, are authentic.  *See* Fed. R. Evid. 901(b)(1); *Melo*, 439 F. Supp. 3d at 695.

These exhibits show images and text found on *jetflicks.mobi* on different dates, and thus are not statements that fall within the hearsay rule.  Fed. R. Evid. 801; *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109 (9th Cir. 2015) (photograph, video, or sketch is not hearsay because it is not a statement and makes no assertion); *see also Marten Transport, Ltd.*, 184 F. Supp. 3d at 1010; *Abu-Lughod*, 2015 WL 12746198, at *3; *Perfect 10, Inc.*, 213 F. Supp. 2d at 1155.  In addition, even if any of these exhibits contained statements by the defendants, the statements would still be admissible as statements of a party opponent and/or as statements in furtherance of the conspiracy.  Fed. R. Evid. 802(d)(2)(A) & (E).

### 5. *Jetflicks' Use of Piracy Tools to Obtain Television Episodes*

We seek to admit GX 172, 174, 176, 301 to 306, 307A, 308, 308A, 308B, 309, 309A, 309B, 310, 310A, 314A, 315, 316A, 316B, 317A, 321, 321A to 321E, and 918.

| Exhibit | Description[170] |
|---|---|
| 172 | Photo of SABnzbd on Dallmann iPhone |
| 174 | Web bookmarks on Dallmann iPhone |
| 176 | Web bookmarks on Jaurequi iPhone |
| 301 | Screenshot of SickRage installed on 1B76 |
| 302 | Screenshot of Sick Beard installed on 1B76 |
| 303 | Screenshot of SABnzbd installed on 1B76 |
| 304 | Screenshot of SABnzbd downloads on 1B76 |
| 305 | Screenshot of uTorrent installed on 1B76 |
| 306 | Screenshot of uTorrent torrent file downloads on 1B76 |
| 307A | Excerpt of GX 307,[171] list of uTorrent torrent file downloads on 1B76 |
| 308 | SickRage configuration file from 1B76 |
| 308A | SickRage provider ranking from configuration file |
| 308B | Metadata for GX 308 |
| 309 | SickRage backup configuration file dated June 9, 2016 from 1B76 |
| 309A | SickRage provider ranking backup configuration file dated June 9, 2016 |
| 309B | Metadata for GX 309 |
| 310 | Jetflicks SickRage database |
| 310A | Excerpt of GX 310, Jetflicks SickRage database |
| 314A | Excerpt from GX 314, SickRage logs |

---

[170] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

[171] At trial, we will mark GX 307 but not seek to admit it.

| 315 | SABnzbd configuration file |
|-----|----------------------------|
| 316A | Excerpt from GX 316, SABnzbd history file |
| 316B | Metadata for GX 316 |
| 317A | Excerpt from GX 317,[172] SABnzbd logs |
| 321 | altHuB screenshot |
| 321A | NZBgeek screenshot |
| 321B | RARBG screenshot |
| 321C | NzbNdx screenshot |
| 321D | NZBFinder screenshot |
| 321E | Binsearch screenshot |
| 918 | Note found on Dallmann's iPhone that states the static IP provided by CenturyLink is 67.77.106.136. |

These exhibits are authentic and do not constitute inadmissible hearsay for the following reasons.

a.      **GX 172, 174, and 918**.  As noted above, SA Cox seized 1B65 from Dallmann's principal residence, Forensic Examiner Kern extracted data from the phone, and Forensic Examiner Ogden processed that data.  These steps resulted in the identification of GX 172, 174, and 918.  The former is a photo from November 3, 2017, of SABnzbd being used to download various television episodes, and this exhibit matches up with other exhibits.  For example, one episode listed in the photo already downloaded by SABnzbd is "Arrow.S03E21.1080p.HDTV.X264-DIMENSION."  That exact file name is listed in GX 310 as

---

[172] At trial, we will mark GX 317037 but not seek to admit it.

downloaded by Jetflicks on December 25, 2016.  Similarly, GX 174 shows bookmarks on Dallmann's phone for uTorrent, The Pirate Bay, Sky Torrents, and TorrentLeech, and these pirate sites show up in numerous other exhibits.  *See* GX 054, 066, 305, 306, 307A, 308, 308A, 309, 309A, and 314A.  GX 918 is a note found on Dallmann's iPhone that states the static IP provided by CenturyLink is 67.77.106.136.  Accordingly, GX 172, 174, and 918 are authentic pursuant to Fed. R. Evid. 901(b)(1) and (b)(4).  Further, GX 172 consists of a photo and thus is not a statement within the rules against hearsay.  Fed. R. Evid. 801; *Lizarraga-Tirado*, 789 F.3d at 1109; *Marten Transport, Ltd.*, 184 F. Supp. 3d at 1010; *Abu-Lughod*, 2015 WL 12746198, at *3; *Perfect 10, Inc.*, 213 F. Supp. 2d at 1155.  And, GX 174 and GX 918 are statements of a party opponent and/or as statements in furtherance of the conspiracy.  Fed. R. Evid. 802(d)(2)(A) & (E).

> b.      **GX 176**.  On November 16, 2017, SA Cox seized an Apple iPhone from Dallmann's principal residence, which the FBI later designated as 1B87.  Forensic Examiner Kern extracted data from the phone and Forensic Examiner Ogden processed that data. These steps resulted in the identification of GX 176, which is a set of bookmarks on 1B87 for The Pirate Bay, Sick Beard, SickRage, SABnzbd, NZBgeek, Sky Torrents, and other sites.  As discussed above, these piracy tools and sites show up in numerous other exhibits as well, and are authentic.  Fed. R. Evid. 901(b)(1) and (b)(4).  Moreover, GX 176 is not hearsay because it contains statements of a party opponent and/or statements in furtherance of the conspiracy.  Fed. R. Evid. 802(d)(2)(A) & (E).

> c.      **GX 301 to 306**.  As noted above, FBI SA Cox seized 1B76 and the Cybercrime Lab imaged it.  Subsequently, Forensic Examiner Thomas Song made a copy of the image.  SA Poston reviewed the original image and the copy of the image, and took screenshots

of some of the software and files installed on 1B76.  GX 301 to 306 are those screenshots and

they are authentic.  *See* Fed. R. Evid. 901(b)(1); *Melo*, 439 F. Supp. 3d at 695.  These exhibits,

moreover, do not constitute statements.  Fed. R. Evid. 801; *Marten Transport, Ltd.*, 184 F. Supp.

3d at 1010; *Abu-Lughod*, 2015 WL 12746198, at *3; *Perfect 10, Inc.*, 213 F. Supp. 2d at 1155.

In addition, even if any of these exhibits did contain statements by non-defendants, we will not

offer those statements for their truth.

>      d.    **GX 307A, 308, 308A, 308B, 309, 309A, 309B, 310, 310A, 314A,**
>
> **315, 316A, 316B, 317A**.  As noted above, FBI SA Cox seized 1B76 and the Cybercrime Lab

imaged it.  Forensic Examiner Varani examined the image and located numerous piracy tools

and records of the use of those tools.  Subsequently, SA Poston examined the items that Forensic

Examiner Varani located and determined that Jetflicks installed and used the tools to search for,

download, process, upload, and make available infringing television episodes from specific

torrent and NZB sites.  In fact, one can even trace specific infringing television episodes through

the whole process.  For example, on November 16, 2017, about five hours before agents

executed search warrants on Jetflicks, co-conspirators used SickRage to search for season 4,

episode 8 of *Broad City*, using a subscription to Usenet service provider TweakNews, SickRage

found a copy of the episode at the pirate site altHUB from the release group "TBS" and

downloaded it using SABnzb, and the episode was then further processed, organized, and

uploaded.  *See* GX 310, 314, 316, and 317.  Subsequently, literally minutes before FBI agents

arrived at the house, co-conspirators searched for season 15, episode 9 of *Pawn Stars*, and

SickRage found a copy at the pirate site RARBG from the release group "KILLERS" and

downloaded it using uTorrent.  The episode then was further processed and made available to be

uploaded.  GX 307, 310, and 313.  The exhibits, accordingly, are all authentic.  *See* Fed. R. Evid.

901(b)(1) and (b)(4).  Moreover, these exhibits are not hearsay because they are computer-generated output.  And, even if some of these exhibits also reflect or incorporate some information originally inputted by the user, the exhibits remain admissible.  *BMG Rights Mgmt. (US) LLC,* 881 F.3d at 313; *Channon,* 881 F.3d at 810-11; *Washington,* 498 F.3d at 230-31; *Hamilton,* 413 F.3d at 1142-43.

        e.      **GX 321 and 321A to 321E**.  Based on his review of the items found on 1B76, SA Poston identified the pirate sites on which Jetflicks focused its efforts to obtain infringing television episodes including altHUB and RARBG.  He then visited the sites or, if he was not able to access them, did other research on the sites.  SA Poston took screenshots of some of these sites.  GX 321 and 321A to 321 E are those screenshots and they are authentic.  *See* Fed. R. Evid. 901(b)(1); *Melo*, 439 F.Supp.3d at 695.  These exhibits, moreover, do not constitute statements.  Fed. R. Evid. 801; *Marten Transport, Ltd.*, 184 F. Supp. 3d at 1010; *Abu-Lughod*, 2015 WL 12746198, at *3; *Perfect 10, Inc.*, 213 F. Supp. 2d at 1155.  In addition, even if any of these exhibits did contain statements by non-defendants, we will not offer those statements for their truth.

    **D.**    **Exhibits Establishing Willfulness**

        Summarized below are the exhibits we seek to admit to prove that the defendants acted willfully.[173]

     *1.*     *Cease-and-Desist Letters*

        We seek to admit GX 1, which is a July 22, 2011 cease-and-desist letter from HBO, and GX 2, which is a November 16, 2012 cease-and-desist letter from the MPAA.  The facts

---

[173] The exhibits discussed herein may be relevant for other reasons and may illustrate aspects of the conspiracy other than willfulness, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

establishing the authenticity of each of these exhibits were provided to the defense during the discovery process.  In sum, the FBI seized GX 1 from Dallmann's principal home during the execution of search warrants, and GX 2 was personally served on Dallmann by an individual hired by the MPAA.  These exhibits, accordingly, are authentic pursuant to Rule 901(b)(1).

GX 1 and 2 do not constitute hearsay because we are not offering the letters for the truth of the matters asserted.  Rather, we are offering these exhibits simply to show that Dallmann and any co-conspirator with whom he discussed the letters were on notice that they were unlawfully streaming copyrighted television shows.  *See United States v. Rodriguez-Lopez*, 565 F.3d 312, 314–15 (6th Cir. 2009) ("If the statements were questions or commands, they could not—absent some indication that the statements were actually code for something else—be offered for their truth because they would not be assertive speech at all. They would not assert a proposition that could be true or false."); *see also United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011) ("[A] command is not hearsay because it is not an assertion of fact."); *United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984) ("An order or instruction, is, by its nature, neither true nor false and thus cannot be offered for its truth.").

Cease-and-desist letters demanding that Jetflicks stop infringing on copyrighted material constitute a clear basis from which a jury reasonably could find that the defendants entered into this criminal conspiracy knowingly and willfully.   Therefore, as required by Rules 401(a) and 401(b), these facts have a tendency to make it more probable that the defendants acted willfully and these exhibits are of consequence to the jury in determining the defendants' guilt.  For the foregoing reasons, we ask the Court to admit GX 1 and 2.

### 2. *Messages Among Defendants About Immediate Availability of Shows*

We also seek to admit GX 34, 35, 40, 49, 97, and 1304, which are text message exchanges between Garcia and Courson, as well as between Dallmann and Vaillant.  These exhibits discuss the conspirators' efforts to download television episodes as soon as possible after the copyright holder originally broadcast the episodes.  The exhibits are described as follows:

| Exhibit | Date | Description[174] |
|---|---|---|
| 34 | July 23, 2014 | Garcia and Courson discuss obtaining a show from the night before. |
| 35 | Aug. 7, 2014 | Garcia and Courson discuss obtaining a show available only three hours earlier. |
| 40 | Sept. 2, 2014 | Garcia and Courson discuss a show they already acquired that will air that night. |
| 1304 | Jan. 7, 2015 | Courson responds to a complaint that shows are not airing the next day. |
| 49 | Jan. 23, 2015 | Garcia and Courson check Sick Beard every morning to obtain recently aired shows. |
| 97 | Aug. 23, 2016 | Dallmann and Vaillant discuss the fact that the "airing tonight" page is blank and that the SickRage daily search function is not running. |

The facts establishing the authenticity of each of these exhibits were provided to the defense during the discovery process.  In sum, GX 34, 35, 40, 1304, and 49 were all recovered from 1B76, and GX 97 was recovered from Dallmann's Apple iPhone (1B65).  The reports provided to the defense establish that the text communications listed above were properly

---

[174] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

extracted, and the messages are further authenticated by the fact that, at times, the defendants identified themselves in the messages.  Therefore, each exhibit is authentic pursuant to FRE 901(b)(1) and (b)(4).

Each text message constitutes an opposing party's statement and as such is not hearsay pursuant to FRE 801(d)(2)(A).  In addition, each statement was made by a co-conspirator during and in furtherance of the conspiracy.  Each statement was made by a charged co-conspirator during the time period alleged in the indictment.  Each statement is in furtherance of the conspiracy because they pertain to quickly acquiring the shows that the conspirators then unlawfully streamed to their subscribers.  As a result, each text message constitutes a statement by a co-conspirator and is therefore not hearsay pursuant to FRE 801(d)(2)(E).

The messages are relevant under FRE 401 because downloading television episodes soon after they had aired demonstrates that the co-conspirators did not work within the normal commercial process for licensing the reproduction, distribution, and streaming of copyrighted television shows with the permission of and payment to the copyright holders.

In addition, this evidence is relevant to rebut the implausible claim of some defendants that they reasonably believed their operation was lawful if they simply purchased from a local retail store a DVD of the television show they were illegally streaming.  The fact that these defendants were discussing acquiring shows the same day or the next day after the show was originally aired and long before the shows were commercially available on DVD, is relevant evidence that these defendants did not really believe owning a single DVD allowed them to stream the program to tens of thousands of paying subscribers.  If, by chance, the jury did find the defendants held this belief, and that such a belief was reasonable, these exhibits are powerful evidence of the fact that the defendants did not actually purchase DVDs before streaming the

programs to their subscribers.  Therefore, as required by FRE 401(a) and (b), these facts have a tendency to make it more probable that the defendants knowingly and willfully committed the charged offenses and are of consequence to the jury in determining the defendants' guilt.

For the foregoing reasons, we respectfully ask the Court to admit GX 34, 35, 40, 49, 97 and 1304.

### 3.   *Evidence of Defendants' Knowledge of Copyright Law*

We seek to admit GX 64A, 160, 1101, 1104, 1105, 1106, 1107, and 1108, which are statements by defendants evidencing an understanding of copyright law.  These exhibits are described as follows:

| Exhibit # | Date | Description[175] |
|---|---|---|
| 64A | July 9, 2016 | Dallmann and Jaurequi discussed the fact that Garcia has threatened to call the MPAA which would be a "problem" for Dallmann. |
| 1101 | Jan. 2008 | Legal memorandum regarding legality of copying content from DVDs. |
| 1104 | Oct. 23, 2016 | Courson told Jaurequi, "as I explained to kris before, since Jetflicks is questionable with respect to it being a legal enterprise (because no royalties are paid for the use of the material)…" |
| 1105 to 1107 | Oct. 25 to 27, 2016 | Dallmann, Courson, and Jaurequi discuss locating a legal memo to send to PayPal in order to convince PayPal that Jetflicks is not engaging in copyright infringement. |
| 1108 | Oct. 27, 2016 | Jaurequi told Courson, "Kris has been obsessing over the thought of wire fraud and fraud." |
| 160 | Mar. 13, 2017 | Dallmann and Vaillant discussed preventing others from stealing their content. |

---

[175] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

The facts establishing the authenticity of each of these exhibits were provided to the defense during the discovery process.   In sum, GX 64A, 1106, and 1107 were recovered from Dallmann's Apple iPhone (1B65) seized by the FBI during the execution of a search warrant, whereas GX 1104, 1105, and 1108 were recovered from Jaurequi's Apple iPhone (also seized during the FBI's search in November 2017 and designated by the FBI as 1B87).  GX 160 is a Google chat provided by Google, and the FBI found GX 1101 in Dallmann's primary residence in November 2017.  The discovery provided to the defense establish that the items listed above were properly extracted from the respective Apple iPhones, found within Dallmann's Google account, or seized by the FBI from Dallmann's house.  The communications, moreover, are further authenticated by the fact that, at times, the defendants identified themselves in the messages, and GX 1101 is further authenticated by the fact that the defendants discussed this item over text.  Therefore, each exhibit is authentic pursuant to FRE 901(b)(1) and (b)(4).

GX 064A 1104 to 1108, and 160 constitute opposing parties' statements and as such are not hearsay under Rule 801(d)(2)(A).   In addition, GX 64A and 1104 to 1108 were statements made by a co-conspirator during and in furtherance of the conspiracy.  These statements were made by a charged coconspirator during the time period alleged in the indictment.  GX 64A was in furtherance of the conspiracy because Dallmann and Jaurequi were discussing how to address a potential threat to the conspiracy, namely Garcia notifying the MPAA of the defendants' ongoing criminal conduct.  Similarly, GX 1104 was in furtherance of the conspiracy because Courson and Jaurequi were discussing how they and Dallmann should address the fact that Polo had stolen information from Jetflicks, ironically including material that Jetflicks had stolen from the copyright holders.  The loss of information used to run Jetflicks to a competing illegal

streaming operation posed a challenge to the continued success of the conspiracy and as such the conversation was in furtherance of the charged offense.

As with all the hard copy records recovered from Dallmann's residences, GX 1101 qualifies as an adopted statement by the defendants and thus is not hearsay under Rule 801(d)(2)(B). *United States v. Merritt*, 145 F.3d 1327, *1 (4th Cir. 1998) (per curiam) ("[A] document found in a defendant's possession may be admissible as an 'adoptive admission' under Fed. R. Evid. 801(d)(2)(B)."); *see also United States v. Pulido-Jacobo*, 377 F.3d 1124, 1132 (10th Cir. 2004) (finding a receipt for a speaker constituted an adoptive admission because the defendant kept the receipt for over two months after purchasing the speaker and law enforcement found speakers in the trunk of the defendant's car that matched those described in the receipt); *United States v. Paulino*, 13 F.3d 20, 24 (1st Cir. 1994) ("[S]o long as the surrounding circumstances tie the possessor and the document together in some meaningful way, the possessor may be found to have adopted the writing and embraced its contents.").[176]

GX 64A, 160, 1104, and 1108 are relevant under Rule 401 because they demonstrate the defendants' knowledge of copyright law and the fact that Jetflicks was operating unlawfully. Each of these statements are directly relevant to whether the defendants knowingly and willfully violated the law. In addition to establishing knowledge, GX 1104 is offered for the truth of the matter asserted, namely that Jetflicks paid no license fees to the copyright holders and that Courson discussed that issue with Dallmann. Therefore, as required by FRE 401(a) and (b), these facts have a tendency to make it more probable that the defendants acted with the requisite

---

[176] If the Court were to disagree that the defendants adopted GX 1101, then we will seek to use this document not for the truth of the matter but to prove that the defendants were on notice that "ripping" DVDs and copying the content for commercial purposes violated U.S. copyright law.

*mens rea* and these communications are of consequence to the jury in determining the defendants' guilt.

For the foregoing reasons, we ask the Court to admit GX 64A, 160, 1104, 1105, 1106, 1107, and 1108.

### 4. *Messages Relating to PayPal's Notice to Defendants of Potential Copyright Violations*

We seek to admit GX 126 and 126A, which are communications from PayPal to Dallmann in which PayPal informed Dallmann that PayPal had restricted the Jetflicks' account due to potential copyright violations. At the time PayPal froze the Jetflicks account it was the only payment processing company used by Jetflicks to collect money from its subscribers. PayPal was crucial to the operation of the conspiracy because it ensured money flowed from the Jetflicks subscribers to the conspirators. When PayPal suspected it was unwittingly aiding a criminal conspiracy, it limited the Jetflicks' account and required that Dallmann establish that Jetflicks was operating within the law.

We also seek to admit GX 127 and 128, which are communications among the defendants discussing PayPal's decision to freeze the Jetflicks account and how the conspirators should respond. Each exhibit is described as follows:

| Exhibit | Date | Description[177] |
|---------|------|-------------|
| 126 | Oct. 24, 2016 | Email from PayPal to Dallmann in which PayPal informed Dallmann that PayPal had restricted the Jetflicks account due to potential copyright violations. |
| 126A | Oct. 27, 2016 | Follow-up email from PayPal to Dallmann discussing the need for Dallmann to show proof that he was operating Jetflicks in accordance with the law. |

---

[177] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion. The full exhibits have been provided to the Court and to defense counsel.

| 127 | Oct. 28, 2016 | Text message from Jaurequi to Corson in which Jaurequi stated, "I am going to forward you the email PayPal sent…I don't even think Kris wants to respond to it." |
| 128 | Oct. 29, 2016 | Dallmann and Jaurequi draft the following response to PayPal: The email described Jetflicks as a business that provided "inflight entertainment for the private and executive aviation industry." |
| | | The email also stated, "if we provided PayPal with free access to the copyrighted content on our website, we would be liable for providing you with free access to view copyrighted material with no royalties having been paid." |

The facts establishing the authenticity of each of these exhibits were provided to the defense during the discovery process.    In sum, GX 126 and 126A were communications derived from a Google account belonging to Dallmann.  GX 127 was recovered from Jaurequi's Apple iPhone, and GX 128 was found on Dallmann's Apple iPhone.  Therefore, each exhibit is authentic pursuant to FRE 901(b)(1) and (b)(4).

GX 126 and 126A are not hearsay because we are not offering the emails for the truth of the matter asserted.  Rather, we are offering these exhibits simply to show that Dallmann, Jaurequi and Courson were on notice as to basic principles of copyright law and to explain the defendants' subsequent statements and reactions to the PayPal emails, including but not limited to, the fact that shortly after receiving these emails Dallmann opened an account at Stripe and claimed that Jetflicks was an aviation entertainment business.

GX 127 and 128 constitute opposing parties' statements and as such are not hearsay under Rule 801(d)(2)(A).  In addition, GX 127 and 128 were statements made by a co-conspirator during and in furtherance of the conspiracy.  Each of these statements were made by a charged coconspirator during the time period alleged in the indictment.  Each of these

statements were in furtherance of the conspiracy because they addressed PayPal's decision to freeze the Jetflicks account and how the conspirators should respond.

Government Exhibits 126 and 126A are relevant under Rule 401 because they prove these defendants acted with knowledge of key principles of copyright law.  GX 127 and 128 also are relevant because they demonstrate a coordinated effort to deceive PayPal into believing that Jetflicks is an aviation entertainment business and not an unlawful streaming conspiracy.  In GX 128 the conspirators refuse to give PayPal access to the *jetflicks.mobi* because doing so would violate copyright law.  This statement is highly relevant and highly probative of the defendants' knowledge and intent as well as their attempt to conceal the nature and existence of the conspiracy.  Each of these statements are directly relevant to whether the defendants knowingly and willfully violated the law.  Therefore, as required by Rules 401(a) and (b), these facts have a tendency to make it more probable that the defendants acted with the requisite *mens rea* and these communications are of consequence to the jury in determining the defendants' guilt.

For the foregoing reasons, we ask the Court to admit GX 126, 126A, 127, and 128.

### 5.  *Communications Regarding Efforts to Conceal the True Nature of Jetflicks.mobi*

We seek to admit GX 406, 406A, 128, 131, 134, 135, 136, 137, 140, 142, 164, 179, 180, and 181 at trial.  These communications are statements by defendants (principally Dallmann) in which the defendants sought to mislead PayPal and Stripe into believing Jetflicks was an aviation entertainment business rather than an illegal streaming conspiracy.  Employing a online payment processing company such as PayPal or Stripe was necessary in order for Jetflicks to collect credit card and debit card payments from their tens of thousands of subscribers over the internet.  Yet, PayPal and Stripe took steps to ensure their companies were not used to facilitate the transfer of

proceeds from illegal conduct.  Therefore, as the statements below clearly establish, the defendants concealed the true nature of Jetflicks from PayPal and Stripe by falsely claiming to be a aviation services business.   These exhibits are described as follows:

| Exhibit | Date | Description[178] |
|---|---|---|
| 406 | 2013 | Letter from Jetflicks to PayPal in which Jetflicks is described as an aviation services business. |
| 406A | 2013 | Metadata associated with GX 406. |
| 128 | Oct. 29, 2016 | Email from Jetflicks to PayPal in which Dallmann and Jaurequi state "our company (Jetflicks) provides inflight entertainment for the private and executive aviation industry…" |
| 131 | Nov. 6, 2016 | Dallmann instructed Vaillant that all payments had to go through *jetflicks.com*. |
| 134 | Nov. 9, 2016 through Nov. 15, 2016 | Email exchange between Dallmann and Stripe, Inc. in which Dallmann described Jetflicks as an aviation services company. Dallmann forwarded this email exchange to Vaillant. |
| 135 to 137 | Nov. 13, 2016 through Nov. 14, 2016 | Emails between Dallmann and Valliant that depict graphics used in the creation of a *jetflicks.com* website |
| 140 | Nov. 16, 2016 | Email between Dallmann and Vaillant in which Dallmann told Vaillant that Vaillant's completion of *jetflicks.com* is the key to having PayPal and Stripe release money and to getting paid. |
| 142 | Nov. 17, 2016 | Email from Dallmann to Vaillant in which Dallmann told Vaillant what Dallmann had previously communicated to Stripe. |
| 164 | Apr. 21, 2017 | Dallmann wrote to a third party and acknowledged that *jetflicks.com* was a fake website and the aviation services business was a lie. |
| 179 to 181 | Nov. 14 to 16, 2016 | Dallmann and Vaillant discuss the status of *jetflicks.com* and the need to get the site operational so that Stripe will process payments. |

---

[178] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion.  The full exhibits have been provided to the Court and to defense counsel.

The facts establishing the authenticity of each of these exhibits were provided to the defense during the discovery process.    In sum, GX 406, 406A, 134, 135, 136 and 137 were recovered from 1B76, whereas GX 128, 131, 140, 142 164, 179, 180, and 181 were recovered from 1B65, Dallmann's Apple iPhone.  The reports provided to the defense clearly establish that the communications listed above were properly extracted from 1B76 and 1B65.  The communications are further authenticated by the fact that at times the defendants identified themselves in the messages.  Therefore, each exhibit is authentic pursuant to FRE 901(b)(1) and (b)(4).

GX 406, 128, 131, 134, 135, 136, 137, 140, 142, 164, 179, 180, and 181 constitute opposing parties' statements and as such are not hearsay under Rule 801(d)(2)(A).[179]  In addition, GX 406, 128, 131, 134, 135, 136, 137, 140, 142, 179, 180, and 181 were statements made by a co-conspirator during and in furtherance of the conspiracy.[180]  Each of these statements were made by a charged coconspirator during the time period alleged in the indictment.  Each of these statements were in furtherance of the conspiracy because they addressed ongoing efforts to conceal the existence of the criminal conduct.    GX 164, the email from Dallmann to a third party in which Dallmann acknowledged that *jetflicks.com* was a fake

---

[179] If the Court determines that GX 135 through 137, which are photographs or graphic designs of aircraft, do not constitute statements under Rule 801(a), then we will tailor our argument to the jury accordingly.

[180] GX 406A does not constitute hearsay because it is computer-generated.  *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018) (spreadsheets reflecting point-of-sale data were machine-generated records falling outside of the hearsay rule); *United States v. Washington,* 498 F.3d 225, 230-31 (4th Cir. 2007) (printed result of computer-based test was not the statement of a person and thus would not be excluded as hearsay); *United States v. Hamilton,* 413 F.3d 1138, 1142-43 (10th Cir. 2005) (computer-generated header information was not hearsay as "there was neither a 'statement' nor a 'declarant' involved here within the meaning of Rule 801").

website and the aviation services business was a lie, is being offered only against Dallmann as a statement by a party opponent.

The messages are relevant under FRE 401 because falsely representing Jetflicks as an aviation entertainment business to PayPal and Stripe is direct evidence of the defendants' efforts to conceal the unlawful streaming conspiracy they conducted using *jetflicks.mobi*. These communications also prove that the *Jetflicks.com* was a non-functioning website tied to an essentially non-existent aviation entertainment business. The jury could reasonably infer the defendants lied to PayPal and Stripe because the defendants knew their operations were illegal. Therefore, as required by Rules 401(a) and 401(b), these facts have a tendency to make it more probable that the defendants acted with the requisite *mens rea* and these communications are of consequence to the jury in determining the defendants' guilt.

For the foregoing reasons, we ask the Court to admit GX 406, 406A, 128, 131, 134, 135, 136, 137, 140, 142, 164, 179, 180, and 181.

### 6.      *Google Search History and Letter from MPAA to IPEC*

We seek to admit GX 62A, 62B, 62C, and 182 which is evidence that establishes Dallmann's knowledge that Jetflicks constituted a criminal conspiracy as well as the legal jeopardy Dallmann and his co-conspirators faced by operating an illegal streaming business.[181] These exhibits are described as follows:

| Exhibit | Date | Description[182] |
|---------|------|------------------|
| 62A | Nov. 4, 2015 | Dallmann's use of Google to conduct searches about Jetflicks. |

---

[181] The exhibits relating to Dallmann's Google searches are derived from GX 062, which we will mark but not admit at trial.

[182] The exhibit descriptions are intended only to provide a partial summary of the exhibit in order for the Court to properly rule on the Government's motion. The full exhibits have been provided to the Court and to defense counsel.

| 62B | Aug. 20, 2012 | PDF of Aug. 20, 2012 MPAA letter to IPEC mentioning Jetflicks on page 15 |
| 62C | Aug. 20, 2012 | Hard copy of MPAA letter to IPEC which is tagged on page 15 where it mentions Jetflicks. |
| 182 | Oct. 27, 2016 | Dallmann's Google Search: Jetflicks/warrant/fraud/punishment |

The facts establishing the authenticity of each of these exhibits were provided to the defense during the discovery process.    In sum, GX 62A, 62B, and 182 are Dallmann's Google search histories provided by Google.   In addition, these exhibits are further authenticated by the fact that at times Dallmann searches words and phrases unique to him and his criminal conspiracy.  For example, Dallmann's search history includes key words "Kristopher Dallmann warrant," "wire fraud punishment," "wire fraud jetflicks," and "fraud jetflicks."  Therefore, each exhibit is authentic pursuant to Rules 901(b)(4) and 902(11).

GX 62C is a hard copy document recovered during the FBI's search of Dallmann's principal residence.  The reports provided to the defense establish that the document was, in fact, seized.  Therefore, each exhibit is authentic pursuant to FRE 901(b)(1).

GX 62A and 182 reflect statements by Dallmann that are not hearsay pursuant to Rule 801(d)(2)(A).  In addition, GX 62B and 62C are not hearsay because we are not offering those documents for the truth of the matter asserted.  Rather, we are offering these exhibits simply to show that Dallmann was on notice as to the illegality of the Jetflicks operation.

Each of these exhibits are relevant under Rule 401 because they demonstrate the defendants' consciousness of guilt and that they knowingly and willfully executed the charged conspiracy.   Therefore, as required by Rules 401(a) and 401(b), these facts have a tendency to make it more probable that the defendants acted with the requisite *mens rea* and these communications are of consequence to the jury in determining the defendants' guilt.

For the foregoing reasons, we respectfully request the Court to admit GX 62A, 62B, 62C, and 182.

### E.      Search Warrant Photographs and Sketches

As explained above, the FBI searched two Las Vegas homes belonging to Dallmann in November 2017.  The FBI took photographs and made sketches during these searches, and we seek to admit the following: GX 201A; 201B; 201F; 201H; 201J; 201L; 201N; 201O; 201R; 201T; 201V; 201W to 201Z; 201AA; GX 202; GX 203A; 203C; 203E; 203G to 203K; 203M to 203P; 203R to 203U; 203W; and GX 204.

These photographs and sketches are relevant because they depict where the FBI located evidence, and at least SA Cox and SA Umphress, who were involved in the searches, will authenticate these exhibits. Consequently, the Court should deem GX 201A, 201B, 201F, 201H, 201J, 201L, 201N, 201O, 201R, 201T, 201V, 201W to 201Z, 201AA, GX 202, GX 203A, 203C, 203E, 203G to 203K, 203M to 203P, 203R to 203U, 203W, and GX 204 to be authentic. Further, these exhibits are not hearsay because they are not statements and make no assertions. *See United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109 (9th Cir. 2015).  Moreover, we will seek to admit most or all of the photographs not to prove the "truth" of the photograph (whatever that would mean), but to help establish ownership and control of the items depicted within the photographs.  And, as noted below, even if some of the photographs or videos contain statements, Rule 801(d)(2) applies given that the statements are admissions of a defendant or in furtherance of the conspiracy.

For the foregoing reasons, we respectfully request the Court to admit GX 201A, 201B, 201F, 201H, 201J, 201L, 201N, 201O, 201R, 201T, 201V, 201W to 201Z, 201AA, GX 202, GX 203A, 203C, 203E, 203G to 203K, 203M to 203P, 203R to 203U, 203W, and GX 204.

### F.     Copyright Registration Certificates

We seek to admit GX 801 to 804, which are copyright certificates for television episodes that SA Chase streamed or downloaded while in this District.  The certificates comply with Rule 902(4) of the Federal Rules of Evidence and thus are self-authenticating.

In addition, we seek to admit GX 805 to 808.  GX 805 consists of 10 copyright certificates of television episodes that were available on Jetflicks to which NBCUniversal owns the copyrights, GX 806 consists of 10 copyrights of television episodes that were available on Jetflicks to which Netflix owns the copyrights, GX 807 consists of 10 copyrights of television episodes that were available on Jetflicks to which ViacomCBS owns the copyrights, and GX 806 consists of 10 copyrights of television episodes that were available on Jetflicks to which WarnerMedia owns the copyrights.  A representative from each company is expected to testify that the works named in the copyright certificates are just a sample of the works to which the company owns copyrights and to which it has exclusive rights, and the copyright certificates are kept in the companies' business records.

Each copyright certificate we have designated for admission is self-authenticating under the Federal Rules of Evidence.  Included at the top of each certificate is a statement that the certificate has been "issued under the seal of the Copyright Office" and constitutes an "attest[ation] that registration has been made for the work" listed therein.  Pursuant to Rule 902(4), a copy of an official record is self-authenticating if the copy is certified as correct by a person authorized to make the certification.  Although the attestations on the certificates do not specifically state that the contents of the certificates are "correct," 17 U.S.C. § 410 provides that such a certificate is "prima facie evidence of the validity . . . of the facts stated in the certificate," and the plain import of the attestations is that the listed works were, in fact, registered by copyright claimants.

Nonetheless, even if a more formulistic view of 902(4) is taken, GX 801 to 808 can be deemed self-authenticating under other Federal Rules of Evidence.  For instance, the certificates are self-authenticating pursuant to Rule 902(1) because they bear a seal of an agency of the United States and a signature purporting to be an attestation.

With respect to *Crawford*, "[b]usiness and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009); *United States v. Williams*, 662 F. App'x 366, 376 (6th Cir. 2016) ("the mere fact that a business record might foreseeably be relevant to a subsequent prosecution does not automatically transform the record into a 'testimonial' statement.").  GX 801 to 808 thus are admissible under Rules 803(8) and 807.  *See, e.g.*, *Lance v. Freddie Records, Inc.*, 986 F.2d 1419, *3 (5th Cir. 1993) (per curiam); *Classical Silk, Inc. v. Dolan Grp., Inc.*, No. CV1409224ABMRWX, 2016 WL 7638113, at *1 n.2 (C.D. Cal. Feb. 2, 2016).

For the foregoing reasons, we respectfully request the Court to admit GX 801 to 808.

## G.    Financial Records

At trial, we will introduce a series of financial records that will trace the proceeds of the defendants' illegal streaming operation.  First, we will introduce records from PayPal and Stripe, the payment processing companies that Dallmann used to collect the subscription fees from subscribers.  As explained above, the PayPal and Stripe records contain, among other information, the identities of subscribers, the amount paid, the date paid, as well as debit or credit card data, including the address associated with the card.  The PayPal and Stripe records also reflect the transfer of the subscribers' payments into bank accounts controlled by Dallmann at Bank of America and Wells Fargo.  PayPal records also show Dallmann made payments directly

from his Paypal account.  Second, we will introduce records from Bank of America and Wells Fargo establishing that Dallmann distributed the proceeds of the charged crimes to other members of the conspiracy, used the proceeds to finance and perpetuate the unlawful scheme, pay his personal expenses and engage in the money laundering transactions charged in Counts Twelve through Fifteen of the Indictment.[183]

### 1.    The Stripe Exhibits (account ending in 141TNmp)

We seek to admit GX 407A, 407B, and 407C, which are financial records provided by Stripe that pertain to the Jetflicks account.  In a previous filing, all defense counsel affirmatively stated they had no objection to the admission of the Stripe exhibits.  (Dkt. No. 586.)  These exhibits are described as follows:

| Exhibit | Date | Description |
|---------|------|-------------|
| 407A | Nov. 3, 2016 | Application that Dallmann submitted to Stripe in order to open an account for Jetflicks. |
| 407B | Nov. 6, 2016 to Feb. 3, 2018 | Customer payments that Stripe processed for Jetflicks. |
| 407C | Nov. 19, 2016 to Feb. 23, 2018 | Transfers of funds from Stripe to Jetflicks. |

GX 407A, 407B, and 407C are authentic and properly admitted as business records pursuant to Rules 902(11) and 803(6).  A Stripe employee who is a custodian of records or is otherwise qualified as a result of their position with Stripe provided a declaration under penalty of perjury that these exhibits were records of Stripe's regularly conducted business activity.

---

[183] The exhibits discussed herein may be relevant for other reasons, but in the interest of brevity, we have not identified all the reasons certain exhibits are relevant.

Specifically, Stripe certified that these exhibits: (a) were made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters; (b) were kept in the course of the regularly conducted activity of the business; and, (c) the records were made as a regular practice of the business.  *See* Fed. R. Evid. 803(6) & 902(11).  Stripe's certification is marked as GX 407D and has been provided to defense counsel.

Therefore, we ask the Court to admit GX 407A, 407B, and 407C.

### 2.   *The Wells Fargo Exhibits (account ending in 6241)*

We seek to admit GX 409 and 410, which are financial records provided by Wells Fargo Bank that pertain to the Jetflicks' account ending in 6241 opened by Dallmann.  These exhibits are described as follows:

| Exhibit | Date | Description |
| --- | --- | --- |
| 409 | Oct. 31, 2016 | Application submitted by Dallmann as the sole owner of Jetflicks for purposes of opening the account ending in 6241 at Wells Fargo. |
| 410 | Oct. 2016 to Apr. 2017 | Wells Fargo statements for account ending in 6241. |
| 412 | Feb. 20, 2014 | Wells Fargo's FDIC Certificate |

As with the Stripe records, GX 409 and 410 are authentic and admissible as business records pursuant to Rules 902(11) and 803(6).  A Wells Fargo employee who is a custodian of records or is otherwise qualified because of their position with Wells Fargo provided a declaration under penalty of perjury that these exhibits were records of Wells Fargo's regularly conducted business activity.  This certification, which is marked as GX 411, complies with Rule 902(11) and has been provided to defense counsel.

In a previous filing, all defense counsel affirmatively stated they had no objection to the admission of the GX 409.  (Dkt. No. 586.)  However, they did object to GX 410, the bank statements, under FRE 402 and 403.  The Wells Fargo bank statements are relevant under Rule 401 because the proceeds of the fraud are transferred from Stripe into the Wells Fargo account and from there Dallmann used those funds to pay for expenses necessary to operate the conspiracy, including paying coconspirators as well as financing Jetflicks digital infrastructure. In addition, the Wells Fargo account is what Dallmann used to conduct the financial transactions that are charged as money laundering in Counts 12, 13 and 14.  Tracing the proceeds of the unlawful streaming conspiracy and identifying financial transactions that were essential to perpetuate the conspiracy is relevant to proving the existence, scope and membership of the conspiracy.  Therefore, as required by Rules 401(a) and (b), these facts have a tendency to make it more probable that the defendants knowingly and willfully committed the charged offenses and are of consequence to the jury in determining the defendants' guilt.   To date, the defense has not articulated any specific basis under Rule 403 to exclude the Wells Fargo bank statements.

GX 412 is a certificate and supporting document from the Federal Deposit Insurance Corporation (FDIC) that Wells Fargo is a financial institution that is insured by the FDIC.  This exhibit is authentic pursuant to Rule 902(11), too.  An FDIC employee who is a custodian of records or is otherwise qualified by their position with the FDIC provided a declaration under penalty of perjury that this exhibit was a record of the FDIC's regularly conducted business activity.  The FDIC's certification complies with Rule 902(11), is marked as GX 412A, and has been provided to defense counsel.  All defense counsel have stated they have no objection to the admissibility of GX 412.

For the foregoing reasons, we ask the Court to admit GX 409, 410 and 412.

### 3.     The PayPal Exhibits (Account Ending in 1360)

We also seek to admit GX 413, 414A, 414B, and 414C, which are financial records

provided by PayPal that pertain to the Jetflicks' account.  These exhibits are described as

follows:

| Exhibit | Date | Description |
| --- | --- | --- |
| 413 | Sept. 8, 2004 to Oct. 24, 2016 | Subscriber information for the Jetflicks PayPal account ending in 1360. |
| 414 | Apr. 2016 to Dec. 2018 | PayPal Transaction Log |
| 414A | June 2016 to Aug. 2016 | Customer Payments to PayPal |
| 414B | June 2016 to Aug. 2016 | Transfers from PayPal #1360 to BOA #4488 |
| 414C | July 2016 to Aug. 2016 | Direct Payments from PayPal Acct #1360 |

GX 413, 414A, 414B, and 414C are authentic pursuant Rule 902(11) and admissible as

business records pursuant to Rule 803(6).  A PayPal employee who is a custodian of records or is

otherwise qualified as a result of their position with PayPal provided a declaration under penalty

of perjury that these exhibits were records of PayPal's regularly conducted business activity.

The PayPal certificate complies with 902(11), is marked as GX 417, and has been provided to

defense counsel.

In a previous filing, all defense counsel affirmatively stated they had no objection to the

admission of the PayPal financial records,[184] but did object to GX 413, the subscriber

---

[184] At the time of the defense's objections, we had proposed admitting PayPal records covering a shorter time frame.  Our revised exhibit list that is being filed in conjunction with this brief includes PayPal records that cover a more expansive time frame.

information, based on FRE 402 and 403.  (Dkt. No. 586.)  The subscriber information is relevant under Rule 401 because it is necessary to show who opened the PayPal account and therefore who controlled the funds that flowed through the PayPal account.   To date, the defense has not articulated any specific basis under Rule 403 to exclude the PayPal subscriber information.

For the foregoing reasons, we respectfully request that the Court admit GX 413, 414A, 414B, and 414C.

### 4.    *The Bank of America Exhibits (account ending in 4488)*

We seek to admit GX 418 and 420, which are financial records provided by Bank of America that pertain to the Jetflicks account ending in 4488 opened by Dallmann.  In a previous filing, all defense counsel affirmatively stated they had no objection to the admission of the Bank of America exhibits.  (Dkt. No. 586.)  These exhibits are described as follows:

| Exhibit | Date | Description |
|---|---|---|
| 418 | May 23, 2017 | Bank of America signature card dated May 23, 2007, signed by Dallmann, in which he opened the account ending in 4488 in the name of Rent-a-Geek. |
| 420 | Aug. 2016 to Oct. 2016 | Bank of America account statements for Dallmann's account ending in 4488 from August 2016 to October 2016, which reflects deposits into the account from PayPal and how Dallmann used those funds. |
| 421C | Dec. 31, 2019 | Certificate and supporting document from the Federal Deposit Insurance Corporation (FDIC) that Bank of America is a financial institution that is insured by the FDIC. |

Government's Exhibits 418 and 420 are authentic pursuant to Rule 902(11) and admissible as business records pursuant to FRE 803(6).  A Bank of America employee who is a custodian of records or is otherwise qualified as a result of their position with Bank of America provided two declarations under penalty of perjury that these exhibits were records of Bank of America's regularly conducted business activity.  These certifications, which have been marked

as GX 421A and 421B, comply with Rule 902(11) and have been provided to defense counsel.

Moreover, GX 421C is also authentic pursuant to Rule 902(11).  The FDIC's certification

complies with Rule 902(11), is marked as GX 421D, and has been provided to defense counsel.

For the foregoing reasons, we ask the Court to admit GX 418, 420 and 421C.

### 5.   Communications Pertaining to Jetflicks' Income

We seek to admit GX 1208, 141, 144, 161 and 163, which are statements by Dallmann to

other members of the conspiracy regarding how much money Jetflicks was making.  The exhibits

are described as follows:

| Exhibit | Date | Description |
| --- | --- | --- |
| 1208 | Sept. 15, 2016 | Dallmann tells Vaillant Jetflicks makes $1000 per day, $750 on a bad day; they were making $1500 per day; July (2016) took in $27,072, and August (2016) $28,697, trending down in September. |
| 141 | Nov. 17, 2016 | Dallmann tells Vaillant they made 750,000 and are technically lying to Wells Fargo. |
| 144 | Nov. 20, 2016 | Dallmann tells Vaillant that before the issue with PayPal Jetflicks was making $20,000 to $30,000 per month. |
| 161 | Mar. 12, 2017 | Dallmann states that Jetflicks has 30,000 subscribers and makes $60,000 per month. |
| 163 | Apr. 3, 2017 | Dallmann states that Jetflicks made, $750,000 (2014), $500,000 (2015) and then $350,000 (2016). |

The facts establishing the authenticity of each of these exhibits were provided to the defense

during the discovery process.  In sum, GX 1208, 141 and 144 were recovered from Dallmann's

Apple iPhone (1B65), which was seized during the FBI's November 2017 searches.  GX 161 and

163  are chats that Google provided along with a Rule 902(11) certification, and the full

production of which has been marked as GX 159.[185]  The reports provided to the defense clearly establish that the exchanges listed above were properly extracted from the devices or provided by Google.  The communications are further authenticated by the fact that at times the defendants identified themselves in the messages.  Therefore, each exhibit is authentic pursuant to Rules 901(b)(1) and (b)(4) and 902(14).

Each text message constitutes an opposing party's statement and as such is not hearsay pursuant to Rule 801(d)(2)(A).  In addition, each statement was made by a coconspirator during and in furtherance of the conspiracy.  Each statement was made by a charged coconspirator during the time period alleged in the indictment.  Each statement is in furtherance of the conspiracy because the discussions about how much money Jetflicks was making were part of the decision-making process about how to execute the conspiracy going forward as well an important tool used by Dallmann to recruit and retain loyal co-conspirators.  As a result, each text message constitutes a statement by a coconspirator and is therefore not hearsay pursuant to Rule 801(d)(2)(E).

The messages are relevant under Rule 401 for the same reasons they were made in furtherance of the conspiracy.  In short, communications among the co-conspirators (led by Dallmann) regarding how much money Jetflicks was making were part of the decision-making process about how to execute the conspiracy going forward as well an important tool used by Dallmann to recruit and retain loyal co-conspirators.

For the foregoing reasons, the United States respectfully requests the Court admit GX 1208, 141, 144, 161 and 163.

---

[185] At trial, we will mark but not admit GX 159.

## IV.    Exhibits Not Discussed Herein

We have not discussed the following items, which are on our exhibit list: GX 003; 009; 011; 017; 021; 023; 026; 032; 033; 039; 043; 052; 053; 055; 063; 064; 071 to 076; 085; 089; 094; 095; 096; 101; 104 to 106; 109; 110; 113; 119; 120; 129; 130; 134A; 138; 138A; 138B; 143; 146; 147; 148; 150; 153; 155; 158; 165; 168; 170; 175; 177; 178; 183 to 187; 191; 201C to 201E; 201G; 201I; 201K; 201M; 201P; 201Q; 203B; 203C; 203F; 203L; 203Q; 203V; 208; 209 to 2011; 307B; 310B to 310D; 311; 311A; 312; 312A; 313; 313A; 320; 401 to 405; 405A to 405K; 408; 419; 422; 422A to 422D; 423 to 427; 506; 601; 602; 705; 706; 809 to 813; 901 to 910; 912; 913; 915; 1001 to 1005; 1007; 1008; 1010; 1011; 1102; 1103; 1109; 1201 to 1207; 1209 to 1217; 1302; 1303; 1306 to 1313; 1401; 1501 to 1510.   These exhibits are included on the exhibit list for a variety of reasons. Some of these exhibits may be used to refresh recollection, as recorded recollections, or in a rebuttal case.  Others reflect the original evidence upon which Rule 1006 summaries, excerpted exhibits, or demonstratives are based.  Some of these exhibits, moreover, may be offered as demonstratives but not moved into evidence.

We also may tender some of these exhibits to the Court pursuant to Rule 104(a) so that the Court may consider them in deciding whether the United States has made a *prima facie* case that related exhibits are authentic. In deciding whether the United States has made a *prima facie* case of authenticity, "the court is not bound by evidence rules, except those on privilege." Rule 104(a). "The Supreme Court held that a district court can consider 'any evidence whatsoever, bound only by the rules of privilege,' to make factual determinations under Rule 104." *Pierce*, 62 F.3d at 827 (quoting *Bourjaily v. United States*, 483 U.S. 171, 178 (1987)). Thus, in deciding whether evidence is *prima facie* authentic, for example, "the judge may consider . . . hearsay evidence which the jury could not consider." *Vinson*, 606 F.2d at 153 (6th Cir. 1979); *see also,*

*e.g.*, *United States v. Kilpatrick*, 2012 WL 3236727, at \*5 (E.D. Mich. Aug. 7, 2012) ("This Court can consider the admissions made by Defendant . . . and his attorneys in other proceedings to determine whether the government has made a prima facie showing of authenticity.")

## CONCLUSION

The government respectfully requests that the Court exercise its discretion to admit, or conditionally admit, the exhibits identified and discussed herein.

Respectfully submitted,

Date: September 3, 2021                    Raj Parekh
                                          Acting United States Attorney

                                          _____/s/_____
                                          Alexander P. Berrang
                                          William E. Fitzpatrick
                                          Monika Moore
                                          Assistant United States Attorneys
                                          United States Attorney's Office
                                          2100 Jamieson Avenue
                                          Alexandria, Virginia 22314
                                          Phone: (703) 299-3700
                                          Fax: (703) 299-3981
                                          Email: Alexander.P.Berrang@usdoj.gov

                                          _____/s/_____
                                          Matthew A. Lamberti
                                          Special Assistant United States Attorney,
                                             Eastern District of Virginia
                                          Senior Counsel,
                                             Computer Crime and Intellectual Property Section
                                          United States Department of Justice
                                          1301 New York Avenue, NW, Suite 600
                                          Washington, DC 20530
                                          Phone: (202) 514-1026
                                          Email: Matthew.Lamberti@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2021, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing

(NEF) of the foregoing to the attorneys for the defendants.

_____/s/_____
Alexander P. Berrang
Assistant United States Attorney
U.S Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: Alexander.P.Berrang@usdojg.gov
